# CHARGING PARTY (UNION) EXHIBITS 13 - 23

**CHARGING PARTY – CNA  EXHIBITS**

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

| | | |
|---|---|---|
| DHSC, LLC, d/b/a AFFINITY<br>MEDICAL CENTER, COMMUNITY<br>HEALTH SYSTEMS, INC., and/or<br>COMMUNITY HEALTH SYSTEMS<br>PROFESSIONAL SERVICES<br>CORPORATION, LLC, a single<br>employer and/or joint employers<br>and<br>NATIONAL NURSES ORGANIZING COMMITTEE (NNOC) | CASES | 08-CA-117890<br>08-CA-124398<br>08-CA-131772<br>08-CA-144212<br>08-CA-153759 |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | | |
|---|---|---|
| DHSC, LLC, d/b/a AFFINITY<br>MEDICAL CENTER, COMMUNITY<br>HEALTH SYSTEMS, INC., and/or<br>COMMUNITY HEALTH SYSTEMS<br>PROFESSIONAL SERVICES<br>CORPORATION, LLC, et al. a<br>single employer and/or joint employers<br>and<br>CALIFORNIA NURSES ASSOCIATION/NATIONAL<br>NURSES ORGANIZING COMMITTEE  (CNA/NNOC) | CASE | 08-CA-130717 |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | | |
|---|---|---|
| HOSPITAL OF BARSTOW INC., d/b/a<br>BARSTOW COMMUNITY HOSPITAL,<br>COMMUNITY HEALTH SYSTEMS, INC.,<br>and/or COMMUNITY HEALTH SYSTEMS<br>PROFESSIONAL SERVICES CORPORATION,LLC,<br>a single employer and/or joint employers<br>and<br>CALIFORNIA NURSES<br>ASSOCIATION/NATIONAL NURSES<br>ORGANIZING COMMITTEE (CNA/NNOC) | CASES | 08-CA-130717<br>31-CA-116300<br>31-CA-119831<br>31-CA-124540<br>31-CA-133880<br>31-CA-153504 |

Place:     Cleveland, OH
Date:      03/06/17 – 03/16/17

OFFICIAL REPORTERS
Veritext National Court Reporters
Mid-Atlantic Region
1250 Eye Street, NW – Suite 350
Washington, DC  20005
888-777-6690

## CHARGING PARTY – CNA  EXHIBITS

### BEFORE THE

### NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| BLUEFIELD HOSPITAL COMPANY, LLC, d/b/a BLUEFIELD REGIONAL MEDICAL CENTER, COMMUNITY HEALTH SYSTEMS, INC., and/or COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION, LLC, a single employer and/or joint employers<br>    and<br>NATIONAL NURSES ORGANIZING COMMITTEE (NNOC), AFL-CIO | CASES  08-CA-130717<br>10-CA-094403<br>10-CA-110743<br>10-CA-112255<br>10-CA-116246 |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | |
|---|---|
| FALLBROOK HOSPITAL CORPORATION, d/b/a FALLBROOK HOSPITAL, COMMUNITY HEALTH SYSTEMS, INC., and/or COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION, LLC, a single employer and/or joint employers<br>    and<br>CALIFORNIA NURSES ASSOCIATION/NATIONAL NURSES ORGANIZING COMMITTEE (CNA/NNOC), AFL-CIO | CASES  08-CA-130717<br>21-CA-121480<br>21-CA-124295<br>21-CA-134774 |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | |
|---|---|
| GREENBRIER, VMC, LLC d/b/a GREENBRIER VALLEY MEDICAL CENTER, COMMUNITY HEALTH SYSTEMS, INC., and/or COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION, LLC, a single employer and/or joint employers<br>    and<br>NATIONAL NURSES ORGANIZING COMMITTEE (NNOC), AFL-CIO | CASES  08-CA-130717<br>10-CA-117698<br>10-CA-121156<br>10-CA-126416<br>10-CA-124354 |

OFFICIAL REPORTERS<br>Veritext National Court Reporters<br>Mid-Atlantic Region<br>1250 Eye Street, NW – Suite 350<br>Washington, DC  20005<br>888-777-6690

**CHARGING PARTY – CNA  EXHIBITS**

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

---

| | | |
|---|---|---|
| JACKSON HOSPITAL CORPORATION | CASES | 09-CA-102403 |
| d/b/a KENTUCKY RIVER MEDICAL | | 09-CA-105751 |
| CENTER, COMMUNITY HEALTH SYSTEMS, | | 09-CA-129151 |
| INC., and/or COMMUNITY HEALTH SYSTEMS | | 09-CA-131638 |
| PROFESSIONAL SERVICES CORPORATION, | | 09-CA-133951 |
| LLC, a single employer and/or joint employers | | |
| and | | |
| UNITED STEEL, PAPER AND FORESTRY | | |
| RUBBER, MANUFACTURING, ENERGY | | |
| ALLIED INDUSTRIAL AND SERVICE | | |
| WORKERS INTERNATIONAL UNION, AFL-CIO-CLC | | |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | | |
|---|---|---|
| WATSONVILLE HOSPITAL CORPORATION | CASES | 08-CA-130717 |
| d/b/a WATSONVILLE COMMUNITY | | 32-CA-120642 |
| HOSPITAL, COMMUNITY HEALTH | | 32-CA-124332 |
| SYSTEMS, INC., and/or COMMUNITY | | |
| HEALTH SYSTEMS PROFESSIONAL | | |
| SERVICES CORPORATION, LLC, a | | |
| single employer and/or joint employers | | |
| and | | |
| CALIFORNIA NURSES ASSOCIATION | | |
| (CNA), NATIONAL NURSES UNITED | | |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | | |
|---|---|---|
| FALLBROOK HOSPITAL CORPORATION | CASE | 21-CA-143512 |
| d/b/a FALLBROOK HOSPITAL | | |
| and | | |
| SEIU, UNITED HEALTHCARE | | |
| WORKERS-WEST | | |

---

OFFICIAL REPORTERS
Veritext National Court Reporters
Mid-Atlantic Region
1250 Eye Street, NW – Suite 1201
Washington, DC  20005
888-777-6690

●●●○○ AT&T  LTE          19:25          ✳ 98% ▭

‹     🔍  NNOC/NNU Ohio

 **Michelle M Mahon**
January 15, 2015

Affinity RNs will present these Assignment Despite Objection forms to management at bargaining today. Safe Staffing Now!







CNA ᵧₒ₋ 13



29 Likes   7 Comments

News Feed       Requests       Messenger       Notifications       More

2

7-6-16

11:13  Employer meeting

DC: Given info
PPE, Grievance + Arb.
Union Sec.

DC: DID NOT BRING COPY
U rejected package proposal.

US: Yes as a complete document
but there are items that we can drop

DC: ? Is it acc to come to an
agreement that these items
must be present?  Written
union sec. (pack-in
grievance log

US: Yes

11:16 — Adjourne Caucus.

Mediator — 11:39
Code of Conduct GHC applies everytime

CNA Exh 14

p3

7/6/16

| ED | OR | Tele |
| CATH | PACU | |
| CVOR | SDS | |
| ICU | ENDO | |
| CVS | CALD | |
| | RW Ortho | |
| | SMA | |

12:25 lunch.

M-F   3 PAT   Lisa Byrne, Stille Szabo, Keith
      A's      8⁵⁰—5 × 5      6³⁰—5 7,10¹⁰   Weltili
                              Δ to 6³⁰—3 5,8     6³⁰—5
                                                 7³⁰—4  5₄

Rationale :ᵒ ?

Stand on Package Proposal.
Nothing further to offer

6/16/14

All pages

Cerner Discussion

PART 1 (20 pages)

CNAX    15
GC Exh

6/16/14

PART 1

GC Exh. _____

CNA          10:10a
6/16/14

_1_

| | |
|---|---|
| DC: | Angie - address |
| Angie: | Provide us w/ list as individuals working with for discipline? |
| m.m: | Reps ? |
| Angie: | Yes. Then I'll know who to contact. |
| JB : | Where start? |
| DC : | Provide info |
| Angie! | FMLA Source. (Passes out info) |
| | Memo re: Conversion to FMLA Source. Directs employers whom to contact. |
| JB: | Went to all signs |
| | All leadership — to explain |
| | Communicated thru Staff Meetings? |
| | Yes. |
| | Any agendas? |

GC Exh. ____

6/16/14 2

AB: Most of times goes to HR.

JB: Can explain changes in process. Post election?

AB: Decision made earlier?

JB: Is it a decision at facility or system wide?

AB: No idea. Contract between CHS + FMLASource.

JB: Local affiliate opts in.

AB: Yes.

JB: Contract?

AB: Don't have.

JB: We're interested in Contract between CHS + FMLA Source

JB: Who at affiliate makes decision to participate?

Angie: Me

Able to identify what's different?

GC Exh. ____

3

6/6/14

| | |
|---|---|
| AB | In past, med info come to HR office. Opinion — my thought better approach. Review handled through 3rd party and they're experts. FMLA extensive & better if experts. Ensures confidentiality. |
| JB | You don't have access? |
| AB | No. Leave (explains not available to HR - specifics |
| JB | Can't ask what leave is about. Not JB on leave? |
| AB: | Medical professionals review documentation |
| JB | What's |
| AB: | Don't want to make clinical judgement. |
| JB | So they are? |
| AB | Physicians — often if someone is released to work. |
| JB: | Sounds like worker's comp. |

GC Exh.

4

6/6/14

AB | If surgery, release date

Police

Maybe easier.  How is it different?

AB: | Before come to HR, now call #.

JB: | If I'm an employee, what's different?

AB: | Nothing

JB: | If I have letter from doc, HBP.  Intermittent. In past, I gave to you.  I could schedule.  How is different?

AB | Now, notify FMLA source instead of HR

Every time.

AB: | Yes.  Not more onerous than before.  No employee has said "Worse".  But if need help HR will give it.

↓

AB | Had it from 2012.  We had to be notified now FMLA so not an attendance occurred. Burden on employee to notify that absent is

GC Exh.

5

6/10/14

How did it occur?

JB    Could be before or after? Always with HR? What about manager?

AB    Not usual protocol to notify manager

JB    Can manager notify FMLA Source.

AB    Get back to you

JB    Do you get a report of number of employees using requesting FMLA? Also Denials? ←

AB :    Yes.

How often?

Infrequently, usually not timely documentation

Can FMLA Source require other doc notes for intermittent.

Does not require a physician's note?

What if they are?

They're not.      GC Exh. ____

6

6/16/14

How do you know? Contradicting self

DC   Put it in writing — If you think policy change
     were
     Discussion provoking her.

Refusing

JB   not at all. Not badger her —

DC.  Just what you're doing. Putting on a show.
     What else?

JB   Interested in contract.

DC   You'll put it in writing

     From feedback
AB   Policy is same; if problem, I can intervene
     resolve issue. Benefit employee

JB   # people denied FMLA & will put in writing.
     What next — do you have response to proposal?
          ↓
     So not respond?

GC Exh. ____

7

6/6/14

| DC | Not today. |
|---|---|

~~~~~~~~~~~~~~~~

| JB: | Waste time — discussion about Something productive & positive. Beth, why you're here. |
|---|---|

| AB: | Changes to policies — 13 policies. None of changes implemented — here for you to review. |
|---|---|

| JB: | Would actually say this is progress |
|---|---|

| Angie | (Hands out policies) |
|---|---|

| JB: | 5 min break |
|---|---|

10:45

| JB | On FMLA, one issue. If personal employee's doc says "condition", can FMLA doc override it? |
|---|---|

| AB | Shouldn't happen, but could ask for additional info. |
|---|---|

| JB | FMLA source — not make clinical determination, just processing? |
|---|---|

8

6/6/14

|  | Should be - nothing I wouldn't do |
| AB | Outline of issues surrounding electronic record |
| JB | Questions - Why "Cerner"? Then issues with rollout |
| Angie: | Neither Beth nor I had any part of decision regarding selection of vendor |
| JB: | CHS decision |
| Beth | My understanding — number of vendors & chose from. |
| JB: | Massilon or Franklin, TN? |
| Beth | Don't know. |
| JB: | Don on your list — who made decision |
| DC: | Is it on list? |
| JB | Yes. A2 |
| JB | Can hospital opt out? |

GC Exh. ____

9

6/16/14

| | |
|---|---|
| Beth | Not involved in decision. |
| MM | Could use Epic? |
| Beth | Not involved in decision |
| JB | Systemic - does hospital have to pay? |
| Beth | Don't know. |
| Angie: | Question - what is relevance to union |
| JB | Alternatives evaluated? |
| DC | Operational decision |
| DC | Still don't see how relevant. |
| JB | It is - Typically must provide Contract, alternatives, costs, can local affiliate opt out of system. Understand can't, but maybe you can. Largest are Epic & Cerner |
| | Like it better? |
| | Most facilities like Cerner because it's easier to bill. |

GC Exh. ____

10
6/16/14

MM: Epic more nurses like.

JB: Not clear. Please start off about whats
~~implemented~~ is this from word to implementing
unfolding training & then timeline.

Beth: Makes sense. Not involved in initial - other job
Before - completely paper. Since Cerner - maintaining
Meaningful Use Requirement
Every week phone call
        Care Net, Pharm Net, Path net

JB: Group responsible for overseeing it @ Affinity

Beth: Essentially all RNs - give input or send list
to Cerner.

JB: Administrative - systematically.

Beth: RNs go to mgr or Beth. If educational, sends to
Cerner or do training itself.

JB: What is Title?

Beth: RN Liason?

JB: Are there other liasons w/in Affinity? Pharmacist

11

6/16/14

| | |
|---|---|
| JB | Dir of Pharm, Dir of Lab and you. Others involved? |
| Beth : | IT has clinical analyst |
| Angie: | Clinical Informaticist |
| JB | Your role. |
| Beth | Different role. Oversaw all aspects pe |
| JB | Affinity person? |
| Beth | Yes. |
| AB : | Person no longer here. |
| mm: | Who is clinical analyst? |
| Beth : | Debbie _____ |
| JB | Who to meet with? If Cerner consultant |
| AB | Administrative Team & Beth - Chief Officers & Beth |
| JB | When original project — who |
| Angie | Admin Team - then trickled down. |

GC Exh. _____

12

6/16/14

| | |
|---|---|
| | Who gives authority? |
| Beth | Informaticist - Greg Kranz ; RN Educator - Heather Rhodes bring our timeline how close |
| JB | Then adopt a timeline? |
| Beth | Yes. |
| JB | When meetings? One issue is not lots of time between decision. Is |
| Beth | Changes based on phases. |
| JB | Who dealing with? |
| Beth | Dan Kinder. On site. Headquarters KCity but here. This is his project. |
| JB | CPOE? |
| Beth: | None from physicians RNs enter all |
| MM: | Doesn't stand for physicians - so not close |

GC Exh.

13

6/16/14

| Beth | Entry is being done by RNs — since last year. |
| JB | Walk through process |
| Beth: | 1 yr ago — RN documentation + order entry |
| | Preliminary. |
| Amy: | Physician writes + then we enter enter into Computer. |
| JB | All RNs. |
| Beth | Yes |
| Amy: | In our dept — send with chart. OP not entered. Only put in order for L4 or DS. Goes to med records |
| Beth | Pharmacies enter medications — RN cannot. |
| JB | Why |
| Beth | Pharm — per OH Board — have to verify that medication is correct. |
| Angie | Only referring to OP? |

GC Exh.

14

6/16/14

| | |
|---|---|
| Amy: | If done during procedure, can enter them |
| JB: | Phases to RN documentation |
| | All implemented at 1 time |
| | Cerner gave timeline — Don interested in seeing this + back + forth. Will follow up request. Training provided. |
| Debbie or Pam | As a trainee. We were provided w/ 2 days w/ completely classroom oriented training |
| JB | Decision how? |
| | Cerner guidelines? |
| JB | Interested in seeing. |
| MM | Was assessment of RN computer skills |
| Beth | Determined during. Problems — extra trainings |
| | What? |
| Beth | Skills lab + Schedule of training. |

GC Exh.

15.

6/16/14

| | |
|---|---|
| Member | Not all RNs received 2 days — some 1 8 hr. |
| Beth | Decision made by dept. Surg 1 day. |
| Member | Ours shortened, Crash |
| MM | GD only hours |
| Beth | Decision of Dept. |
| MM | Angie — training actual? |
| AB: | Educator may have records. |
| JB | Mgr — comes out of budget? |
| Beth | No. Not familiar w/ ER charting & were @ level of competence that floor RN not |
| JB | Was there a conference where Mgr. |
| Beth | Don't know. |
| JB | Training different? |
| JB | If people work on multiple units? |
| Beth | No — same training. |

GC Exh. ____

16

6/16/14

| | |
|---|---|
| Angie: | On several occasions I floated to unit but not fully competent – assisted others. Never required to use system. Extra person to do call lights |
| | After? |
| Angie: | No always a discussion – sitter, call lights. |
| JB: | In terms of training. Was con |
| Angie: | If regularly did, would have 2 different trainings |
| MM: | So RNs who float from ICU to others – Charting completely different. What's been done for them? |
| AB | Not really understanding. |
| MM | Like a "glitch" – documents different on other unit. If done on back end rather than front end – due to problem. May be better if other way |
| Angie: | Perhaps example. |
| Pam: | If Pam goes to telemetry; asks for primary RN or secondary. If ICU – different request, never to telemetry. |

17
6/16/14

Because badge as ICU RN, documentation is for ICU. Different as to telemetry RN. Rehab - just floated the other day - use Cerner for vitals & pharos. Assigned w/o training. Was only RN - not even a regular aide. Uncomfortable w/o familiarity w/ procedure. Know that Sr Mental Health is too - RNs floated are not familiar w/ procedure.

| | |
|---|---|
| JB: | Heard this before? |
| Beth | Not ICU - |
| JB | But had heard Sr Mental Health. |
| Beth | Yes, And over House Sups. Ensure RN not only. |
| MM | One thing hoping is pathway for remedial issues & pathway for projected changes |
| Beth | Hopefully will get remedial OK - gave issues |
| JB | Cerner - rollout timeline. Did have modules? |
| Beth | Yes |
| JB | Training modules - Interested in those. Are there modifications? Who has it? |
| Beth | Yes, Me & analyst |

GC Exh.

*18*

*6/16/14*

| | |
|---|---|
| MU | Open Skills lab next? Anyone not competent? |
| Beth | Yes - but not told to any |
| Angie | Paid for additional time. Could be driven by employee request. Some cases, manager referred someone is not mastered |
| JB | What timeline training to Go Live? |
| Beth | 1 month before —— 1 weeks before |
| Angie | Early May — Go Live June 22 |
| JB | Was anyone disciplined/termed |
| Angie | No one terminated. One employee chose to retire |
| JB | Was there discipline policy created? |
| Angie | No |
| Pam | RNs asked for meeting w/ Bill Osterman wanted addressed. Denied meeting. |
| JB | From hospital's perspective - everyone trained |
| Angie | To best of knowledge. |

GC Exh. _____

19
6/16/14

| JB | What superusers? How selected. |
| Beth | If aptitude for it. Originally trainers & then others ~~[struck through]~~ |
| | trainer from Cerner – contracted w/ CHS. |
| JB | How were these selected? |
| Beth | Willingness to make commitment. |
| Amy: | Sara chose her – she couldn't commit because busy & computer crashed so practically no training. |
| JB: | So undertaking same process? |
| Beth | Yes. |
| JB | Would like to see list of trainers. So trainers in phase 1 – Cerner trained. When |
| | Don't know. Wasn't one of those. |
| Beth | If Superuser – were they Resource. Scheduled 24 hrs/day for 4 weeks to be available. |
| Beth | If Med/Surg – someone staffed 24 hours/day. |

GC Exh. ____

20

6/16/14

| | |
|---|---|
| MM: | Did have pt assignment? |
| Angie: | No. |
| JB: | Was there additional staff? |
| Beth: | Yes - if had it. |
| Angie: | Always an attempt. |
| Beth: | Called "Green Shirt" people. Cerner implementation team was there for a couple weeks |
| JB: | After training period — then what? |
| Beth: | Additional resource person for 3 months. We've had them for 1 year since go-live |
| JB: | One person |
| | LOIS → 3 → 1 after 1 month |
| | Next phase — same kind of process. |
| Angie: | Start with timeline & if request additional from Cerner. |
| | Is there a parallel person |

GC Exh. ____

6/16/14

Cerner

PART 2 (20 pages)

21
6/16/14

Beth:  Regional Clinical Informaticist — Kimberly Nagle

CHS I-Connect bulletins — from her

No. Production release from team @ CHS — Stephanie
Maring. Leads phone calls from hospitals on Cerner.

Beth:  Not sure where hospitals are located.

Does Kimberly report to Stephanie

Believe they are peers.

Dan — regional?

No. Only deal w/ Dan.

Would Kimberly deal w/ Dan?

Don't know. Stephanie — get Cerner to work

Systemwide —

3 Hubs — OH — Northside
                    Trumbull
                    Rehab
                    Affinity

2 other hubs
based on location.

GC Exh. ____

22
6/16/14

CHS has lots of hospitals. Dan is Affinity

Is there someone @ Cerner for hub you deal with?

No. Deal with Stephanie. 3 different servers

Could modifications from Affinity affect
Northside?

All changes must agree. If want to add GI drain,
Northside will see it.

CHS calls - are Cerner on it?

Cerner reps to troubleshoot for hub. All Hubs are
on call +

All of Hub 1 on same timeframe for implementation

Process question - if issue with system - how
does it get fixed?

Example - upgrade something doesn't function.
Talk w/ IT Debbie Colangelo. She opens IT ticket
with corporate - priority assigned.

Ticket to Cerner + an internal CHS?

GC Exh. ____

23
6/16/14

All goes through CHS ticket.

Does RN get ticket #?

Yes.

Does it go to mgr?

No - Service desk tries to contact employee. If connectivity, CHS. If not, goes to Cerner to fix.

Who evaluates if CHS or Cerner.

IT has decision tree — Affinity. Or 24/7 to CHS.

Affinity IT Dept availability?

M-F day but take call so can come in + take care of it.

If Affinity — issue can be done w/o corporate.

Does someone get list of tickets - @ Affinity.

IT Director gets it — Mary.

If something to be Cerner issue.

GC Exh. ____

24

6/16/14

Debbie Colangelo reports to Mary - she'd report it

Are there other IT people deal w/ it?

Not like Mary or Debbie. Can take call & send to them

Exted 11:39

1:03p

JB: III Meaningful Use Attestation

Debbie Colangelo reviews Attestations. Starting Stage 2 July 1

Are you familiar with stage 1 part

Somewhat.

Competent in CPOE in Stage 1? You submitted to medicare.

I did not submit it nor am familiar. Shouldn't speak to.

JB: (Reads)

GC Exh. _____

25

6/16/14

In Stage 1, ER Dept counted toward Stage1.
In Stage 2, In patients

~~730 of all their pts admitted to hospital or~~
ER

Qualified thru ER.

Stage 2 Reporting period begins July 1, 2014.

Is reporting period time to get up to spud?

3 months.

Major thing accomplished is docs?

Yes. Affinity Stage 2 is physicians

Oversight IV. Ad hoc mostly?

Yes, Input from RNs via ticket. Used to
have Superuser Meeting + then send to
Cerner.

Amy:    Just for floors or everyone.

JB:    Is there a list of Superusers?

GC Exh. _____

26
6/16/14

Believe so - can check for minutes. Bill Osterman
ran the meetings.

~~How does ___ interact with list?~~

I let him know what problem is. You may want
to see.

Written reports — no — emails? no.

Only Enhancement Form Request. Just a request
to change make-up. Can be by ticket.

Who else?

RN or anyone else. Same process as opening
ticket.

Difference.

Ticket - hardware issue, connectivity, something
different. Enhancement — fixes something
needed.

JB:    Ticket captures errors, Enhancement is
not working the way supposed to
Do Enhancement Requests come to you

Beth:    Yes CAST meeting.

GC Exh. ____

27

6/16/14

Him, Info Tech, Beth, Quality, Nursing
meet in CAST.

~~Specifically related to review?~~

Yes.

How often meet

Every other week

Troubleshooting Committee?

Beth:    Bring forward issues + proposed solutions.

If someone already has issues

Is Dir of Nursing in meeting?

Yes. As clinical + myself

Is different forum for training?

Ange:    Decided by discipline, then within or by
dept.

JB:    IVC. Communication of Changes. How are
changes communicated. Walk through broadcast
to smallest. Broad — you go ahead w/ Phase 2.
Small — how?

Primarily communicated to managers. Once informed,
we email managers'

GC Exh. ____

28

6/16/14

| | |
|---|---|
| Beth: | Who— clinical analyst in IT. |
| | Example. Affinity communicated |
| ~~Beth:~~ | ~~different choice in drop down.~~ |
| | different choice in drop down. |
| | Is there an enhancement @ affinity not at northside |
| | No — the whole hub. |
| | Show up in both places. |
| | Timeline for additional rollout. Areas of concern. Useability errors |
| mm: | Huge number of issues RNs are reporting. Interface — where are things found — changing — on vacation when come back changed w/ no notice. RNs report chart 45 min. + come back after lunch & not there. |
| Amy: | Screen completely blank. For whole day couldn't get into system. Ticket had been closed. Someone else had to do charting. |
| mm: | Other types — can't see estimated blood loss if need to. What is NEBL in ICU during procedure |

GC Exh. ___

29

6/16/14

Not calculating properly. There's a very long list
of problems. Some into "glitch" and some in
"poor design." Very dangerous / critical to somewhat
~~...~~
then into critical to less severe. Data lost — recovery.
RN gave a med medication — order changed — no record
of old order. Made RN look likes she made a med
error.

| Beth | 1st time hearing some of these. Calls Cerner when hears critical. |

Does something get flagged to you of med error
that system detects?

| Beth: | No. |
| JB: | Moving to another area. Not exhausted questions |

| Debbie: | Example. Gets blood ready — hands off — they look — no data. Appears not communicating Systems don't talk to each other. |

They talk, but such a delay. Identified as an
issue. May be education. Taking an hour to
bring up solutions.

| Amy: | RNs being trained? |
| | Yes. |

GC Exh. ____

30

6/16/14

RNs —

When was reported to you?

Within past 2 weeks.

Patients upset because computer delays.
Difficult to →I pt in Surgnet because of design
Rehab — time consuming process.
Recovery — we're all locked behind screens.
ICU — needs direct call RN involvement
New things in Cerner wastes time.
Different answers from everyone

Endo No option to chart what needs documented
Surgery — can't document + monitor PT simultaneously
ED — CT has no computer.
2100 — Not able to change time of med admin.
(reads others HX)
Can't get meds in timely manner
Told about changes PRIOR
JIT Bulletins tossed in corner. We need person
(Some depts — read & sign — difficult; no one to ask)

HOW far in advance do you hear advancements?

Hear it's going to be approved, then put in. Hear
fixed the next day. Discussed with all Hubs.

GC Exh. ____

31

6/16/14

Roughly how long does it take to process?

Approx 4 weeks — Hosp–Hub–Hosp.   If Cerner
~~has to build I based on page~~

V.D Recording of Adverse Events = Ticket
        Review — IT, CHTR, Affinity
V.E Medication Administration Scanning

Beth:   Scanner doesn't work.

Debbie:  Sometimes scans differently.

member  Some stuff doesn't scan- Pharmacy breaks
pills into smaller doses.

Debbie:  Insulin — doesn't scan. We use every week.
~~Trent~~  Lot numbers are delayed.

JB:   This isn't new. So what's plan for solving the
problem. Generally, how does

Inform pharm. Once informed, escalate to quick
subgroup of use — then Cerner consultant
back in for med issue.

Insulin one — First I heard about lot numbers
I need to take issue back to hospital.

If 5 RNs + 1 bottle, lots of stickers. Go back to
stickers.                                    GC Exh. ____

32

6/16/14

| | |
|---|---|
| Debbie | V.E: Retiring ~~Orders~~ – Both day + night shift RN. 🏳 |
| Pam: | IF ~~had ability to retire meds for 24 pt~~ needs there. |
| Beth: | Trying to add process/function when move to Phase 2 |
| MM: | CPOE used today when RNs enter data. So how change "if doc put in order? |
| Beth: | Currently function turned off. Pharm enters all med orders. When back on with CPOE. RN can use it. |
| MM: | Will RNs be able to Retire orders? |
| Beth: | Yes. And can put med orders in. |
| JB: | What would stop you doing that now. |
| Beth: | In programming now. Can't do it – can't access |
| MM: | Could do a ticket or enhancement? |
| Beth: | It's something that can be – but not until trained to do. |

GC Exh. ____

33

6/16/14

Break 1:50p
2:08p

Pam: Does Pharm get notification about which meds

Beth: Don't believe test scan but not sure.

Pam: We did for several months but fell by wayside.

Debbie: Not fixed by Affinity — should be CHS - med came
from different distributer. Not something
Pharm can do

Beth: I'll ask pharmacy about process.

JB: Other issue — forko described ability to open ticket.
People say don't have time to open ticket.
Process to discuss based on discussion
VF - EHR Setup.

McKinney: Can't jump back and forth between results
page & lab.

Beth: I understand problem Can't jump back & forth.

MM: Can potentially lose info.

Beth: Will ask how to work around.

GC Exh. _____

34
6/16/14

**Debbie:** Insulin can be gotten to - has a box.

**Beth:** Not everyone knows. Tidbits should be communicated. ~~the need to be out in evrol tidbity~~

**Amy:** Care plans - no one knows how to do. No feedback and new people being disciplined.

**Debbie:** Big problem, because don't know what doing

**mm:** Can't do Admission, discharge & Care Plan in Cerner.

**Debbie:** Pneumonia - not any way say "not applicable."

**Beth:** Had discussed a couple weeks ago. ER Physician will be not applicable. If transported by staff member - have to choose "other" and write in staff.

**Pam:** Docs can't view nursing documentation. It's a problem. Blood sugars in ICU.

**Debbie:** Heparin - no way to document bolus of Heparin

**Beth:** Can't put it on MAR?

**mm:** No - not in Cerner. Only document when ~~to~~ Exp a new bag

35

6/16/14

| | |
|---|---|
| mm. | Not everyday, but potential |
| Angie: | Have you discussed issue with mgr or Beth? ~~Which issues not addressed vs which issues not able.~~ |
| Beth: | Have not heard heparin. |
| Pam: | Physicians' discussions regarding Cerner. Many issues by physicians that would use RN documentation help. |
| Beth: | A doc from Cerner is here. |
| JB: | F3 Difficulty ~~to~~ In Locating |
| Debbie: | Advance Directives — still can't find it. About 2pm everyday, so frustrated. So many issues — I'm there to take care of patients. |
| mm. | Many RNs have same issues. ① Basic needs (Admissions, etc.) RN feels stupid. |
| Debbie: | Doesn't know where goes to after Beth? No one has come to her & says you haven't done something — now 2 people got disciplined. We're busy — want to do a good job. |

GC Exh. ____

36

6/16/14

**Debbie** (cont): Don't want to be disciplined for what we do?

**Amy:** Also, time to do a ticket — taking care of patients. Someone needs to expedite the process.

**Debbie:** Feedback & would like to know is heard.

**Amy:** And education - may be a simple solution.

**mm:** What's also eye-opening is RN blames self — it's not them, it's Computer. Very frustrating. Find out issues with everybody.

**JB:** Narrative documentation

**Pam:** Section where you can write. Inconvenient — You must sign it. Can't use PHYSICIAN NOTIFICATION — so need something with Vital Signs that is convenient.

**Debbie:** You can comment but only gives a sentence or so

**JB:** Generally a problem. Maybe can't fit into a "tweet."

**Debbie:** System hinders efficient documentation

**JB:** Hard stops.

GC Exh. ____

37

6/16/14

| | |
|---|---|
| MM: | Hard stops are dangerous. Need to be eliminated. RN needs control; not tool over the RN. Don't know what it takes to make it go away — need to be able to override. |
| JB: | Not something Affinity can do? Hub? |
| Beth: | Most based on meaningful use |
| MM: | Federal govt. |
| Angie: | Lots of federal govt. We'll bring it up. |
| MM: | Customization  Ⓐ Not appropriate documents  Ⓑ Training offered after change  10 days later  Ⓒ Care often different — computer not designed to document while sitting |
| Angie: | We'll revisit this screen issue. |
| JB: | Override — dealt with  Staffing — when training occurred. How accommodated. As you've heard, additional time requirements  And Performance Standards — if now subject to discipline |
| Angie: | Nothing specific to this that's been developed GC Exh. ___ |

38

6/16/14

| | |
|---|---|
| Amy: | Not RN issue of efficiency. Takes more time. |
| Debbie: | Are some computers updated + others not. RN station couldn't bring stuff up (same as somewhere else) |
| Beth: | Beth will look into — IT issue. Dictation computers for physician. |
| MM | RNs locked out for 90 minutes. Work continues Performance Standards. |
| Amy: | 2 RNs could get in, rest could not. |
| JB: | Suggestion on how next to proceed. Want discussion sooner rather than later. Some contract, but some working condition for effects bargaining. Correct what's been done, others not. |
| | Must kick it around. |
| | Do want to take a few minutes now? Gretchen about bargaining tomorrow? |

39

3pn.                                      6/16/14

DC: We're going to be taking up w/ sr mgt.
Well correspond by email.

To schedule next dates.

DC: Day after tomorrow. May be free week after
next. Where leave discussion. Proposal as to
how to proceed. Some things already in works
to be fixed. Policies. Take a look & let know
what any changes.

Want to do in context of whole discussion. If
parallel process to do with contract negotiations
but w/o
changes need to be bargained.

Why time is of the essence.

Have right to people on committee. Up to you because
made offer. On wage issue. Make determination
annually.
On wage

We make it.

Abide by status quo. If criteria, interested in
knowing what it.                    GC Exh. ____

40
6/16/14

Accepting as proposal.

We'll have

Several people off because thought bargaining.

If let people know came work, they'll try. NOT tracking.

What if wants to work?

Notify manager — if hole

Do we have to use PTO for days to bargain

Unpaid?

Yes.

**Beth:** Do you have regular hours?

Policy — Request day off — your PTO.

A little

GC Exh. _____

## ARTICLE 30. PATIENT NEEDS -- STAFFING

### SECTION 1. GENERAL PRINCIPLES

The Facilities shall have a staffing system based on assessment of patient needs in conformance with the accreditation requirements of the Joint Commission on Accreditation of Hospitals and *applicable state law*. The Hospital, CHS agrees to meet and negotiate over changes adopted by either body during the term of the contract.

The patient classification system shall be a method of determining staffing requirements for each patient, each unit and each shift as appropriate, based on physical observation and assessment of each patient by the RN who is responsible for the patient.

The system will be adhered to in all areas to which it is applicable and for patient care areas such as outpatient surgery, equivalent or appropriate systems for assessing staffing needs will be maintained. In the event the scheduled staffing is insufficient to meet the specific staffing ratios called for by the system, the Facilities will make every reasonable effort to procure additional personnel. Should persistent shortages be identified, the Facilities will take the necessary step to ensure safe patient care.

The staffing system with full information summarizing or explaining the system will be located in the appropriate manual on every nursing unit, and a copy will be provided to the Professional Performance Committee upon request.

As a general practice, newly hired nurses will not be counted in the regular staffing complement during orientation or portions thereof as designated in advance by the Facilities provided, however, that the Facilities shall determine the duration and scope of orientation to be given based upon the Nurse's prior experience and/or training. Exceptions to this general practice may occur provided that such exceptions shall not be unreasonably made. Within ninety (90) days of ratification of this Agreement, Facilities shall, upon request, make available for review by NNOC its orientation practices relative to newly hired nurses if those practices have changed since the Facilities last submission and subsequently if Facilities changes these practices.

### SECTION 2. PATIENT CLASSIFICATION SYSTEM COMMITTEE

1. The patient classification system used by each Facility for determining nursing care needs of individual patients shall:
   - reflect the assessment of patient requirements made by the direct care RN; and
   - provide for shift-by-shift staffing based on those requirements.

2. The system shall include, but not be limited to, the following elements:
   - individual patient care requirements, including the nursing process;
   - the patient care delivery system;
   - generally accepted standards of nursing practice; and

CP 16

- the unique nature of each Facility's patient population.

3.  In accordance with ***state law***, the responsibility for review of the reliability and validity of the patient classification system, and for recommending any modifications or adjustments necessary to assure accuracy in measuring patient care needs will be function of a committee appointed at each Facility. The committee shall consist of an equal number of representatives of nursing management and RNs appointed by the Professional Performance Committee (the exact number to be determined at the local table) -- the Patient Classification System Committee shall consist of six (6) representatives of nursing management and six (6) RNs appointed by the Professional Performance Committee. The review referred to in this sub-Section 3 shall be performed annually and completed no later than December 1 of each calendar year. The Facility will make its best effort to implement within thirty (30) days recommendations that are approved by Management. Members of the committee shall be paid at their straight time hourly rate for time spent in attending committee meetings. Such time is not "time worked" for overtime purposes.

4.  The Facilities shall notify the PPC of proposed changes to the Patient Classification System or staffing matrices which result in a reduction of RNs covered by this Agreement within 30 calendar days of the proposed implementation date of the changes. Simultaneous with the notification of the proposed change(s), each Facility shall supply NNOC with the reasons for the proposed change(s). Nursing Administration will meet with the PPC upon request to discuss the system proposed changes in the system and the conformance of the system to the requirements of this Article.

5.  Differences of opinion under B.4 of this Article shall be handled under the following provisions:

    a.  In the event there is such a difference of opinion, the PPC shall refer the issue to the Chief Nurse Executive ("CNO") of the facility where it has arisen. The PPC shall simultaneously provide the following information writing to the CNO:
    (1)  A detailed description of the facts which have given rise to the difference of opinion, including dates and times where appropriate;

    (2)  The provisions of this Article that are relevant; and

    (3)  The proposed remedy or resolution.

    b.  Provided the written referral is in compliance with sub-section 4 above, the CNO shall respond to the PPC within 30 days of receipt of the written allegation of violation.

    c.  If the difference of opinion is not resolved by this process, the PPC may

bring this matter to the Special Review Committee established under article twenty-nine (29) of this Agreement, provided there is a written referral to the Review Committee within thirty days of the CNO's response.

## SECTION 3.  NURSE PARTICIPATION IN BUDGET DEVELOPMENT PROCESS

Each year, Staff Nurses on each nursing unit shall be notified in advance and allowed an opportunity to submit input during the Facility's annual budget development process.  During that period of the Facility's budget development when standard hours per patient day ("standards") for each unit are reviewed, the Unit Representative appointed by NNOC shall solicit input from Staff Nurses at a Staff Meeting and together with the Nurse Manager for the unit may meet with the CNO. Upon request and at reasonable times thereafter, the unit staff may consult with the CNO and Nurse Manager on the appropriateness of the standards and related issues.  Upon request at Unit Staff Meetings, all RNs shall be involved in the discussion of the appropriate staffing mix for their unit.

**NNOC Proposal to Affinity Medical Center**

**Date:** 2/24/14

**Time:** 948 am

## ARTICLE 31.  STAFFING RATIOS

Upon the ratification of this contract, the Hospital shall comply with the following nurse to patient ratios to provide quality care at this facility:

| Department | Registered Nurse | Patients |
|---|---|---|
| Med Surg | 1 | 5 |
| Tele | 1 | 4 |
| Stepdown | 1 | 3 |
| ICU | 1 | 2 |
| Surgical | 2 | 1 (one circulating and one scrub) |
| PACU | 1 | 1 |
| Endo | 1 | 2 |
| ER | 1 | 3 |
| ER | 1 | 2 (critical care patient) |
| ER | 1 | 1 (trauma patient) |
| Cath Lab | 1 | 1 |
| SMH | 1 | 4 |
| Ortho | 1 | 4 |
| Rehab | 1 | 5 |

*Same Day Surgery to be proposed….
*In case of emergency Pediatric Medical Patients will be 1 RN to 4 like patients…
*Pediatric patients in phase 1 recovery will be 2 RNs to 1 child…
*Pediatric in phase 2 recovery will be 1 RN to 1 child… ~~Pediatric patients will not be admitted to inpatient units~~

The above ratios are the minimum nurse to patient staffing requirements. Higher patient acuity will require additional RN staff as determined by the individual professional judgment of each RN caring for the patient.

Failure to staff as above shall obligate the Hospital to pay the RNs on duty in the department/shift that is short staffed at (1 ½) time and one-half the straight time pay for each RN. This article is subject to the Grievance and Arbitration provisions of this contact.

*Counter*

**NNOC Proposal to Affinity Medical Center**
September 4, 2014

5.

Article ___:  On-Call/Standby and Call Back

### Section 1:  Definitions

On Call/Standby:  Nurses who are placed on On Call/Standby Duty shall be <u>unrestricted in the use of their free time,</u> although the nurse must (a) leave a telephone number where the nurse can be reached or carry a pager or beeper and (b) be capable of reporting for duty within thirty (30) minutes of being summoned by the Employer.

Call Back:  When a nurse is asked to work by the Hospital after the nurse's normal shift ends to meet special needs, the time spent at the Hospital shall be considered "Call Back."  For those nurses who work on a unit where there is not a "normal shift" end time, <u>that is,</u> those nurses end times are irregular, the end of a shift for "Call Back" purposes shall be <u>eight and one-half (8-1/2) hours</u> from the commencement of the nurses' workday.

### Section 2:  On Call/Standby Compensation

In specified departments at the Hospital, nurses are eligible for "On Call/Standby" compensation when they are placed "on-call" outside their regular shift, or if they have been cancelled and <u>are asked to placed "on-call."</u>  Compensation for time categorized as "On Call/Standby" will be [to be <u>negotiated by the parties during economics.]</u>

### Section 3:  Call Back Compensation

In the event a nurse who is "on call" is called ~~back~~ *in ×B* to work, the nurse shall receive time and one-half (1-1/2) the straight time regular hourly rate for all hours actually worked during the call back, ~~for a minimum of two (2) hours.~~  Nurses will not be paid "On-Call" and "Call-Back" compensation simultaneously; that is, "On Call" pay ceases when "Call Back" pay begins."

> If the nurse has left the hospital and is called back to work, the nurse will be paid a minimum of two (2) hours on call at time and one-half (1½) the straight time regular hourly rate.

CNA 17

<u>EXHIBIT NOT SUBMITTED</u>

CHARGING PARTY/CNA's Exhibit No. _____18_____

Case Name _____DHSC_____ (☐) Identified

Docket No. _____08-CA-117890_____ (☐) Received

Date _____3-09-17_____ (☐) Rejected

This exhibit is not being submitted with this case because it was:

(☐) Identified, but not offered in evidence;

(☐) Identified, received, but withdrawn from evidence;

(☐) No duplicate was furnished to the Reporter;

(☐) Withdrawn by _____
    in order to make duplicate(s);

(☐) Retained in the possession of _____

(☑) Other     EXHIBIT NEVER IDENTIFIED,
    OFFERED OR RECEIVED INTO EVIDENCE
    BUT A COPY WAS GIVEN TO THE REPORTER

_____
Signature of Presiding Official

*NNOC*
*Union Counter Proposal*
*to*

*4-21-14*

# AFFINITY MEDICAL CENTER

## &

# NATIONAL NURSES ORGANIZING COMMITTEE

### MANAGEMENT PROPOSAL

## IN-SERVICE EDUCATION, TUITION REIMBURSEMENT
## AND ORIENTATION

### MARCH 29, 2014

*Red 4\7\14*

**ARTICLE    .  IN-SERVICE EDUCATION, TUITION REIMBURSEMENT AND ORIENTATION**

**SECTION 1.    IN-SERVICE EDUCATION**

The Hospital shall continue to provide continuing education opportunities on an in-house basis through the Hospital's Department of Education and the respective patient care or service departments.  This shall include cross-training to help Registered Nurses meet new nursing responsibilities within the Hospital.

    (a)    In-service education shall be provided to nurses prior to their assignment involving specialized equipment or care.

    (b)    In-service shall be provided at regularly scheduled hours best to meet the needs of all shifts of nurses.

    (c)    Any continuing education programs (CE), in-service programs and/or meetings which are mandatory will be paid at straight time hourly salary.

    (d)    The Hospital may require nurses to attend mandatory in-service programs when it is determined that such education is necessary for the nurse(s).

    (e)    The Hospital shall pay for the cost of Hospital required courses.

*CNA 18 1*

SECTION 2.     ORIENTATION

Each newly hired nurse shall be given an organized and effective orientation program. The length of such program shall be determined by assessment of the skills necessary to function at the level of practice expected for the classification and the unit to which the nurse is assigned. During the orientation period, the newly hired nurse or a nursing student shall not be included in the staffing ratio for purposes of patient care.

<u>SECTION 3.</u>     CONFERENCE DAYS.

A.     All regular full-time and part-time RNs shall receive two (2) <u>unpaid</u> 8-hour conference days per year for purposes of attending educational programs.

B.     If a conference day is used to attend a Hospital-sponsored program, the costs of the program will be waived.

SECTION 4.     TUITION REIMBURSEMENT

<u>Section 1. Tuition Reimbursement</u>

<u>a.     General.</u>  The purpose of the Hospital tuition reimbursement program is to establish a program to provide educational assistance to Registered Nurses who obtain formal job-related education and training during employment.  It is designed and intended to provide the terms and conditions for a separate written plan document pursuant to Section 127 of the Internal Revenue Code.

<u>b.     Eligibility.</u>  Regular full-time and regular part-time Registered Nurses who have budgeted/approved hours of at least 36 hours per week (.9 FTE) are eligible to submit an application for tuition assistance if they have completed three (3) months of continuous employment and are not receiving grants or assistance from any other source. Regular part-time Registered Nurses who have budgeted/approved hours of at least forty- eight (48) per pay period are eligible for tuition reimbursement on a pro-rated basis.

<u>c.     Criteria.</u>  The proposed course of study must be work-related.  For purposes of this Article, "work-related" means education directly related to improving the Registered Nurse's skills, knowledge, and performance in the Registered Nurse's present career field or to gain advancement in a health care career.  Tuition assistance is only available for courses from regionally accredited institutions, such as universities, colleges, associate degree colleges, and technical schools.  Tuition assistance is not available for seminars, professional meetings, and workshops.  Tuition reimbursement does not apply to

continuing education units, which are necessary to maintain a license, registration or certification that is a requirement for a position. The courses for which tuition assistance is sought must be during non-work time.  In determining whether to approve an application for tuition assistance, The Hospital may consider other criteria at its discretion including, but not limited to, a Registered Nurse's performance record with the Hospital.  Applications for tuition assistance shall be processed in accordance with applicable Hospital policies and procedures.

d.      Benefits.   Educational assistance is limited to:

- a maximum of Five Thousand Dollars ($ 5,000.00) per calendar year for courses at approved nursing schools;
- a maximum of  Two Thousand Five Hundred Dollars ($ 2,500.00) per calendar year for all other courses

> Expenses eligible for reimbursement include tuition, books, fees, equipment, and supplies used for and necessary to the course.

> As a condition for reimbursement, all Registered Nurses must execute an Educational Assistance Agreement before funds will be released.

> The Registered Nurse must receive at least a "C" grade or equivalent to be reimbursed. In courses where no formal grade or equivalent measure of completion is normally provided, the Registered Nurse must obtain a written document from the instructor or institution, satisfactory to the hospital, indicating successful completion of the course.

> Upon satisfactory completion of the course, the participating Registered Nurse must submit acceptable written proof of successful course completion and grade attained to the Human Resources Department.  Acceptable examples include: grade report, official transcript, certificate of completion and/or a letter on official letterhead, all as endorsed by the class instructor or official or registrar.

Registered Nurses whose employment is terminated for any reason prior to the completion of their course will not be eligible for reimbursement on any basis.

e.      Repayment at Termination of Employment: The Hospital shall recover a Registered Nurse's outstanding authorized debts at the time of termination (one year of service for each $2,500 of education expenses reimbursed), in accordance with State law.  The Hospital is not required to pay out any accrued unused PTO hours as they are not considered hours worked (unless otherwise directed by state law.

PEARSON, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DHSC, LLC d/b/a AFFINITY MEDICAL CENTER, | ) ) ) | CASE NO. 5:13CV1770 |
| Plaintiff, | ) ) | |
| v. | ) ) | JUDGE BENITA Y. PEARSON |
| CALIFORNIA NURSES ASSOCIATION / NATIONAL NURSES ORGANIZING COMMITTEE (C.N.A./NNOC), AFL-CIO, | ) ) ) ) | |
| Defendant. | ) | **ORDER OF DISMISSAL** |

This Court, having filed its Memorandum of Opinion and Order, hereby dismisses Plaintiff's Amended Complaint for Breach of Contract, Specific Performance, and Declaratory Judgment and for a Speedy Hearing Under Fed. R. Civ. P. 57 (ECF No. 18).

This Order of Dismissal constitutes entry of judgment pursuant to Fed. R. Civ. P. 58. Final.


IT IS SO ORDERED.


 May 31, 2016 _____           _/s/ Benita Y. Pearson_____
Date                                          Benita Y. Pearson
                                                   United States District Judge

CNA19

PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DHSC, LLC d/b/a AFFINITY MEDICAL CENTER, | ) | CASE NO.  5:13CV1770 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | |
| CALIFORNIA NURSES ASSOCIATION / NATIONAL NURSES ORGANIZING COMMITTEE (C.N.A./NNOC), AFL-CIO, | ) | **MEMORANDUM OF OPINION AND ORDER** |
| | ) | [Resolving ECF No. 45] |
| Defendant. | ) | |

Pending is Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Pursuant to Fed. R. Civ. P. 12(b)(1) (ECF No. 45).  The Court has been advised, having reviewed

the record, the parties' briefs, and the applicable law.  The Court has also considered the

Memorandum by Amicus Curiae The National Labor Relations Board ("NLRB" or "Board") in

Support of Defendant's Motion (ECF No. 63-2) and the oral arguments of counsel offered during

the Telephonic Status Conference on March 14, 2016.  For the reasons that follow, the motion is

granted.

**I.**

In early 2012, the Parties began negotiating a framework for an agreement governing their

relationship during Defendant California Nurses Association/National Nurses Organizing

Committee, AFL-CIO's (Defendant or "Union") efforts to organize the registered nurses

employed by Plaintiff DHSC, LLC, d/b/a Affinity Medical Center (Plaintiff or "Affinity"), as

*C N A 20*

(5:13CV1770)

well as the Parties' conduct during any collective bargaining negotiations that might follow. Amended Complaint for Breach of Contract, Specific Performance, and Declaratory Judgment and for a Speedy Hearing Under Fed. R. Civ. P. 57 (ECF No. 18) at PageID #: 200, ¶ 14.  The Parties produced two documents with the terms of their negotiations—a Labor Relations Agreement ("LRA") (ECF No. 18-1) and an Election Procedure Agreement ("EPA") (ECF No. 18-2).  Both documents provide terms for arbitration of disputes:  the LRA provides that "[t]he Parties agree to submit any unresolved disputes about [the LRA] to final and binding arbitration[;]" (ECF No. 18-1 at PageID #: 223) and the EPA provides that ". . . either party may . . . submit [an] unresolved dispute about [the EPA] for final and binding resolution[.]"  (ECF No. 18-2 at PageID #: 249).  The Parties, however, did not sign or execute either the LRA or the EPA.  ECF No. 18 at PageID #: 200, ¶ 16.

On August 20, 2012, the Union filed a petition with the NLRB seeking to represent registered nurses working at the Massillon, Ohio facility operated by Plaintiff.  On August 22, 2012, Affinity and the Union signed a formal Consent Election Agreement (ECF No. 45-2 at PageID #: 541-43) using the standard Board form.  The signed Consent Election Agreement was approved by the NLRB's Regional Director for Region 8 the same day it was signed.  ECF No. 45-2 at PageID #: 543.  Paragraph 12  gave the Regional Director final authority to rule on election challenges and objections.  ECF No. 45-2 at PageID #: 542-43.  Plaintiff does not dispute that neither party advised the Regional Director that any previous or conflicting agreements existed between them with respect to the election.  Respondent's Post-Hearing Brief (ECF No. 45-3 at PageID #: 593).  Thereafter, in accordance with the terms of the Consent

2

(5:13CV1770)

Election Agreement (ECF No. 45-2 at PageID #: 541-43), the NLRB's Regional office

supervised and conducted the election held on August 29, 2012. One hundred votes were cast for

the Union, 96 against, with seven challenged ballots.[1]  Since the challenged ballots were

sufficient in number to be determinative of the outcome of the election, the Regional Director

investigated the matter, soliciting statements of position from Plaintiff and Defendant. The

Union provided its position on the challenged ballots on September 17, 2012; Plaintiff did not

file any statement or response regarding the challenged ballots. On September 5, 2012, Plaintiff

filed with the Regional Director a statement of its objections to the election which made no

mention of a private election agreement with the Union. *See* Report on Challenged Ballots and

Objections (ECF No. 45-2 at PageID #: 545). In a letter dated September 7, 2012, the Regional

Director explicitly requested that Plaintiff provide its supporting documents and advised that the

failure to provide supporting evidence "will result in your objections being overruled without

further investigation." *See* ECF No. 45-2 at PageID #: 548. On September 21, 2012, the

Regional Director issued a report on the challenged ballots and objections, overruling Plaintiff's

objections because no substantiating evidence had been submitted. ECF No. 45-2 at PageID #:

544, 548. The report concluded that four of the seven challenged ballots were cast by eligible

voters. When these four ballots were counted, a majority of voters had voted in favor of Union

representation. ECF No. 45-2 at PageID #: 544-49. On October 5, 2012, the Regional Director

---

[1] The Board agent supervising the election challenged the ballots of seven voters
whose names did not appear on the list of eligible voters.

(5:13CV1770)

certified the Union as the National Labor Relations Act (NLRA) Section 9(a) representative of

the nurses at Affinity.  *See* ECF No. 45-2 at PageID #: 564;[2] ECF No. 18 at PageID #: 199, ¶ 8.

Following certification, Defendant requested that Plaintiff begin bargaining.  After

Plaintiff refused to bargain and denied Union representatives access to its facilities after the

election, Defendant filed charges with the NLRB.  The Regional Director issued a complaint

alleging various violations of the NLRA.  *See* Third Order Consolidating Cases, Amended

Consolidated Complaint and Notice of Hearing (ECF No. 45-2 at PageID #: 509-21).  In its

Answer, Affinity raised several affirmative defenses, two of which are pertinent here:  (1) that the

Board's certification of the Union as exclusive bargaining representative was

> invalid, and unenforceable, inasmuch as the representation election . . .was held
> not only pursuant to a consent election agreement, but also pursuant to an oral "ad
> hoc" agreement between Affinity and the [Union] which provided that an
> arbitrator possessed exclusive jurisdiction to determine challenged ballots and
> objections related to the conduct of the representation election[;]

and (2) that pursuant to that same "oral 'ad hoc' agreement . . . an arbitrator possesses exclusive

jurisdiction over the allegations set forth by the Complaint."  Answer to Amended Consolidated

Complaint (ECF No. 45-2 at PageID #: 531-32).  Board deferral to arbitration, however, is

completely discretionary.  Memorandum of Opinion and Order (ECF No. 22) at PageID #: 346

("Only the NLRB may decide to defer a pending charge to private arbitration.").  On April 30,

---

[2]  NLRA Section 9(a) states, in pertinent part:
Representatives designated or selected for the purposes of collective
bargaining by the majority of employees in a unit appropriate for such
purposes, shall be the exclusive representatives of all the employees in
such unit for the purposes of collective bargaining in respect to rates of
pay, wages, hours of employment, or other conditions of employment. . . .
29 U.S.C. § 159(a).

4

(5:13CV1770)

2015, a three-member panel of the Board issued its decision and order finding, *inter alia*, that Affinity had unlawfully refused to bargain with the Union and discriminatorily denied Union representatives access to its facility in violation of the Act. *DHSC, LLC, d/b/a Affinity Medical Center and National Nurses Organizing Committee (NNOC)*, 362 NLRB No. 78, 2015 WL 1956191 (2015). Relying on long-standing Board precedent, the panel majority rejected Affinity's procedural affirmative defenses regarding the arbitrator's exclusive jurisdiction under the purported "oral ad hoc agreement," finding that the parties had neither a collective bargaining agreement in place nor an established history of productive bargaining that would warrant the Board's deferring to any referenced arbitration provision. *Id.* at *1 n. 3[3] (citing *Arizona Portland Cement Co.*, 281 NLRB 304, 1986 WL 54325 at *1 n. 2 (1986); *United Technologies Corp.*, 268 NLRB 557, 1984 WL 36028, at *2 (1984); *San Juan Bautista Medical Center*, 356 NLRB No. 102, 2011 WL 702297 at *2 (2011)).[4]

The Board's unfair labor practice decision is currently pending before the United States Court of Appeals for the District of Columbia Circuit, on Affinity's petition for review and the NLRB's cross-application for enforcement of the order under § 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f). *DHSC, LLC v. NLRB*, Nos. 15-1426, 15-1499.

---

[3] Member Johnson also relied on the Federal Arbitration Act's requirement that agreements to arbitrate must be in writing. 9 U.S.C. § 2. *Id.*

[4] "[I]t is well-settled that the Board's authority and jurisdiction over questions of representation is exclusive; accordingly, the Board will not defer to a private dispute resolution mechanism, including proceedings under the AFL-CIO constitution, in deciding representation cases." *McLaren Health Care Corp.*, 333 NLRB 256, 2001 WL 120598, at *4 (2001).

5

(5:13CV1770)

On August 13, 2013, Plaintiff filed a Complaint for Breach of Contract, Specific

Performance, and Declaratory Judgment and for a Speedy Hearing Under Fed. R. Civ. P. 57

(ECF No. 1) in the above-entitled action.  On September 3, 2014, the Court granted Plaintiff

leave to file an amended complaint.  See Order (ECF No. 17).  On September 17, 2014, Plaintiff

filed an Amended Complaint (ECF No. 18) under § 301 of the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 185.  ECF No. 18 at PageID #: 198, ¶ 1.  Affinity alleges that it has a

valid implied-in-fact collective bargaining agreement ("Implied Agreement") with Defendant

which provides that both Affinity and the Union must submit any unresolved disputes about

compliance with, or construction of, the Implied Agreement to binding arbitration, including

disputes related to any elections.  ECF No.18 at PageID #: 198, ¶ 3; 201, ¶¶ 18-20.  Affinity

further alleges that Defendant breached the Implied Agreement by not submitting all unresolved

disputes to final and binding arbitration.  ECF No. 18 at PageID #: 205, ¶¶ 30-32; 206, ¶¶ 33-35.[5]

Affinity brings three claims against Defendant as a result of the Union's alleged breach of the

Implied Agreement:  (1) Defendant's breach resulted in damages to Affinity, ECF No. 18 at

PageID #: 206-207, ¶¶ 38-43; (2) Affinity is entitled to Defendant's specific performance of the

Implied Agreement's terms and conditions, including submission of unresolved disputes to final

and binding arbitration, ECF No. 18 at PageID #: 207-208, ¶¶ 44-47; and (3) Affinity is entitled

to a declaratory judgment mandating the Parties to submit all unresolved disputes under the

Implied Agreement to final and binding arbitration, ECF No. 18 at PageID #: 208-209, ¶¶ 48-51.

---

[5]  Affinity is not seeking enforcement of the EPA and LRA, as those documents
appear in the record; however, the Implied Agreement alleged in the Amended Complaint
(ECF No. 18) mirrors previously-negotiated terms appearing in those documents.

(5:13CV1770)

Defendant moved the Court to dismiss the Amended Complaint pursuant to Fed. R. Civ.

P. 12(b)(6) (ECF No. 19), making multiple arguments in support, none of which questioned the

Court's subject-matter jurisdiction.  On August 31, 2015, the Court denied Defendant's Motion

to Dismiss.  *See* ECF No. 22.  On September 14, 2015, Defendant filed an Answer (ECF No. 24).

On December 4, 2015, Defendant filed the within Motion to Dismiss for Lack of Subject-Matter

Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) (ECF No. 45), which the Court construes as a

Rule 12(c) motion.  *See* Order (ECF No. 47).

## II.  Standards of Review

A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same

standard applicable to a motion to dismiss under Rule 12(b)(6).  *Tucker v. Middleburg-Legacy*

*Place*, 539 F.3d 545, 549 (6th Cir. 2008).  The Court must construe the complaint in the light

most favorable to the non-moving party, accept all factual allegations as true, and make

reasonable inferences in favor of the non-moving party.  *Total Benefits Planning Agency, Inc. v.*

*Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008); *In re Sofamor Danek*

*Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997).  The complaint must "give the defendant fair

notice of what the claim is and the grounds upon which it rests."  *Nader v. Blackwell*, 545 F.3d

459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  A motion

brought pursuant to Rule 12(c) is appropriately granted "when no material issue of fact exists and

the party making the motion is entitled to judgment as a matter of law."  *JPMorgan Chase Bank,*

*N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007) (quoting *Paskvan v. City of Cleveland Civil*

*Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)).

(5:13CV1770)

A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in th[e] complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiffs are not required to include detailed factual allegations, but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. It must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Twombly*, 550 U.S. at 556. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557 (brackets omitted).

Defendants' motion is brought pursuant to Fed. R. Civ. P. 12(b)(1) for a lack of jurisdiction. Rule 12(b)(1) permits dismissal for "lack of subject-matter jurisdiction." Lack of subject-matter jurisdiction may be asserted at any time, either in a pleading or in a motion. *See* Fed. R. Civ. P. 12(b)(1). "[S]ubject-matter jurisdiction, because it involves a court's power to

(5:13CV1770)

hear a case, can never be forfeited or waived." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)

(quoting *United States v. Cotton*, 535 U. S. 625, 630 (2002)).  "A Rule 12(b)(1) motion can

either attack the claim of jurisdiction on its face, in which all allegations of the plaintiff must be

considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court

must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists."

*DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  A party making a "factual attack" on

subject-matter jurisdiction challenges the actual existence of the court's jurisdiction, *i.e.*, a defect

may exist even though the complaint contains the formal allegations necessary to invoke

jurisdiction.  *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir.

1996).

      Challenges to subject-matter jurisdiction through a Rule 12(b)(1) motion to dismiss come

in two different forms—facial and factual attacks.  "In reviewing a 12(b)(1) motion, the court

may consider evidence outside the pleadings to resolve factual disputes concerning

jurisdiction. . . ."  *Nichols v. Muskingum College*, 318 F.3d 674, 677 (6th Cir. 2003); *see also* 2

James Wm. Moore, *Moore's Federal Practice* § 12.30[4] (3d ed. 2000) ("[W]hen a court reviews

a complaint under a factual attack, the allegations have no presumptive truthfulness, and the

court that must weigh the evidence has discretion to allow affidavits, documents, . . . to resolve

disputed jurisdictional facts.").

### III. Discussion

      Where a contract dispute brought under § 301 of the LMRA is "primarily

representational," *i.e.*, a dispute within the primary jurisdiction of the NLRB, a district court may

(5:13CV1770)

not exercise jurisdiction if, as here, the Board has already exercised its jurisdiction and is

considering, or has already decided the matter.  *Int'l Bhd. of Elec. Workers, Local 71 v. Trafftech,*

*Inc.*, 461 F.3d 690, 693 (6th Cir. 2006).  Plaintiff argues that the dispute in the case at bar falls

outside of the scope of "primarily representational" matters.  ECF No. 54 at PageID #: 932, 944;

ECF No. 69 at PageID #: 1104, 1109; ECF No. 72 at PageID #: 1136.  It contends "the issues

decided by the NLRB are materially different than the issues currently pending before the Court,

which arise as a result of the [Union's] breaches of the [Implied Agreement]."  ECF No. 69 at

PageID #: 1104.[6]  That the § 301 disputes at issue in the case at bar are "primarily

representational" is evident from Plaintiff's stated requests for relief:  specific performance of the

Implied Agreement's terms and conditions, including submission of unresolved disputes to final

and binding arbitration, ECF No. 18 at PageID #: 207-208, ¶¶ 44-47; and a declaratory judgment

mandating the Parties to submit all unresolved disputes under the Implied Agreement to final and

binding arbitration.  ECF No. 18 at PageID #: 208-209, ¶¶ 48-51.

 This is not a case where "the issues before the district court and the NLRB were different

. . . or where the NLRB explicitly declined to decide the issue and instead deferred to the district

court."  *DiPonio Constr. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 687

F.3d 744, 751 (6th Cir. 2012).  On the contrary, the case at bar raises the precise issues

previously addressed by the Board:  whether the election challenges and objections and,

---

 [6] In March 2016, the Court allowed Plaintiff to serve and file a list or discernment
that offers clarification of the disputes Affinity claims should be subject to the arbitration
provision of the Implied Agreement. *See* Minutes of Proceedings dated March 14, 2016.
Affinity declined the offer. *See* ECF No. 72 at PageID #: 1136, ¶ 4.

(5:13CV1770)

ultimately, the Union's representation rights and Affinity's bargaining obligations, will be determined by an arbitrator or by the Board. The Board definitively decided that issue when it certified the Union as the employees' collective bargaining representative in October 2012 and exercised its discretion to decline deferral in April 2015. In short, as the Sixth Circuit observed in an analogous situation,

> the instant NLRB proceeding involves a representation issue, i.e., a determination of which union should represent the Olympic employees. There is a strong policy in favor of using the procedures vested in the Board for representational determinations in order to promote industrial peace. That the International has characterized the instant claim as a § 301 contract claim is of no consequence. [T]o fail to apply this policy [preemption] to § 301 actions would allow an end run around provisions of the NLRA under the guise of contract interpretation.

*Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers v. Olympic Plating Indus.*, 870 F.2d 1085, 1089 (6th Cir. 1989) (internal citation and quotation marks omitted, brackets in original). *Accord Trafftech*, 461 F.3d at 695-96 ("When a dispute is primarily representational . . ., simply referring to the claim as a breach of contract [is] insufficient for the purposes of § 301 federal courts' jurisdiction . . .") (internal quotation marks omitted, brackets in original).

Since any decision in the case at bar cannot revoke the Board's certification of the Union as collective-bargaining representative or negate Affinity's resulting duty to bargain, entry of the requested order for specific performance or declaratory judgment would be a hollow act on the part of the Court. Mandating arbitration in the circumstances presented here would be, at best, an idle gesture and "[t]he law does not require the doing of a nugatory act." *Tacey v. Irwin*, 85 U.S. 549, 551 (1873). *See Fine v. CSX Transp., Inc.*, No. 99-1645, 2000 WL 1206526, at *2 (6th Cir.

11

(5:13CV1770)

Aug. 18, 2000) ("the law requires no one to do a vain or useless thing"). As a practical matter,

no court could enforce an arbitrator's order purporting to undo the 2012 certification or finding

of the Board that Plaintiff's actions did not so violate the NLRA. Affinity has not cited any case

law to the contrary. Nor could it. Case law forecloses this possibility. *See, e.g., Bakers Union*

*Local No. 4 of Greater St. Louis v. Schnuck Baking Co. Inc.*, 614 F. Supp. 178, 182 (E.D. Mo.

1985) (refusing to compel arbitration under the parties' collective bargaining agreement because

the dispute turned on question of representation that had already been decided by the Board under

NLRA Section 9).

Deferral premised on the arbitration provision in the unsigned Election Procedure

Agreement ("EPA") (ECF No. 18-2 at PageID #: 249) is also questionable given the commitment

reflected in the signed Consent Election Agreement (ECF No. 45-2 at PageID #: 542-43) that

gave the Regional Director final authority to rule on election challenges and objections. Such

voluntarily signed election agreements are binding upon the parties. *NLRB v. General Tube Co.*,

331 F.2d 751, 753 (6th Cir. 1964). Moreover, the unsigned EPA itself conditioned Affinity's

recognition and bargaining with the Union "upon the certification of the election results by the

NLRB" (ECF No. 18-2 at PageID #: 234, ¶ 4(d))—a process over which the Board has sole

discretion and need not defer to private arbitral mechanisms. *Grand Rapids Die Casting Corp. v.*

*NLRB*, 831 F.2d 112, 116 (6th Cir. 1987).

## IV. Conclusion

Because Affinity has failed to identify any disputes that fall outside primarily

representational preemption, Defendant's Motion to Dismiss for Lack of Subject-Matter

(5:13CV1770)

Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) (ECF No. 45), which the Court construes as a

Rule 12(c) motion, is granted.


IT IS SO ORDERED.


May 31, 2016                              /s/ Benita Y. Pearson
Date                                      Benita Y. Pearson
                                          United States District Judge

13

1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  HOSPITAL OF BARSTOW, INC.,       )
12  d/b/a BARSTOW COMMUNITY          )    Case No. 13-cv-01063-CAS-DTB
    HOSPITAL,                        )
13                                   )
                                     )    ~~[PROPOSED]~~
14            Plaintiff,             )    **ENTRY OF JUDGMENT**
                                     )
15        v.                         )
                                     )
16                                   )
    CALIFORNIA NURSES                )
17  ASSOCIATION/NATIONAL NURSES      )
    ORGANIZING COMMITTEE             )
18  (CNA/NNOC), AFL-CIO,             )
19                                   )
             Defendant.              )
20                                   )
21

22        On November 18, 2013, this Court granted Defendant California Nurses

23  Association's Motion to Dismiss in its entirety with prejudice. ECF No. 24.

24  Plaintiff Hospital of Barstow ("Barstow") submitted a Notice of Appeal on

25  December 18, 2013. ECF No. 25. On July 2, 2014, the Ninth Circuit granted the

26  parties' motion to voluntarily dismiss the appeal. ECF No. 29. The Ninth Circuit's

27  granting of the voluntary dismissal served as a mandate from the court.

28  / / /

CNA
2(

1      Accordingly, judgment is hereby entered for Defendant.

2      It is so ordered.

3

4  Dated: July 25, 2014

                            *Christina A. Snyder*

5                   The Honorable Christina A. Snyder

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROPOSED ENTRY OF JUDGMENT                                        Case No. 13-cv-01063-CAS-DTB

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10 FALLBROOK HOSPITAL                         CASE NO. 13cv1233-GPC(WVG)
   CORPORATION,
11                                            **ORDER GRANTING**
                                Plaintiff,    **DEFENDANT'S MOTION TO**
12       vs.                                  **DISMISS THIRD AMENDED**
                                              **COMPLAINT WITH PREJUDICE**
13

14 CALIFORNIA NURSES
   ASSOCIATION/NATIONAL                       [Dkt. No. 23.]
15 NURSES ORGANIZING
   COMMITTEE (CNA/NNOC), AFL-
16 CIO

17                              Defendant.

18

19       Before the Court is Defendant California Nurses Association/National Nurses

20 Organizing Committee's ("CNA/NNOC" or "CNA") motion to dismiss the third

21 amended complaint ("TAC") under Federal Rule of Civil Procedure ("Rule") 12(b)(6).

22 (Dkt. No. 23.)  Plaintiff Fallbrook Hospital Corporation d/b/a Fallbrook Hospital filed

23 an opposition and Defendant filed a reply.  (Dkt. Nos. 25 & 26.)  The motion is

24 submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1).

25 Based on the analysis below, the Court GRANTS Defendant's motion to dismiss with

26 prejudice.

27                              **Background**

28       Plaintiff Fallbrook Hospital operates an acute care hospital in Fallbrook,

CNA 22

1    California.  (Dkt. No. 20, TAC ¶ 5.)  Defendant CNA/NNOC is a labor organization

2    and was certified by the National Labor Relations Board ("NLRB") on May 24, 2012

3    as the exclusive collective bargaining representative of registered nurses employed by

4    Fallbrook Hospital.  (Id. ¶¶ 6, 7.)  According to the third amended complaint, around

5    March 13, 2012, the parties met to discuss an agreement between Fallbrook Hospital

6    and the CNA "which would define certain terms and conditions to govern any

7    organizing which might be conducted by the CNA among Registered Nurses employed

8    by Fallbrook, and which would define a framework for the negotiation of an initial

9    collective bargaining agreement in the event the CNA was certified by the NLRB as

10   the exclusive collective bargaining agent for Fallbrook's Registered Nurses." (Dkt. No.

11   20, TAC ¶ 14.)  At the meeting, the parties entered into a proposed labor relations

12   agreement ("proposed LRA") where the parties agreed to submit any unresolved

13   disputes about compliance with or construction of the Agreement to final and binding

14   arbitration, including disputes related to the conduct of any collective bargaining

15   negotiations which might ensue between the parties out of organizing activity on the

16   part of the CNA at Fallbrook.  (Id. ¶ 15.)  They also agreed that they would work

17   together to resolve issues through direct discussion and arbitration.  (Id.)  The CNA

18   representatives assumed the responsibility of preparing an initial draft of the proposed

19   LRA.  (Id. ¶ 16.)  Written drafts of the proposed LRA were then exchanged between

20   the parties.  (Id. ¶ 17.)

21        The proposed LRA contained an "Election Procedure Agreement" which defined

22   certain terms and conditions governing any organizing the CNA might conduct among

23   Registered Nurses employed by Fallbrook.  (Id. ¶ 18.)  According to these terms, the

24   CNA was entitled to commence organizing among RNs employed by Fallbrook by

25   serving a "Notice of Intent to Organize."  (Id. ¶ 19.)  In order for the "Notice of Intent

26   to Organize" to be effective, the CNA would have to serve any such "Notice" within

27   48 hours of being notified by Fallbrook that it had received written notification from

28   another specified labor organization that the other specified labor organization was

[13cv1233-GPC(WVG) ]

1   commencing its own organizing activities among employees other than RN employed

2   by Fallbrook. (Id. ¶ 20.) Around April, 10, 2012, an attorney from the other specified

3   labor organization informed Carmody by telephone that a "Non-RN Notice of Intent

4   to Organize" would be served later that day upon Fallbrook. (Id. ¶ 21.) Following that

5   telephone conversation, the other specified labor organization served Fallbrook with

6   a "Non-RN Notice of Intent to Organize." (Id. ¶ 22.)

7         On April 12, 2012, in a telephone conversation between Don Carmody,

8   Fallbrook's representative, who is also an attorney, and Jane Lawhon, legal counsel for

9   the CNA, Carmody informed Lawhon about Fallbrook's receipt of the Non-RN Notice

10  of Intent to Organize." (Id. ¶ 23.) In that conversation, both discussed the fact that the

11  proposed LRA required the CNA to satisfy the 48 hours requirements in order to serve

12  an effective "Notice of Intent to Organize" the registered nurses at Fallbrook. (Id.)

13  They also discussed that although Fallbrook and the CNA expected the proposed LRA

14  would be mutually executed relatively soon, they were still in the process of

15  exchanging comments regarding minor modifications to drafts. (Id. ¶ 24.) Further,

16  Carmody proposed and Lawhorn agreed that the parties should simply orally agree to

17  apply the terms memorialized in the most recent written draft copy of the proposed

18  LRA with respect to the following terms: "a) the CNA's service of a 'Notice of Intent

19  to Organize' the Registered Nurses employed by Fallbrook; b) [t]he CNA's subsequent

20  organizing activity at Fallbrook; c) [t]he filing of a petition for an election with, and the

21  conduct of a secret ballot election by, the National Labor Relations Board

22  ("N.L.R.B."); and d) [t]he negotiation of an initial collective bargaining agreement in

23  the event the CNA won an election and was certified by the NLRB, including the

24  standard of the conduct of bargaining between the Parties as specified on page 5,

25  Section 4(a)(2) of the Proposed LRA." (Id. ¶ 25.)

26        Pursuant to the Agreement, the CNA agreed to a standard that would apply to the

27  parties' negotiations of a collective bargaining agreement ("CBA") and that the

28  negotiations would be governed by a private standard developed by the parties whereby

- 3 -

1   a private arbitrator would have jurisdiction to decide whether the CNA or Fallbrook

2   had violated the private standard that would apply to the parties' negotiation of a

3   collective bargaining agreement. (Id. ¶ 27.)

4       Pursuant to the terms of the Agreement, around May 16, 2012, the NLRB

5   conducted a secret ballot election among the registered nurses employed at Fallbrook.

6   (Id. ¶ 28.) Around May 24, 2012, the NLRB certified the CNA as the exclusive

7   collective bargaining representative of registered nurses employed at Fallbrook. (Id.

8   ¶29.) Around June 12, 2012, pursuant to the terms of the Agreement, the parties began

9   collective bargaining. (Id. ¶ 31.)

10      To demonstrate that the parties were in compliance with the terms and conditions

11  of the Agreement, Plaintiff points to numerous instances where the parties' conduct

12  demonstrate compliance with the Agreement. (Id. ¶ 32.) Moreover, from April 12,

13  2012 until September 26, 2012, Plaintiff claims that the CNA sought to resolve all

14  disputes through the dispute resolution procedure in the Agreement and presents two

15  examples where the CNA informed Fallbrook that it would submit the disputes to an

16  arbitrator. (Id. ¶¶ 33, 34.)

17      In addition, the TAC alleges that on July 3, 2012, the parties participated in a

18  bargaining session pursuant to the Agreement when a dispute arose. (Id. ¶¶ 36, 38.)

19  Mr. Carmody stated that when he told Matthews, the CNA representative, that he could

20  take the matter to binding arbitration in compliance with the terms of the Agreement,

21  Matthews did not state any disagreement that arbitration was the parties' agreed upon

22  forum. (Id. ¶ 42.) Matthews ultimately filed an unfair labor practice charge against

23  Fallbrook with the NLRB. (Id. ¶ 44.) Around July 2012, Plaintiff complains that

24  Defendant breached the Agreement by failing and refusing to negotiate a collective

25  bargaining agreement pursuant to the standards of bargaining defined in the Agreement

26  for the conduct of collective bargaining negotiations between the Parties arising out of

27  organizing activity on the part of the CNA at Fallbrook. (Id. ¶ 45.) Also, the CNA

28  breached the Agreement by failing and refusing to submit to arbitration any disputes

1  that arose during and were related to the collective bargaining between Fallbrook and

2  the CNA pursuant to the Agreement. (Id. ¶ 46.)

3      Plaintiff has demanded that the CNA resolve "any and all disputes that arise from

4  and are related to the Parties' negotiations of a collective bargaining agreement in

5  compliance with the terms and conditions of the Agreement by going through binding

6  arbitration with a private arbitrator." (Id. ¶ 47.)  The Agreement's Dispute Resolution

7  Procedure is mandatory.  (Id. ¶ 49.)  Plaintiff has complied with the terms and

8  conditions of the Agreement. (Id. ¶ 50.)

9      Plaintiff brings this action under Section 301 of the Labor Management

10  Relations Act ("LMRA"), 29 U.S.C. § 185 et seq. against Defendant for breaching an

11  implied-in-fact contract by failing and refusing to negotiate a collective bargaining

12  agreement pursuant to standards of bargaining defined by the Agreement for the

13  conduct of collective bargaining negotiations between the parties arising out of

14  organizing activity on the part of the CNA at Fallbrook; and failing to submit any

15  disputes that arose during and were related to the collective bargaining between

16  Fallbrook and the CNA pursuant to the Agreement.  It alleges a cause of action for

17  breach of contract and seeks relief in the form of damages, specific performance and

18  declaratory relief.

19  **A.  Legal Standard on Federal Rule of Civil Procedure 12(b)(6)**

20      Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure

21  to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal

22  under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory

23  or sufficient facts to support a cognizable legal theory. See Balistreri v. Pacifica Police

24  Dep't., 901 F.2d 696, 699 (9th Cir. 1990).  Under Federal Rule of Civil Procedure

25  8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the

26  claim showing that the pleader is entitled to relief," and "give the defendant fair notice

27  of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v.

28  Twombly, 550 U.S. 544, 555 (2007).

[13cv1233-GPC(WVG)]

1    A complaint may survive a motion to dismiss only if, taking all well-pleaded

2 factual allegations as true, it contains enough facts to "state a claim to relief that is

3 plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly,

4 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual

5 content that allows the court to draw the reasonable inference that the defendant is

6 liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause

7 of action, supported by mere conclusory statements, do not suffice." Id. "In sum, for

8 a complaint to survive a motion to dismiss, the non-conclusory factual content, and

9 reasonable inferences from that content, must be plausibly suggestive of a claim

10 entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir.

11 2009) (quotations omitted). In reviewing a Rule 12(b)(6) motion, the Court accepts as

12 true all facts alleged in the complaint, and draws all reasonable inferences in favor of

13 the plaintiff. al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009).

14    Where a motion to dismiss is granted, "leave to amend should be granted 'unless

15 the court determines that the allegation of other facts consistent with the challenged

16 pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc.,

17 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv-Well

18 Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to

19 amend would be futile, the Court may deny leave to amend. See Desoto, 957 F.2d at

20 658; Schreiber, 806 F.2d at 1401.

21 **B.    Breach of Implied in Fact Contract**

22    Defendant argues that the TAC fails to state a claim because it does not allege

23 the existence of an implied in fact contract to arbitrate disputes. Plaintiff argues that

24 it has properly alleged an implied in fact contract to submit all disputes to binding

25 arbitration.

26    An implied-in-fact contract is a mutual agreement shown by the acts and conduct

27 of the parties, rather than by their spoken or written words. Varni Bros. Corp. v. Wine

28 World, Inc., 35 Cal. App. 4th 880, 888 (1995); Cal. Civ. Code § 1621 ("[a]n implied

- 6 -

[13cv1233-GPC(WVG)]

1  contract is one, the existence and terms of which are manifested by conduct.")  "If a
2  written or oral contract did exist, there could be no implied contract because this would
3  be inconsistent with an oral or written contract.  Where a written or oral contract exists,
4  any implied agreement would necessarily be an implied term of such written or oral
5  contract . . . ."  Id. at 889.  The very heart of an implied promise is an intent to promise,
6  Gorlach v. The Sports Club Co., 209 Cal. App. 4th 1497, 1507 (2013), and the conduct
7  alleged must give rise to the specific understanding sought to be enforced, Guz v.
8  Betchel, 24 Cal. 4th 317, 342 (2000).  An implied in fact contract arises from a *mutual*
9  *agreement and intent to promise* where the agreement and promise have not been
10  expressed in words.  Gorlach,  209 Cal. 4th at 1508 (emphasis in original)
11  (citation omitted).

12         A cause of action for breach of implied contract has the same elements as a cause
13  of action for breach of contract, except that the promise is not written or oral but is
14  implied from the promisor's conduct.  Yari v. Producers Guild of America, Inc., 161
15  Cal. App. 4th 172, 182 (2008); see also California Emergency Physicians Medical
16  Group v. PacifiCare of California, 111 Cal. App. 4th 1127, 1134 (2003).  The elements
17  of a breach of contract claim are: "(1) the contract, (2) plaintiff's performance or excuse
18  for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."
19  Careau & Co. v. Security Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990).
20         Under  the  heading  THE  FORMATION  AND  EXECUTION  OF  THE
21  AGREEMENT, the TAC alleges that "[p]ursuant to the terms and conditions of the
22  Agreement, the CNA agreed to a standard that would apply to the Parties' negotiation
23  of a collective bargaining agreement, insofar as the CNA agreed to a private standard
24  developed by the Parties, whereby a private arbitrator would have jurisdiction to
25  resolve disputes between the Parties . . . including any claim by one Party that the other
26  Party had breached the private standard that would apply to the Parties' negotiation of
27  a collective bargaining agreement." (Dkt. No. 20, TAC ¶ 27.)  As to the "Agreement,"
28  the TAC is referencing a telephonic oral agreement made between Mr. Carmody and

[13cv1233-GPC(WVG)]

1   Ms. Lawhon on April 12, 2012 when they agreed to apply certain terms memorialized

2   in the most recent draft copy of the proposed LRA. (Id. ¶ 25.) Plaintiff further alleges

3   "[a]fter the Parties agreed upon the terms of the Agreement, they ratified the Agreement

4   by their conduct." (Id. ¶ 31.)

5          Defendant argues this allegation concerning the formation of the Agreement does

6   not allege an implied in fact contract but an oral agreement to four specified terms as

7   laid out in the TAC. The Court agrees. The TAC does not allege acts or conduct of the

8   parties to demonstrate the existence or formation of an implied in fact contract. The

9   TAC references an agreement made between the parties but does not allege an "oral"

10  agreement.  Interestingly, based on the Court's prior order, Plaintiff has removed

11  reference to any "oral" agreement. (Compare Dkt. No. 20, TAC ¶ 33 with Dkt. No. 11,

12  SAC ¶ 33.)  Plaintiff does not allege the conduct that created the implied in fact

13  agreement to arbitrate all bargaining disputes through mutual assent and intent to

14  promise.  The allegations concerning the formation of the contract reference an oral

15  agreement, not an implied in fact contract.  Therefore, Plaintiff has not alleged the

16  existence or formation of an implied in fact contract between CNA and Fallbrook, and

17  therefore, Plaintiff has not properly alleged a cause of action for breach of an implied

18  in fact contract.

19         Defendant also argues that the TAC makes clear that Fallbrook's true complaint

20  is that the CNA filed unfair labor practice ("ULP") charges before the National Labor

21  Relations Board ("NLRB" or "Board") and Plaintiff cannot allege that the CNA agreed

22  to both exclusive arbitration of bargaining disputes, its theory in prior complaints, and

23  to non-exclusive arbitration of bargaining disputes, its theory in the instant complaint.

24  Plaintiff contends that the TAC does not allege that the CNA violated the agreement

25  based on its ULP charges with the Board and seeks no relief requiring to Union to

26  abandon their Board charges.

27         In the prior complaints, Fallbrook alleged that the filing of unfair labor practice

28  charges before the NLRB constituted breach of the Agreement to bring all disputes

1    before an arbitrator. The Court previously dismissed the complaints because Fallbrook

2    failed to demonstrate a "clear and unmistakable" waiver of the right to file NLRB

3    charges. (Dkt. No. 19.) Plaintiff now argues that the TAC "*does __not__ allege the Union*

4    *violated the Agreement due to the fact the Union filed ULP charges with the Board*

5    *and seeks no relief requiring the Union to abandon, or to otherwise impact, their*

6    *Board Charges*." (Dkt. No. 25 at 3.) Plaintiff asserts that disputes can be subject to

7    both unfair labor practice proceedings as well as an arbitration arising out of a

8    grievance. Therefore, the TAC now alleges that the CNA's failure to submit disputes

9    to arbitration breached an implied in fact contract between the parties.

10            While Plaintiff does not allege that the CNA violated the Agreement by bringing

11   a ULP charge before the Board and does not seek to have the CNA abandon the Board

12   charges, the Court concludes that Plaintiff seeks to indirectly challenge the CNA's ULP

13   charges before the Board. Plaintiff has redrafted its TAC to avoid dismissal based on

14   the Court's prior orders. Plaintiff has given up the theory that pursuant to the terms and

15   conditions of the oral CBA, the parties waived their right to resolve any dispute by

16   filing an unfair labor practice charge with the NLRB and all disputes should have been

17   submitted directly to the arbitrator. However, the TAC alleges that in July 2012, which

18   is when the CNA filed ULP charges with the Board, the CNA breached the Agreement

19   by failing and refusing to submit any and all disputes that arose during collective

20   bargaining to binding arbitration. (Dkt. No. 20, TAC ¶¶ 46, 47.) In addition, it alleges

21   the Dispute Resolution Procedure, ie arbitration, is mandatory, implying that Defendant

22   had no choice but to bring its disputes to arbitration. (Id. ¶ 49.) While Plaintiff argues

23   that it does not ask the CNA to abandon, or to otherwise impact, the Board charges, it

24   defies reason that CNA would bring the same disputes before the Board and to

25   arbitration. Moreover, Plaintiff alleges that arbitration is mandatory as to "any and all

26   disputes" which implies that Defendant's only avenue to resolve disputes is through

27   arbitration.

28            Plaintiff is essentially alleging breach of contract based on Defendant's filing of

[13cv1233-GPC(WVG)]

1 | ULP charges before the Board and its failure to submit the disputes to mandatory,

2 | binding arbitration.  As such, the issue arises as to whether there was a "clear and

3 | unmistakable" waiver by Defendant of the right to file ULP charges before the Board,

4 | which Plaintiff failed to allege in prior complaints.  Thus, the Court concludes the TAC

5 | fails to state a claim for breach of contract for failing to submit disputes to arbitration.

6 |          In sum, the breach of an implied in fact contract fails to state a claim as well as

7 | the relief it seeks for damages, specific performance and declaratory relief.

8 | Accordingly, the Court GRANTS Defendant's motion to dismiss the TAC for failure

9 | to state a claim for relief.

10 |                                     **Conclusion**

11 |          Based on the above, the Court GRANTS Defendant's motion to dismiss.  In the

12 | prior order, the Court indicated that it would grant Plaintiff one last chance to remedy

13 | the deficiencies in the complaint which it has failed to do so.  Accordingly, the Third

14 | Amended Complaint shall be dismissed with prejudice and Plaintiff is denied leave to

15 | amend.  The hearing date set for June 20, 2014 shall be **vacated**.

16 |          IT IS SO ORDERED.

17 |

18 | DATED:  June 18, 2014

19 |

20 | HON. GONZALO P. CURIEL
     United States District Judge

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

# FILED

JUN 15 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| FALLBROOK HOSPITAL CORPORATION, DBA Fallbrook Hospital, <br><br> Plaintiff-Appellant, <br><br> v. <br><br> CALIFORNIA NURSES ASSOCIATION/NATIONAL NURSES ORGANIZING COMMITTEE (CNA/NNOC) AFL-CIO, <br><br> Defendant-Appellee. | No.   14-56177 <br><br> D.C. No. 3:13-cv-01233-GPC-JLB <br><br> MEMORANDUM* |

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Submitted June 9, 2016**
Pasadena, California

Before: GOULD and HURWITZ, Circuit Judges and RESTANI,*** Judge.

---

\*       This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\*      The panel unanimously concludes this case is suitable for decision without oral argument.  *See* Fed. R. App. P. 34(a)(2).

\*\*\*     The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

CNA
23

Fallbrook Hospital Corporation ("Fallbrook") appeals the district court's dismissal of its Third Amended Complaint ("TAC") against the California Nurses Association/National Nurses Organizing Committee ("CNA"). The TAC alleged that CNA breached an implied agreement to arbitrate all disputes with Fallbrook and to bargain in good faith. We have jurisdiction under 28 U.S.C. § 1291 and we affirm the district court judgment.

1.    Fallbrook's allegations in support of its contention that the parties entered into an implied agreement to arbitrate all disputes are either conclusory, implausible, or inconsistent with an implied arbitration agreement. *See Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 51 Cal. Rptr. 2d 622, 628 (Cal. Ct. App. 1996) ("[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.").

2.    The arbitration claim also fails because it is premised on the contention that CNA breached an alleged implied contract for mandatory, binding arbitration by successfully pursuing a claim against Fallbrook before the National Labor Relations Board ("NLRB"). *See Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 732 (D.C. Cir. 2015) (upholding relief to CNA for Fallbrook's refusal to bargain in good faith). Under the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a), 160, CNA had the right to seek relief from the NLRB. *See Nash v. Fla.*

2

*Indus. Comm'n*, 389 U.S. 235, 238 & n.3 (1967). Any waiver of a right granted by the NLRA must be "clear and unmistakable." *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983); *see also Local Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1079 & n.10 (9th Cir. 2008) ("[T]he Board requires the matter at issue to have been fully discussed and consciously explored during negotiations and the union to have consciously yielded or clearly and mistakably waived its interest in the matter.") (internal quotation marks omitted).[1] The TAC does not allege such a waiver.

   3.    Fallbrook's opening brief does not address its claim that CNA breached an agreement to negotiate in good faith. That argument is therefore waived. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

   **AFFIRMED.**

---

[1]   We assume for purposes of this disposition that the right to pursue a claim before the NLRB is waivable. *But see Hosp. of Barstow, Inc. v. Cal. Nurses Ass'n*, No. 13-cv-1063, 2013 WL 6095559, *6-8 (C.D. Cal. Nov. 18, 2013).