# GENERAL COUNSEL EXHIBITS 422 - 450

EXHIBIT NOT SUBMITTED

GENERAL COUNSEL 's Exhibit No. _____ 422 _____

Case Name _____ DHSC _____ (✓) Identified

Docket No. _____ 08-CA-117890 _____ ( ) Received

Date _____ 3-07-17 _____ ( ) Rejected

This exhibit is not being submitted with this case because it was:

(✓) Identified, but not offered in evidence;

( ) Identified, received, but withdrawn from evidence;

( ) No duplicate was furnished to the Reporter;

( ) Withdrawn by _____
    in order to make duplicate(s);

( ) Retained in the possession of _____

_____

( ) Other _____

_____

_____

_____
Signature of Presiding Official

# CHS Information Systems
## Standard Support Model

GC Exhibit 422

Transition to Support Presentation R4

# Agenda

- [ ] **Incident Managements**
  - [ ] For Example:
    - ◦ Break Fix
    - ◦ Printer Issues
  - [ ] MyIS  http://myis.chs.net/sc/login.asp
- [ ] **Enhancement Process**
  - [ ] For Example:
    - ◦ Formulary Updates
    - ◦ Adding New Fields
  - [ ] MyIS  http://myis.chs.net/sc/login.asp
- [ ] Escalations
- [ ] Reporting and Metrics
- [ ] QA Follow Up
- [ ] Roles and Responsibilities
- [ ] Information Systems Infrastructure Support
- [ ] Master File Synchronization Process

2

# Incident Management

# Incident Management

Support Operations Incident Resolution Process (High Level)

Last revised February 2013



Assigned – Ticket Assigned to Support Group
In Process – Ticket in process of being addressed
Pending Vendor – Vendor addressing issue
Resolved – Ticket Resolved with Customer Validation
Closed – Ticket Closed; Unable to re-open

NOTE: Links only work in Slideshow view

Click to go to Cerner Process



## Cerner Support Process

Revised 6.20.13

# How are priorities set?

☐ The Service Desk has adopted the ITIL framework as a set of Best Practices. (Information Technology Information Library)

☐ Priority is determined by a combination of Impact and Urgency

   ☐ Impact – Describes the measure of the business criticality of an incident and how widespread the issue is.

   ☐ Urgency- Measure of the business criticality of an incident based on the business needs of the customer.

Transition to Support Presentation R3

# Priority of Tickets

☐ Critical
  ☐ Impact – Major outage affecting a large number of customers or a facility. Patient safety/care is in jeopardy or normal business functions cannot be met. Financial, market image, or regulatory implications.

  ☐ Urgency – Required immediately, Critical Event Manager and Incident Response Team notified.

  ☐ Scope –Service Restoration

☐ High
  ☐ Impact – System or application usable with severe restrictions.  Performance severely degraded.

  ☐ Urgency – Required within 48 hours, all required resources.

  ☐ Scope – Service Restoration, Service Request and Problems

Transition to Support Presentation R3

7

# Priority of Tickets

□ Medium (Normal)

    □ Impact – Incidents affecting a individual or small number of users. Must be resolved but do not impact service level agreements.

    □ Urgency – Required within five days, best effort, prioritized against other work.

    □ Scope – Service Restoration, Service Request and Problems

□ Low

    □ Impact – Incidents that do not directly affect customer's productivity. Workaround is available.

    □ Urgency – Required within the next week.

    □ Effort – Resources are available.

    □ Scope – Service Request

8

# Change Management

## Cerner Standardization
## - Production Change Request Process Overview

- The recent successful go-live of the Cerner Millennium solution has given CHS an opportunity to achieve a major outcome directed by Mr. Smith - *Standardization.*

- CHS is now in position to realize the major benefits of this strategy: reduced cost of system maintenance, an increased ability to rapidly deploy the solution, and improved capabilities to provide excellent support.

- In order to not lose momentum in realizing these benefits, it is important to remember that the CHS Cerner solution is designed and engineered as an enterprise model (hosted in the Birmingham Data Center) and this one enterprise standard must support all facilities, currently planned for a total of nineteen. In order to maintain clinical content Standardization, we have designed and are currently implementing a new approach to Change Management.

10

Transition to Support Presentation R3

# Cerner Standardization
## - Production Change Request Process

- The following slide describes the 'Clinical Systems Change Management Process'. We have tool-enabled the process on behalf of the change submitters. The process supports not only change requests to the application from a clinical content perspective, but also provides for a fast-track for maintenance type items such as CDM/Billing, Room and Bed, Physician, and Lab, Rad, and Pharmacy/Formulary table updates.

- For the clinical content requests, your local clinical liaison will be working with your staff in conjunction with the Corporate Optimization Team and their assigned Regional Clinical Informaticist (RCI). The RCI will assist in refining the definition and justification of the need and will prepare the request for presentation to the facility's Clinical Automation Steering Committee (CAST).

11

# Change Management Process

Clinical Systems Change Management Process 4.26.13

12





# Change Management Process

Clinical Systems Change Management Process 4.26.13

- For the clinical content requests, your local clinical liaison will be working with your staff in conjunction with the Corporate Optimization Team and their assigned Regional Clinical Informaticist (RCI). The RCI will assist in refining the definition and justification of the need and will prepare the request for presentation to the facility's Clinical Automation Steering Committee (CAST).



# Change Management Process

Clinical Systems Change Management Process 4.26.13

- At this local level we ask you to be thinking about how the change requested will affect the other facilities sharing the Cerner solution. We have a finite number of resources available to perform application enhancements, based on industry standard ratios. We need to be judicious in focusing these resources on the changes that provide significant benefit to patients and end users across our health system.



# Change Management Process

Clinical Systems Change Management Process 4.26.13

- We anticipate that the types of changes approved by the local governing body (CAST) will be changes related to CMS, JCAHO and state requirements and not items already identified and planned for in the solution roadmap. The RCI will know this information in most cases.



# Change Management Process

Clinical Systems Change Management Process 4.26.13

● In order to maintain the enterprise standard it is business critical that the process described above is both clearly defined and adhered to.

# Enhancement Requests Utilizing MyIS for CERNER

18

# Requesting Enhancements

☐ Clinical Informaticist
   ☐ Greg Krantz

☐ Regional Clinical Informaticist
   ☐ Karen McCreary

Transition to Support Presentation R3

# Using MyIS for Cerner Enhancement Requests

## ..CHS.

1. Log into MyIS at https://myis.chs.net using your Active Directory credentials (the same username/password that you use to log into your computer)



2. Select the **Enhancement Request** option on the left sidebar, then click on the box that states **CHS Enhancement Request.**



3. Your user information will auto-populate into the request. Verify that it is correct and edit the phone or email if needed.

4.  Select Cerner from the Please select a Vendor dropdown box.



5.  Select the application module for which modifications are needed, and a custom request form for Cerner will appear.



21

6.  Complete the form, select a priority, and add necessary attachments/forms.



** Priority Explanations **

Critical - A vital workflow or process is compromised and all locations are impacted, resulting in users' inability to perform their normal duties. Major patient safety and financial risks exist.

High - A key workflow or process is compromised. One or more locations are affected. Patient safety, regulatory compliance, or financial impact exists.

Medium - There is some operational impact but no immediate impact on service delivery, financial or patient care. An acceptable workflow exists.

Low - A change is desired, but the related component or application is usable with no changes necessary to perform safe patient care & business operations.

** For no-change-related system outages, loss of functionality, or immediate break/fix assistance, call CHS Support Desk at 1-816-405-3100 and log an Incident Ticket **

7. Identify the correct approver in order to route the request to the appropriate approver.



8. Once the request is approved, a Remedy Incident will be created and assigned to the appropriate CHS resource for triage. That team will contact the requestor with the next steps,

# Incident Management Escalation Contacts

# CHS Support Services

## Incident Escalation Contacts

The Service Desk is available 7 x 24 and should be the first point of contact for all IS issues.

**Service Desk Contact - 1-615-465-3100**

On Line – http://MyIS

Escalation: For escalation of critical issues, please contact the following in this order.

| | |
|---|---|
| Larry Chavarria, 1st Shift Team Lead | Steve Mortillaro, 2nd Shift Team Lead |
| 615-465-7330 | 615-465-4930 |
| After Hours Contact Information: | After Hours Contact Information |
| 615-477-7789 | 615-330-8286 |
| Larry_Chavarria@chs.net | Steve_Montillaro@chs.net |

Stephen Brandon, weekend shift Team Lead
615-465-4061
After Hours Contact Information
615-945-8641
Stephen_Brandon@chs.net

**Level 1 Engagement**

Sherry Ryder, Manager, Service Desk
615-465-7816
After Hours Contact Information:
615-418-0119
Sherry_Ryder@chs.net

**Level 2 Engagement**

Gowri Muthumalai, Director, IS Service Operations
615-465-7930

**Level 3 Engagement**

Division IS Liaison

**Level 4 Engagement**

*Note: In case of an enterprise wide event, the Service Desk will open the following bridge to provide updates at the top of each hour and as needed:*
*1-866-628-8620   Pass code   378758*
Transition to Support Presentation R3

25

# Division VP - IS Liaisons

- Division 1- Michael Yzerman
  - Michael_Yzerman@chs.net — 615-465-7305
- Division 2- Michael Oshea
  - Michael_Oshea@chs.net — 615-465-7950
- Division 3- Lisa Cline / John Ulett
  - Lisa_Cline@chs.net — 615-465-7865
  - John_Ulett@chs.net — 615-925-4828
- Division 4- Sammy Cantrell
  - Sammy_Cantrell@chs.net — 615-465-7298
- Division 5- Curtis Watkins
  - Curtis_Watkins@chs.net — 615-465-7789

Transition to Support Presentation R3

26

27

# Reporting and Metrics

http://chsweb.chs.net/Pages/Default.aspx

Transition to Support Presentation R3

# Reporting and Metrics

http://chsweb.chs.net/Pages/Default.aspx



Transition to Support Presentation R3

28

CHS Community
Health Systems

CHS Home > Councils > Departments > Information Systems > Service Operations

Service Operations
Application Training
Facility 15 Director
Resource Site
Recommended &
Required 2012
Recommended &
Required 2013
Quick Reference

# Service Operations

Service Desk | Service Fulfillment | Application Operations | Infrastructure Operations

Service operations is a 24x7 support organization that strives to continuously improve the end user experience. The team is responsible for the support of all IS services at CHS; this includes Network, Server, Security and Applications.

SERVICE DESK: 615- 465-3100       Corporate: Extension 3100       Email: itservicedesk@chs.net

Reports    Process & Standards    Incident Management    Tools and Training    Quick Reference Docs & Links    Transition to Support

## Management Team

Actions

| Name | Title | Office Phone | Business Cellr | Email |
|---|---|---|---|---|
| Govin Muthumalai | Director, Service Operations | 615-628-6595 | 615-651-1163 | Govin_Muthumalai@chs.net |
| Sherry Ryder | Manager, Service Desk | 615-465-7316 | 615-418-6119 | Sherry_Ryder@chs.net |
| Derryl Dismukes | Manager, Infrastructure Operations | 615-935-4717 | 615-927-4294 | Derryl_Dismukes@chs.net |
| Donna Kane | Administrative Assistant | 615-935-4375 | | Donna_Kane@chs.net |



Transition to Support Presentation R3



Transition to Support Presentation R3



Favorites
Free Hotmail
Web Slice Gallery
Report Manager
Page
Safety
Tools
Home | My Subscriptions | Help
SQL Server Reporting Services
Home > Custom Reports > Service Operations Reports >
Closed Incident Details w-Summary Header
Search for:
View
Properties
History
Subscriptions
New Subscription
Resolved Date From 7/1/2013
Resolved Date To: 7/15/2013
Assigned Support Organization All
Assigned Group All
Company Flowers Hospital
Product Name All
View Report
1 of 2 ?
100%
Find | Next
Select a format
Export
Closed Incident Details
Number of Incidents Closed/Resolved by Group
0
20
40
60
2
1
13
57
10
6
2
3
7
6
1
1
2
1
1
2
2
1
3
3
14
1
1
2
Corner AMS Support
Corner Orders Management
Deployment Amalgation Security
Flowers Hospital & Department
L1 Service Desk
L2 Application Security
L2 Clinical Support
L2 Corporate IS Support HQ
L2 Financial Support
L2 Server Support
L3 Citrix Engineering
L3 Enterprise Network Engineering
L3 IT Operations Center
L3 Kronos
L3 Messaging Engineering
L3 Patient Accounting
L3 Payroll
L3 Pharmacy
L3 Remedy Development
L3 Security Compliance
L3 Security Identity Management
L3 Unix Engineering
L3 Wintel Engineering Administration
Problem Management

QA Team & Post Go Live



QA Team Post Go-Live Follow Up

Daily monitoring of facilities issues that are keyed in Remedy.

Monthly Town-point conference calls to address all issues and concerns with the IS Director and C-level executives.

34

# Massillon, *Affinity Medical Center*
# Project Activity Report

| Date: | 3/20/2013 | Project Name: | Massillon / Affinity HMS/Cerner Conversion |
|---|---|---|---|
| Purpose: | Weekly Executive Project Schedules, Objectives, Action Items | | |
| Attendees | Mary Dexter, Ronald Bierman, Bill Osterman, Pam Shanklin, Diane Hawkins, Sammy Cantrell, Dana Steffer, Michael Douzuk, Terry Fowler, Craig Burr, Jawad Shaikh, Steve Wilkins, Charles Spence, Jim Conley, Heather Rhoades, Deborah Rowan, Sheila Kellar, Liz Pruitt, Debbie Colangelo, Greg Krantz, Vickie Magurean, Marylee Newman, Karen McCreary, John Westbrook, Dave Ellsworth | | |

## Schedule & Objectives

**Week of 3/20/13**

- Marylee Newman, PM – Remote
- Jim Conley, EL Cerner – Youngstown/Massillon
- Diane Hawkins, PD – Nashville

**\*Objectives\***

- Project plan revisions for dates and tasks
- Continue monitoring AD migration and wireless cabling
- Continue review of integration test scripts and IT1 preparation
- Monitor 3rd party new data cabling and electrical implementation and PC deployment
- Continue integration 3rd party vendor POs and VPN requests
- Monitor completion of POB training room for 4/1 IT1 event

## Action Items—Risks in red

| Description: | Assigned To: | Due Date: | Item Comments: |
|---|---|---|---|
| 1. House-wide electrical infrastructure | Craig Burr / Charles Spence/ David Ellsworth | 5/22/13 | 3/20-Update: Terry Fowler suggests using a second set of WOWs for the OR until the electrical infrastructure is complete. John Westbrook to f/u. We may be able to borrow some WOWs from another facility. **Waiting for a corporate engineer to review the proposed OR dept electrical infrastructure upgrade.** 3/20—Waiting for PO signoff from procurement for the rest of the hospital data drops and associated cabling. |
| 2. Hardware infrastructure | Craig Burr/ Mary Dexter/John Westbrook | 5/22/13 | 3/20-Reviewing present hardware and working with Dana Staffer and Julie House to determine any additional hardware needed. **3/20 Per John Westbrook assessment—no major obstacles.** |
| 3. Local LCI contract for hardware deployment resources | Craig Burr / Mary Dexter | ASAP | 3/20—LCI Contract has been submitted to procurement. **John W. will follow up with procurement regarding getting the contract to Sammy C. for signature today.** |
| 4. Net-new HW | Craig Burr / Jeff Smith/John Westbrook | 4/15/13 | 3/20: Deploying 30 PC's in training room. 3/20- **Training rooms**- Training room for IT1 to be completed. Redid the image to have Cerner piece added to it. 3/20. PCs imaged and installed. 3/20-Need badge readers for SSO net-new PCs. John to f/u. 3/19/13: **Workstation refresh** – Have the 125 PC's that arrived with first shipment. *Second shipment not received yet or addendum hardware order.* **3/21—John Westbrook is f/u on second HW order.** |
| 5. Wireless installation | Charles Spence/David Ellsworth | 3/29/13 | 3/19/13: Hischer-Clark contract is in the procurement process. 3/20- All hospital wireless should be completed by 3/22. Will then work on clinics/outpatient areas. |

AFFINITY, et. al                     1                     GC Exh. _423_

# Massillon, *Affinity Medical Center*
## Project Activity Report

| 6. | Server REIP | Mary Dexter / Charles Spence | 3/22/13 | *3/12—REIP of servers: Re-IP of the Pyxis must occur in addition to each of the modalities for IT1.* **3/20** This is underway. *3/19: Waiting for static IP's from CHS and cannot move forward without this.* 3/20-Update: Received 5 Static IP addresses have been received but more addresses are needed. |
|---|---|---|---|---|
| 7. | PACs MRN conversion requested for automation since manual process too time-consuming for local staff | Varna Kadambari/Debbie Colangelo | 6/10/13 | It has been learned that the vendor EvriChart may be able to prepare a file for CareStream to convert the MRN file for PACs thus eliminating the current manual merging by the radiology staff at Affinity. Meeting held today and CareStream is investigating necessary steps. **3/20/13:** Radiology will continue processing PACS manually while CareStream does analysis for MRN conversion. CareStream has a test environment which can be used for IT1. The contact name at CareStream needs to be forwarded to Sammy C. for follow up and procurement of a Senior Engineer who has experience with this. **3/21: Sammy has f/u with a senior director at CareStream. A quote and timeline for the work has been received and forwarded to Procurement by Varna K. Timeline is only a few weeks.** |
| 8. | Keane and Fusion historical data | Dustin Grant / Santiago Godinez | TBD | From Dustin on 3/13:" *I talked with Edna. She said that once we identify the frequency that the systems are used from the clinical side she will discuss with Lola Davis to see if there is still a need to do an AR conversion from Fusion to Keane. We were provided the information from the Business Office already.*" **From Debbie C—Can we put this on hold until after the conversion when there is more time?**<br><br>Here is the current Affinity access status from Debbie C.<br>PFS:<br>Cindy Wallick<br>I still have access to the Keane system. I only use when requested for legacy accts. I only have used 1x for 2012 – today.<br>HIM:<br>Erica Miller and Lisa Mayes still have access.<br>1. Keane<br>2. Old information for ROI there is still some dictation and RAD reports we can print off and we also can see pt. types and other misc. demographics that did not cross over the last merger. Doctor's did not have a unit record so the pt. types are very important in record retrieval from EvriChart because in patient and out patient records are housed separately.<br>3. I have used it twice this week. It depends sometime I don't use it for a week or more.<br>Radiology:<br>Radiology access both Keane and Fusion<br>We need to look up patients for x-ray numbers pre Star/PACS so old films can be pulled - mostly mammography<br>Both system are used daily - fusion more than Keane<br>Lab:<br>Daily for Fusion because the pathology historical information is stored in the system.<br>Daily for Keane for blood bank historical file<br>HR:<br>HR has access to Keane (Doctors) which has previous employment history for Doctor's Hospital Employees and we also have access to Fusion which has previous employment history for Massillon Community Hospital employees. This is all pre Affinity Medical Center history. I access about every two weeks dependent on the number of employment verifications I receive. I also have access to HMS and Host which has previous employment history. Let me know if you need anything else.<br>3/20—From Sammy: Sammy will send a f/u email to Edna. 3/21— Edna: *We have discussed this internally and Dustin and group are* |

GC Exh. _____

# Massillon, *Affinity Medical Center*
## Project Activity Report

| | | | |
|---|---|---|---|
| | | | investigating the cost of converting this data to HMS versus leaving it on their current systems.  The issue is that with RAC they can go back a number of years and if we don't convert the data we will need to make sure that these systems are kept on and up to date so that we can pull the data if we need it.   What happened is that when they converted to Lutheran they did not convert the zero balances to Star, therefore this is our concern related to these accounts in these systems.  I had discussed this with Lola and she wanted the zero balances converted to HMS for a certain number of years, however this is before we knew that we would have to outsource to a vendor to get these data extracts.  **Edna-"We will keep this on our radar to make a decision in the next couple of weeks."** |
| 9.   IT1—integration test scripts | Bill Osterman / Greg Krantz | 4/1/13 | **3/20**- We will probably need more than 1 room to accommodate all the participants. Received draft agenda today. Reviewed scripts, making modifications.<br>Per Sammy C. as a result of Vicksburg Integrated testing 32 scripts had errors and is being shipped back along with finding build issues. This point going forward facility needs to work on scripts with unique services—they will be tested in IT2. IT1 with current scripts has no extra time for anything else.<br>**3/20—Need list of testers who can be on-call. Marylee to F/U.** |
| 10. | | | |
| 11. Next meeting | | | 4/3/2013 |
| **Timeline** | | | |

| AMC HMS/Cerner Project key events and competing projects | Dates-week of | Notes |
|---|---|---|
| MPI/AR First data extract | 3/4/13 | Completed |
| Open House Script/IT Prep | 3/12/13 | Completed |
| Star Version 18 upgrade kick-off | 3/18/13 | Completed |
| MPI/AR First validation MPI-AR | 3/18/13 | Completed |
| Wireless turn-up/Validation | 4/1/13 and 4/18/13 | **REVISED DATES** rep needs to arrive Sunday night 3/31 to prepare early Monday morning. |
| Integration Testing 1 | 4/1/13 | |
| CPDI system validation | 4/8/13 | **Marylee N. will follow up to determine what will be needed for CPDI system validation. Clarice Smith is the point person for this. Scanning order in Procurement** |
| Medication Barcode Scanning | 4/8/13 | Pharmacy only. |
| Local Workflow Sessions - Week 1 | 4/8/13 | |
| Local Workflow Sessions - Week 2 | 4/15/13 | |
| Local Workflow Sessions - Week 3 | 4/22/13 | |
| Train the Trainer | 5/6/13 | |
| Integration Testing 2 | 5/6/13 | |
| Emprint eForms / Zynx Modules | 5/14/13 | For print on demand forms for patient care and downtime. Reps will return at time of HMS/Cerner Go-Live to show users how to apply patient information to the forms |
| End User Training | 5/13 - 6/10 | |
| Pre go-live MPI/AR data extracts | 5/13/13 | |
| Star Version 18 upgrade conversion | 5/19/13 | |
| IDaM Resource - Roles and End to End Access Validation | 5/23-5/24/13 | **New event** |

# Massillon, *Affinity Medical Center*
## Project Activity Report

| | | |
|---|---|---|
| Begin pre go live validation MPI-AR | 5/27/13 | |
| Stop Build HMS Copy | 5/27/13 | |
| Load MPI to HMS and PHS | 6/5/13 | |
| Begin Schedule Backload in HMS and Cerner | 6/3/13 | |
| **Security blitz /Physician Favorites** | 6/10/13 | |
| Begin Pre-Admits in HMS and Cerner | 6/10/13 | |
| **HMS/CERNER Conversion** | 6/22/13 | Followed by 2 weeks of 24/7 conversion support |

AFFINITY, et. al

4

GC Exh. _____

# Massillon, *Affinity Medical Center*
# Project Activity Executive Report
# 7/31/2013

| Date: | 7/31/13 |
|---|---|
| Purpose· | REVIEW OF PROJECT ACTION PLAN AND UPDATES |
| Attendees | RON BIERMAN, BILL HANLON, BILL OSTERMAN, TERRY FOWLER, LIZ PRUITT, MARTY BONICK, STEVE WILKINS, DIANE HAWKINS, MARYLEE NEWMAN |

MethodM·

| Facility | Affinity Medical Center |
|---|---|
| Event/Category | (Multiple Items) |

**#Open Issues: By Status**

| Row Labels | Count of Priority |
|---|---|
| Open-Assigned/Investigating | 2 |
| Open-Client Action | 10 |
| Pending - CR | 35 |
| ResID-Retest | 1 |
| Grand Total | 48 |

Remedy:

| Assigned Group | Open Incidents |
|---|---|
| Cerner AMS Support | 52 |
| Total Open Incidents | 52 |

| Description: | Item Comments: Meeting discussion is in blue. |
|---|---|
| 1. **HMS Registration/Cerner Integration challenges** | a. Identify root cause for missing account numbers<br>b. The next steps to address are documented CHS Corporate process, responsible staff, and appropriate education.<br>c. Issue review meeting held on 7/30. Ongoing corporate review and fixing of issues. Weekly meetings scheduled.<br>d. Optimization team has been doing a deep dive on the registration process and making progress. There will be a refresher class for the schedulers.<br>e. Physician phone numbers and fax number: HMS updates not always appearing in Cerner—Corporate investigating via Badar Shaikh.<br>f. SurgiNet and CathLab schedules not always appearing in Cerner- Corporate investigating via Badar Shaikh |

AFFINITY, et. al

GC Exh. 424

# Massillon, *Affinity Medical Center*
## Project Activity Executive Report
## 7/31/2013

| | |
|---|---|
| **2. Emergency Department** | • Completion of printed narcotic prescription design/build changes: COMPLETED<br>• Auto-faxing of discharge summary—Cerner build issue. ECD 8/9/13<br>• Affinity physicians in general want an onsite expert Cerner physician liaison to review workflows and other physician concerns. This includes ED, surgery and internal medicine physicians. Some of these physicians also work at Altman—local competitor hospital which has Cerner. |
| **3. Overall support model/issue resolution of MethodM and Remedy Tickets** | • Requesting Corporate /AMS status on remaining Remedy tickets since many tickets which could be closed remain open. Update: This is still in progress.<br>• Steve is investigating issues with overnight support and making sure correct phone numbers are being utilized.<br>• Weekly meetings have been scheduled to review Remedy tickets. |
| **4. 7X24 downtime process** | • Review and finalize current downtime policy-Heidi Steiner (optimization team) and Bill Osterman (CNO) ECD 8/2/13<br>• Educate end users with regard to: process, identified PCs and use of PCs: local education team and Optimization team ECD 8/9/13<br>• **7X24 devices tested and there are no patients loading. Ticket logged. Cannot educate until it is working properly.**<br>• Steve W. to investigate |
| **5. Reports education** | • The optimization team is working with Affinity leadership to educate Cerner's Explorer Menu and Discern Analytics report capabilities. ECD 8/9/13 Josh Campbell from Cerner is onsite and reviewing Cerner's standard (canned) reports.  ED and Lab have robust reports.  Other departments requesting custom reports.<br>• **Is there a CHS process for this?  Does anyone at CHS know how to build custom CCL reports?**<br>• **Infection control isolation reports.** Update: *Will Rich from corporate has reached out to Nancy today and will assist her with training to print HMS reports.*<br>• Bill O stated current Cerner standard reports are only good for ED and Surgery. This week's onsite Cerner report representative has not proved much value. Once Cerner's Insight is available in September other clinical areas should get more of the reports they need. |
| **6. Clinical education – optimization team** | • Transition of Care document-Optimization team ECD 8/9/13<br>• Clinical competencies checklist – Optimization team ECD 8/9/13<br>• Working with Heather Rhoades next week on transition plan. ECD 8/9/13 |
| **7. Onsite support- next steps** | Steve W. has requested Affinity to identify final milestones and timeline necessary to release remaining Optimization team. **This** |

# Massillon, *Affinity Medical Center*
## Project Activity Executive Report
## 7/31/2013

|  | timeline needs to be completed by 8/2/13. Some of the remaining issues revolve around Radiology, Surgery and nursing education. |
|---|---|
| 8. Other | Affinity has requested these meeting to continue twice a week. Next meeting scheduled for 8/5/13 · |

AFFINITY, et. al

GC Exh. _____

CareNet Medical User Group February 4th, 2014 Recorded Minutes
Attendees: Matt Cole, Sherri Chiste, (teleconfing) BH Carrie, ... BH Karen, ... Family ... Keller, ... Amy Anderson, Steven Reed

| Request Number | Date Submitted | Facility | Description | Facility Discussion and Decision | Comment |
|---|---|---|---|---|---|
| INC0000001662604 | 2/3/2014 | River Region-Kennette | Add RadNet access to the Vascular Nurse Position. Cardiology nurse originally in a SurgiNet position could not chart tasks for holter and ekg  she was changed to the Vascular Nurse position which allowed charting the tasks but she lost the lost RadNet access to do the other departmental functions. Request that RadNet worklist and other RadNet _task access be set for the Vascular Nurse position | No objections | |
|  | 2/4/2014 | Corp | BH Admission PowerForm- Splitting part 1 and 2. Part 2 will go overdue within 8 hours. Part 1 same as acute and adding suicide assessment. | No objections | |
| INC0000001682700 | 2/4/2014 | Corp | Adding Valuables section to Tech Documentation PowerForm -Approved by Cheryl-Waukegan request but a global change. | No objections | |
| INC0000001671005 | 1/29/2014 | River Region-Kennette | ECG Tech Position also does EEG and does not have a way to chart and charge for these tasks. This position needs to have ability to view and document against the EEG tasks. | No objections | |
| Updates | | | | | |

| 186545 | 1/17/2014 | Northside-Steven | Regulatory Compliance- there is a time limit, and when the pt is holding in ED past that limit, we fall out because FirstNet doesn't have that capability Please make the adult and ped admission forms Part 1 and Part 2 available in FirstNet. | Approved. Stephanie to follow up with Michele Reynolds to understand compliance with an ED nurse-filling out the Inpatient Admission Assessment. The ED RN positions would need access to these forms but would not have authorization to submit an enhancement request to modify the form for their ED workflow. 2-4-2014 Wanted to understand workflow and the decisions. | Emailed Michele Reynolds 1-22 1-27-Demoing the Inpatient admission to Michele Reynolds. 1-28 Taking discussion to the CNO council this Friday for the final decision. Would involve new build and workflow changes for both areas. 2-3 Waiting for Michele Reynolds to confirm workflow for ED.Pending meeting. Tasking on inpatient side will be impacted and a defined workflow and policy will need to drive clinicians. 2-10 Options identified. FirstNet and CareNet BP's taking of CNO council for approval. |
| Workflow VTE Admission INC000001682250 | | | Ref. text modification-check with orders team for VTE plans/orders | Stephanie to check with CPOE team to confirm these are built in the system. | 2-3 Business partners provided verbiage. Stephanie submitted a ticket |
| Lab issues | | | Want a continuous order for am labs without changing the physicians current workflow | Discussion to be deferred to the PathNet space | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

2

| Request Number | Date Submitted | Facility | Description | Facility Discussion and Decision | Comment |
|---|---|---|---|---|---|
| 214359 INC000001816457 | 3/27/2014 | Flowers-Samantha | In the Ad Hoc Expiration Record in the Organ Donation band there is no place to document who you spoke with at the Alabam Organ Center, also need a spot to open up when you select "not a candidate" to document this. If you were to combine the organ donation and the organ donation form this would solve this issue with the conditional logic of "not a candidate" opening up a place to comment who you spoke with at AOC. Also in the disposition band there needs to be a spot in which the nurse can document who from the funeral home picked up the body. | Approved. Organ donation section-Not a candidate for donation alpha. Need this field to also open date and time and organ bank representative fields. This is required documentation for Flowers regardless if they are a candidate or not. Would like to merge the Organ Donation and Organ Donor Forms. Disposition- add a free text field to document the staff who transported the body. | Sent to AMS |
| 214361 INC000001807716 | 3/27/2014 | Flowers-Samantha | Add a vital signs band to the nursing discharge summary on depart for documentation on d/c vital sign. Addition of a vital signs band in the nursing discharge summary will ensure the last set of vital signs for discharge are documented on the patient chart. This is also required for patient discharge. | Approved. | Approved-Cheryl. Ticket approved-Sent to AMS 4-7-2014 |
| 215693 INC000001807718 | 3/31/2014 | Flowers-Samantha | Need to tie a task to the order for Patient Education. "When an order is placed for education it does not task the nurse to accomplish. If the nurse does not review the order or it is missed then it is missed altogether. In PowerChart if we were to task the education order to the care compass and tasks then it would be less likely to be missed." Stroke | Approved. | CNO council-Approved 4-4-2014. Ticket approved-Sent to AMS 4-7-2014 |

| ID | Date | Facility | Description | Status | Notes |
|---|---|---|---|---|---|
| 216754 INC000001814025 | 4/1/2014 | Coatesville-Kenneth | Coatesville Laboratory does PA required paperwork in event of patient death. The lab needs a communication order from Nursing to notify them of death on unit. Compliance issue to make sure PA required paper work is completed | Approved for Coatesville. No other site interested in this req routing option or order. | Requires a new order. Will need to work with lab to obtain approval. Reach out to Jim for his approval 4-10-2014. |
| 217335 INC000001812168 | 4/2/2014 | Cleveland | Need to add a notification box to state that notification to family and/or physician of the patient's admission to the hospital was made, attempted or refused. This needs to be in the Adult Info and Hist Part 2. This is a CMS regulation. | Approved by CNO meeting. 4-7-2014 | Approved by CNO meeting. 4-7-2014. Requiring these fields as well. Michelle Miller building |
| 217340 INC000001814023 | 4/2/2014 | Cleveland | The dietician needs the diagnosis to determine when to see the patient and how to prioritize those that she will see. | Approved | Assigned to Kevin. |
| 217348 INC000001812167 | 4/2/2014 | Cleveland | When documenting medication administration of hydrocodone, there is no box within the eMar to document the pain scale Requesting that the pain scale be added to hydrocodone. | Approved | Prod Date April 17th. Michelle Miller building- |
| 217351 INC000001812166 | 4/2/2014 | Cleveland | Need to add power injectable port, power injectable PICC, and power injectable over the wire. | Approved | Moving to Prod April 10th Michelle Miller building |
| 217384-Rejected | 4/2/2014 | Tomball-Lucki | Remove the task for the certified diabetes educator Our dietitians do not do tasks for a certified diabetes educator. The tasks are cluttering up their task list. | Needed for other facilities. | Pending follow up from Lucki to understand impact. No other sites voicing a concern with this task. |
| 217393 INC000001812165 | 4/2/2014 | Cleveland | Need IV pole icon on all patient types to be able to document IV start and stop times. This information is necessary for SkyRidge to avoid losing IV infusion charges on Outpatient, Recurring Outpatient, ED Outpatient and Observation patients. Inpatients need to be included only to have the IV pole icon so that documentation will be consistent. Inpatients will not be charges for IV infusion hours. This continues their current documentation process. | Approved | Moving to Prod April 10th Michelle Miller |
| 218053 INC000001811163 | 4/3/2014 | Tomball-Lucki | When pharmacists are cancelling a medicine, they want to put in the reason and the choices that are there do not always fit. | Approved The comment DTA is dithered. | Sent to AMS |

| | | | | Approved with Clarification- will add lateralities. Not x2,x3, x4. Pulses use +1,+2 etc which already exist. | Sent to AMS |
|---|---|---|---|---|---|
| INC00001807122 | 4/7/2014 | Flowers-Samantha | In the Edema and Pulses section for extremities they would like to have a dropdown selection in each of Type of Pulse and/or edema x2, x3, x4 | Approved with Clarification- will add lateralities. Not x2,x3, x4. Pulses use +1,+2 etc which already exist. | |
| INC00001809338 | 3/20/2014 | Flowers-Samantha | New TPA inclusion/exclusion Assessment PF | Approved by FirstNet, SurgiNet and CareNet buisiness partners. JIT will be sent out ahead of Production | New Cerner standard. FirstNet Tentative Prod date- April 17th. |
| | | | | | |
| Other Discussion | | | | | |
| | 3/1/2014 | Flowers-Samantha | Quality Measure Checklist | Checklist tool in IView to assist the nurse with the measure items to address. | Moving to Prod April 10th |
| | | | | | |
| Report Update | | | | | |
| Will demo the next set of CareNet Reports on the next call. | | | | | |

6

**From:**                Boyle, Angela [angie_boyle@chs.net]
**Sent:**                Thursday, August 20, 2015 10:14 AM
**To:**                  Vanessa Sylvester; Michelle Mahon
**Subject:**           Quorum Health Corporation
**Attachments:**     Press Release.pdf

Vanessa,

Attached is a copy of the release issued by Community Health Systems, Inc. on August 3rd, announcing the creation of Quorum Health Corporation, a publicly traded, diversified portfolio of thirty-eight hospitals presently associated with Community Health Systems, including DHSC, LLC dba Affinity Medical Center.

We have not, as yet, received any inquiry from your organization about this impending development.

Please feel free to contact us at your earliest convenience in the event you wish to discuss this event in a timely fashion.

Angie Boyle, SPHR |Vice President, Human Resources
Affinity Medical Center  | 875 8th St NE| Massillon, OH 44646
Tel: 330.837.6860 | Cell: 330.413.5905 | Fax: 330.830.6927 | http://www.affinitymedicalcenter.com

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

GC Exhibit ____426



August 3, 2015

*A Message from Wayne T. Smith, Chairman and Chief Executive Officer*

Community Health Systems, Inc. is announcing a major, strategic initiative today and I want you to hear directly from me why this is a very positive development for our entire organization. We plan to create a new publicly traded hospital company by spinning off a dynamic, high-quality group of 38 affiliated hospitals. Quorum Health Resources, LLC, which provides management and consulting services to 150 client hospitals, also will become part of the new corporation. The company will be named Quorum Health Corporation to leverage the existing strength of the Quorum brand and will be headquartered in Middle Tennessee.

Quorum Health Corporation will be comprised of hospitals that primarily operate in cities and counties with populations of up to 50,000 people. We know a lot about operating in markets like this. We understand how important these hospitals are to the well-being of their communities and how much residents rely on them for quality care, close to home. We believe these hospitals have opportunities and challenges that are distinctly different from other hospitals elsewhere in our system, especially in larger, more competitive markets.

Realigning our diverse portfolio into two strong companies will allow both organizations to respond to market dynamics with greater agility. Each company will be positioned to pursue its unique path to growth and will capably support its hospitals with defined operating strategies, access to capital and other essential resources.

Quorum Health Resources, LLC will be part of the new company because of its long and successful history of partnering with hospitals in markets similar to those in the spin-off. While this arm of the company will continue to provide expert management and consulting services to non-affiliated hospitals, we see great potential for sharing best practices and resources across the new organization, for the benefit of all of the physicians, employees, patients and communities that will be served by the new company.

This transaction will also enable Community Health Systems to direct the power of its energy and resources to the hospitals and healthcare providers that will remain with the company, so that we can accelerate growth strategies and strengthen our regional healthcare networks. After the spin-off is completed, we will continue to be one of the largest hospital operators in the nation, benefiting from the advantage of our size, with 160 affiliated hospitals in 22 states.

The spin-off will take several months to complete. We expect to finalize the transaction in the first quarter of 2016. We will communicate transition plans to hospital and company leaders in the weeks ahead, but you should not expect to see immediate changes in your daily operations. It is business as usual. Stay focused on the care of patients; they count on you in their time of need. Diligently apply our company's strategies to achieve operational excellence. Physician recruitment, capital investments and other resources will continue, uninterrupted. The success of this initiative requires that we emerge with two strong companies that are operating at the high level that is our standard, ready to embrace the opportunities ahead.

Times have changed since our company was formed thirty years ago. As we've grown exponentially in size, the marketplace, regulation, and economic realities have too. We must continue to adapt to these new circumstances and boldly seize opportunities that best provide for the well-being of our patients – in every location, without exception.

Our growth has been good. Now, progress takes a new form. Our future is brighter as two able, accomplished and respected companies. Thank you for helping to create our organization's lasting success – and for what you will do to keep it going into the future.

| | |
|---|---|
| **From:** | Vanessa Sylvester |
| **Sent:** | Friday, November 06, 2015 6:26 AM |
| **To:** | 'doncarmody'; Janice P..Ellis |
| **Cc:** | 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller; Michelle Mahon; James Moy; Teresa Mack |
| **Subject:** | FW:  RFI Quoum Health Corporationmich |

Mr. Carmody,

During our bargaining session yesterday (11-5-2015) I inquired as to when the employer excepts to respond to the Union's request for information regarding Quorum Health Corporation and the union's demand to meet and negotiate over related mandatory subjects of bargaining.  You had said that the employer would have the response shortly.  The initial request was made on 9-29-2015.  Please respond no later than 11-10-2015.  I've forwarded the correspondence.

**From:** Vanessa Sylvester
**Sent:** Friday, October 30, 2015 8:37 AM
**To:** doncarmody@bellsouth.net; Janice P. Ellis
**Cc:** 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller; Michelle Mahon; James Moy; Teresa Mack
**Subject:** RFI Quoum Health Corporation

Mr. Carmody,

As you know, the Union has been attempting to obtain information regarding CHS' plan to spin off 38 hospitals—including WCH, BCH, and AMC—into a new venture by the name of Quorum Health Corporation.  To date, you have refused to respond to those information requests and have failed to bargain in good faith about this matter.  With this message, the Union hereby reiterates its requests for relevant information (please see the forwarded original RFI on these subjects.)  Additionally, once we've received the requested information, the Union would like to arrange to meet with representatives of CHS, the affected hospitals, Quorum Health Corp., and the person(s) most knowledgeable about the proposed transaction to discuss the planned spinoff and negotiate over related mandatory subjects of bargaining.  We are available to meet in Canton, OH on November 18 or December 11.  If you have any questions, I am available by phone.  Kindly respond to this message by Tuesday, November 3, 2015.

Thank you,

Vanessa Sylvester

**From:** Vanessa Sylvester
**Sent:** Wednesday, October 21, 2015 5:46 PM
**To:** 'doncarmody'; Janice P. Ellis
**Cc:** 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller
**Subject:** FW: RFI Quoum Health Corporation

Mr. Carmody,

Around September 29, 2015, the Human Resource Directors from WCH, BCH, and AMC responded by email with identical text to an information request that I had sent to you and Jan on September 21, 2015.  They stated that they were "unclear as to the entity from which you are requesting information."  I am not sure what the confusion is that you have directed them to describe.  BCH, WCH and AMC are CHS facilities, and CHS intends to make these facilities part of QHC in early 2016.  The Employer (CHS) has access to the requested

GC Exh. 427

information and must provide it.  CHS's confusion over its own identity is not an excuse to deny the Union information that is relevant to bargaining.  I have forward the September 21, 2015 request for your convenience.  Please let me know when we can expect the requested documents.

---

**From:** Vanessa Sylvester
**Sent:** Monday, September 21, 2015 4:08 PM
**To:** 'doncarmody'; Janice P. Ellis
**Cc:** 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller; James Moy; Teresa Mack; Michelle Mahon
**Subject:** RFI Quoum Health Corporation


On August 3, 2015, CHS issued a press release stating that it intends to create a new, publically traded entity called Quorum Health Corporation (QHC).  The new entity will include Quorum Health Resources and 38 hospitals including Affinity Medical Center, Barstow Community Hospital, and Watsonville Community Hospital where the RNs are represented by CNA/NNOC.   On August 20, 2015, CHS notified the union of this development in written correspondence.  On September 4, 2015, CHS and QHC issued an SEC Form 10 Information Statement elaborating on the proposed spin-off.

On the basis of these communications, CNA/NNOC has reason to believe that CHS' proposed spinoff of QHC will impact our bargaining unit members' working conditions. Additionally, the Union has reason to suspect that QHC and CHS will function as a single-employer and/or joint-employer of bargaining unit nurses. Therefore, in order to understand the nature of the proposed spin-off, and in order to carry out our representational duties, the Union requests the following information:

1. The address or addresses of QHC.

2. The list of the current or proposed Board of Directors or Trustees.

3. The name and contact information of the CEO, Director of HR, Director of Labor Relations.

4. An organization chart showing the directors, officers, and key employees of QHC.

5. Copies of all proposed QHC work rules, employment manuals, office manuals, policy manuals, codes of behavior, codes of ethics, and/or statements of policy (e.g., sexual harassment policy, computer use policy) which presently apply or will apply to the bargaining unit members at QHC hospitals.

6. A list of all persons with the authority to review, modify, or rescind the policies listed above, along with their job titles and office address(es).

7. The current and/or proposed staffing plans for QHC operated facilities.

8. A list of all persons with the authority to review, modify, or rescind the staffing plans listed above, along with their job titles and office address(es).

9. A complete description of the following plans and benefits for nurses at those facilities that CHS intends to transfer to the newly formed QHC:  health and dental benefits, short and long term disability, and life insurance.

10. A complete description of retirement benefits for nurses at those facilities that CHS intends to transfer to the newly formed QHC.

11. A copy of any agreements for administrative services, including those relating to the administration of payroll and benefits, between QHC and CHS, including their respective parent organizations, subsidiaries, and/or affiliates.

2

12. A copy of any contracts, leases, guarantees, licensing agreements or other written agreements between QHC and CHS (including their respective parent organizations, subsidiaries, and/or affiliates), including without limitation, a copy of the Separation and Distribution Agreement between CHS and QHC , as well as the Tax Matters Agreement, the Employee Matters Agreement, the Transition Services Agreements and the other ancillary agreements referred to in CHS/QHC's September 4, 2015 SEC Form 10 Information Statement.

13. Any documents describing, concerning or memorializing any proposed transfers of assets or funds between QHC and CHS, including their respective parent organizations, subsidiaries, and/or affiliates, including but not limited to any loans or payments.

14. Any documents showing costs incurred or that will be incurred by CHS, including its parent organizations, subsidiaries, and/or affiliates, that are or will be attributable to QHC, its parent organizations, subsidiaries, and/or affiliates.

15. A list by name, title and department, of any in-house counsel, in-house financial or accounting personnel, in-house human resources personnel or in-house communications or publicity personnel for CHS, including its parent organizations, subsidiaries, and/or affiliates, who have performed or will perform services for QHC, its parent organizations, subsidiaries, and/or affiliates.

16. Any documents memorializing, setting forth or addressing the type or quantity of services rendered to QHC by any of the persons referred to in Requests 15 above.

17. Any documents memorializing, setting forth or addressing any payments made or anticipated to be made by QHC for the services rendered to it by any of the persons referred to in Requests 15 above.

18. A copy of any agreement or other document contemplating, concerning, addressing or memorializing any payment by CHS, including its parent organizations, subsidiaries, and/or affiliates, to any other person or entity for services performed for or on behalf of or goods provided to QHC, its subsidiaries or affiliates.

19. A list of any and all banks or other financial institutions at which both CHS and QHC, including their respective parent organizations, subsidiaries, and/or affiliates, have or will have accounts.

20. A list of any and all accounting firms, advertising firms, law firms, public relations firms, actuarial firms, consultants, banks, financial institutions, and vendors that have provided or will provide services or goods to both CHS and QHC, including their respective parent organizations, subsidiaries, and/or affiliates.

21. A list of all CHS hospitals that will be part of the proposed QHC spinoff, as well as a list of their directors, officers, and key employees.

There may be additional items the Union will find necessary.  Please contact me if you have any questions.

Vanessa Sylvester
Maine Collective Bargaining Coordinator
Maine State Nurses Associaiton/National Nurses United
vsylvester@nnoc.net
207-441-6762



www.NationalNursesUnited.org
@NationalNurses

3

| | |
|---|---|
| **From:** | Vanessa Sylvester |
| **Sent:** | Friday, November 06, 2015 6:26 AM |
| **To:** | 'doncarmody'; Janice P. Ellis |
| **Cc:** | 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller; Michelle Mahon; James Moy; Teresa Mack |
| **Subject:** | FW: RFI Quoum Health Corporationmich |

Mr. Carmody,

During our bargaining session yesterday (11-5-2015) I inquired as to when the employer excepts to respond to the Union's request for information regarding Quorum Health Corporation and the union's demand to meet and negotiate over related mandatory subjects of bargaining. You had said that the employer would have the response shortly. The initial request was made on 9-29-2015. Please respond no later than 11-10-2015. I've forwarded the correspondence.

---

**From:** Vanessa Sylvester
**Sent:** Friday, October 30, 2015 8:37 AM
**To:** doncarmody@bellsouth.net; Janice P. Ellis
**Cc:** 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller; Michelle Mahon; James Moy; Teresa Mack
**Subject:** RFI Quoum Health Corporation

Mr. Carmody,

As you know, the Union has been attempting to obtain information regarding CHS' plan to spin off 38 hospitals—including WCH, BCH, and AMC—into a new venture by the name of Quorum Health Corporation. To date, you have refused to respond to those information requests and have failed to bargain in good faith about this matter. With this message, the Union hereby reiterates its requests for relevant information (please see the forwarded original RFI on these subjects.) Additionally, once we've received the requested information, the Union would like to arrange to meet with representatives of CHS, the affected hospitals, Quorum Health Corp., and the person(s) most knowledgeable about the proposed transaction to discuss the planned spinoff and negotiate over related mandatory subjects of bargaining. We are available to meet in Canton, OH on November 18 or December 11. If you have any questions, I am available by phone. Kindly respond to this message by Tuesday, November 3, 2015.

Thank you,

Vanessa Sylvester

---

**From:** Vanessa Sylvester
**Sent:** Wednesday, October 21, 2015 5:46 PM
**To:** 'doncarmody'; Janice P. Ellis
**Cc:** 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller
**Subject:** FW: RFI Quoum Health Corporation

Mr. Carmody,

Around September 29, 2015, the Human Resource Directors from WCH, BCH, and AMC responded by email with identical text to an information request that I had sent to you and Jan on September 21, 2015. They stated that they were "unclear as to the entity from which you are requesting information." I am not sure what the confusion is that you have directed them to describe. BCH, WCH and AMC are CHS facilities, and CHS intends to make these facilities part of QHC in early 2016. The Employer (CHS) has access to the requested

1

GC Exh. 426 428

information and must provide it. CHS's confusion over its own identity is not an excuse to deny the Union information that is relevant to bargaining. I have forward the September 21, 2015 request for your convenience. Please let me know when we can expect the requested documents.

---

**From:** Vanessa Sylvester
**Sent:** Monday, September 21, 2015 4:08 PM
**To:** 'doncarmody'; Janice P. Ellis
**Cc:** 'Kristi_Abundis@chs.net'; 'Boyle, Angela'; Michelle Miller; James Moy; Teresa Mack; Michelle Mahon
**Subject:** RFI Quoum Health Corporation


On August 3 2015, CHS issued a press release stating that it intends to create a new, publically traded entity called Quorum Health Corporation (QHC). The new entity will include Quorum Health Resources and 38 hospitals including Affinity Medical Center, Barstow Community Hospital, and Watsonville Community Hospital where the RNs are represented by CNA/NNOC. On August 20, 2015, CHS notified the union of this development in written correspondence. On September 4, 2015, CHS and QHC issued an SEC Form 10 Information Statement elaborating on the proposed spin-off.

On the basis of these communications, CNA/NNOC has reason to believe that CHS' proposed spinoff of QHC will impact our bargaining unit members' working conditions. Additionally, the Union has reason to suspect that QHC and CHS will function as a single-employer and/or joint-employer of bargaining unit nurses. Therefore, in order to understand the nature of the proposed spin-off, and in order to carry out our representational duties, the Union requests the following information:

1. The address or addresses of QHC.

2. The list of the current or proposed Board of Directors or Trustees.

3. The name and contact information of the CEO, Director of HR, Director of Labor Relations.

4. An organization chart showing the directors, officers, and key employees of QHC.

5. Copies of all proposed QHC work rules, employment manuals, office manuals, policy manuals, codes of behavior, codes of ethics, and/or statements of policy (e.g., sexual harassment policy, computer use policy) which presently apply or will apply to the bargaining unit members at QHC hospitals.

6. A list of all persons with the authority to review, modify, or rescind the policies listed above, along with their job titles and office address(es).

7. The current and/or proposed staffing plans for QHC operated facilities.

8. A list of all persons with the authority to review, modify, or rescind the staffing plans listed above, along with their job titles and office address(es).

9. A complete description of the following plans and benefits for nurses at those facilities that CHS intends to transfer to the newly formed QHC: health and dental benefits, short and long term disability, and life insurance.

10. A complete description of retirement benefits for nurses at those facilities that CHS intends to transfer to the newly formed QHC.

11. A copy of any agreements for administrative services, including those relating to the administration of payroll and benefits, between QHC and CHS, including their respective parent organizations, subsidiaries, and/or affiliates.

12. A copy of any contracts, leases, guarantees, licensing agreements or other written agreements between QHC and CHS (including their respective parent organizations, subsidiaries, and/or affiliates), including without limitation, a copy of the Separation and Distribution Agreement between CHS and QHC, as well as the Tax Matters Agreement, the Employee Matters Agreement, the Transition Services Agreements and the other ancillary agreements referred to in CHS/QHC's September 4, 2015 SEC Form 10 Information Statement.

13. Any documents describing, concerning or memorializing any proposed transfers of assets or funds between QHC and CHS, including their respective parent organizations, subsidiaries, and/or affiliates, including but not limited to any loans or payments.

14. Any documents showing costs incurred or that will be incurred by CHS, including its parent organizations, subsidiaries, and/or affiliates, that are or will be attributable to QHC, its parent organizations, subsidiaries, and/or affiliates.

15. A list by name, title and department, of any in-house counsel, in-house financial or accounting personnel, in-house human resources personnel or in-house communications or publicity personnel for CHS, including its parent organizations, subsidiaries, and/or affiliates, who have performed or will perform services for QHC, its parent organizations, subsidiaries, and/or affiliates.

16. Any documents memorializing, setting forth or addressing the type or quantity of services rendered to QHC by any of the persons referred to in Requests 15 above.

17. Any documents memorializing, setting forth or addressing any payments made or anticipated to be made by QHC for the services rendered to it by any of the persons referred to in Requests 15 above.

18. A copy of any agreement or other document contemplating, concerning, addressing or memorializing any payment by CHS, including its parent organizations, subsidiaries, and/or affiliates, to any other person or entity for services performed for or on behalf of or goods provided to QHC, its subsidiaries or affiliates.

19. A list of any and all banks or other financial institutions at which both CHS and QHC, including their respective parent organizations, subsidiaries, and/or affiliates, have or will have accounts.

20. A list of any and all accounting firms, advertising firms, law firms, public relations firms, actuarial firms, consultants, banks, financial institutions, and vendors that have provided or will provide services or goods to both CHS and QHC, including their respective parent organizations, subsidiaries, and/or affiliates.

21. A list of all CHS hospitals that will be part of the proposed QHC spinoff, as well as a list of their directors, officers, and key employees.

There may be additional items the Union will find necessary.  Please contact me if you have any questions.

Vanessa Sylvester
Maine Collective Bargaining Coordinator
Maine State Nurses Associaiton/National Nurses United
vsylvester@nnoc.net
207-441-6762



www.NationalNursesUnited.org
@NationalNurses

<u>EXHIBIT NOT SUBMITTED</u>

GENERAL COUNSEL 's Exhibit No. 429

Case Name_____DHSC_____ (✓) Identified

Docket No._____08-CA-117890_____ (☐) Received

Date_____3-07-17_____ (☐) Rejected

This exhibit is not being submitted with this case because it was:

(✓) Identified, but not offered in evidence;

(☐) Identified, received, but withdrawn from evidence;

(☐) No duplicate was furnished to the Reporter;

(☐) Withdrawn by _____
     in order to make duplicate(s);

(☐) Retained in the possession of _____

_____

(☐) Other _____

_____

_____

_____
Signature of Presiding Official

DHSC, LLC d/b/a AFFINITY MEDICAL
CENTER
Case 08-CA-111260

## Confidential Witness Affidavit

I, Maureen Piersol , being first duly sworn upon my oath, state as follows:

I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.

I reside at

My home telephone number (including area code) is:

My cell phone number (including area code) is:      330-832-8761 ext. 1266

My e-mail address is:

I am  employed by            Affinity Medical Center

located at      875 8th Street N.E., Massillon, Ohio 44646

I began my employment with Affinity Medical Center in 1994.  At that time, the hospital was called Doctor's Hospital of Stark County.  I am a registered nurse.  I am the nursing supervisor for the clinical areas in the hospital. I am assigned to the "house" and am the house supervisor in charge, and considered the supervisor of the nurses on the shift.  I am involved in bed placement (assigning patients that are coming to the hospital a bed), staffing of units on the off hours (staffing of employees that care for patient including nurses); I also supervise nurses during the off hours (when the director of the unit or manager is not present- that is considered "off hours") I supervise all employees in the hospital including registered nurses, licensed practical nurses, nurses assistants, technicians, any employee that is "clocked in."

CC  EX
GC   EX 429

Privacy Act Statement
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  Additional information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary.  However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

- 1 -

Initials _____

Case 08-CA-111260                                                   5/29/2014

I am familiar with Michelle Custer.  ~~Custer~~ [she] is a registered nurse.  Sometime in August of 2013, I was at a meeting along with Beth Varner.  At that time Beth Varner was the house supervisor and I was the Director of Medical Surgical Unit.  Beth Varner told me that Michelle Custer had just called down inappropriately to administration – and that ~~Custer~~ [Michelle] spoke with Pamela Hughes, assistant to the Chief Executive Officer, and screamed at Pamela Hughes over the phone regarding her (Michelle's) situation up on the floor.  I told Beth that I was going to go up to the floor to talk with Michelle privately in order to help her focus on her work because she was out of control.  That was the extent of my conversation with Beth.

At that point, I went up to the floor (2200) and I saw Michelle in the med room which is enclosed and I entered the room and I asked Michelle what was going on, what was the problem.  Michelle replied that we don't have enough staff.  I stated that this was the first I am hearing anything about this issue.  I told Michelle that she needed to calm herself down in order to focus on her job and that she needed follow the Chain of Command which would have been to come to me as the Director with her problem (of Med/Surg).  By Chain of Command, I am referring to a policy that the hospital has in place that states that when an employee has an issue what person in the level or Chain of Command ~~what person they~~ [that] should speak to.  I do not know if Michelle was aware of the [written] Chain of Command [policy] prior to our conversation, but I do know that Michelle & all nurses [Med/Surg knew to come to me] I then told Michelle that screaming at Pam Hughes, the assistant to the CEO, was not appropriate behavior for an employee and that Pam Hughes was very disturbed by her call.  Michelle told me that she did not have lunch and I told her that Beth and I were working on getting staffing and that we would send food from the cafeteria up for the employees.  Michelle appeared to have calmed down.  I stayed on the unit for an hour plus and helped out by answering call lights, phones and offered to help the nurses including Michelle.

Initials: _____

Case 08-CA-111260                                                5/29/2014

During the course of the week, I filled out a form indicating that I verbally counseled

Michelle Custer about the incident with Pam Hughes.  A verbal counseling is not considered a

~~like a suspension~~ *it's a* punitive measure it's more of an informative measure.  It is a way for you counsel an employee

about a policy or procedure *or* ~~behavior~~.  This form is marked as E-29.  I dated this form 8/22/2013

and this date reflects ~~that~~ *the* date that I met with Michelle Custer and ~~Kylee~~ *Kiley* Drake, Human

Resource generalist, to present this form to Michelle.  I cannot recall if I called Michelle Custer

down to HR or if I asked the secretary to ask Michelle to come to HR.

Michelle came to Kylee's office and I repeated to Michelle what I had said in the med

room about a week ago regarding the issues of Community Cares (policy that deals with how we

treat one ~~and~~ *with respect* other as colleagues and how we treat patients and visitors) *with respect*, and also about the issue

of Chain of Command, that she needed to follow the Chain of Command that she needed to talk

with me and if I was not there that she should speak with the House Supervisor or the Nursing

Coordinator.  Michelle violated the Chain of Command by not first coming to the Charge Nurse

and then if there was no success, she should have contacted me *if I'm there* or Beth Varner *if I'm not* since we are on

the same level, then she could go to the CNO Bill Osterman.  ~~Anita~~ *Oneida* Benjamin is Bill Osterman's

assistant.  Both Pam Hughes and ~~Anita~~ *Oneida* answer the phone.  I do know that Michelle ~~asked to~~ *demanded*

speak with Bill Osterman when Pamela Hughes answered the phone.  I cannot recall who the

Charge Nurse was that day.  I do not know if Michelle contacted the Charge Nurse before she

contacted Pam  to speak with Bill Osterman.  I knew that the Chain of Command was violated

because I was not contacted by Michelle prior to her calling Pam.  Also, on the day of the

incident, Beth told me that Pam Hughes called down something about staffing and Beth told me

that she did not know what the problem was. Beth said Michelle was out of control and angry

and screamed at Pam Hughes and this is when I said that I was going to go up there. This is how

- 3 -                                 Initials: _MD_____

Case 08-CA-111260                                    5/29/2014

I know that Michelle had not contacted Beth Varner prior to contacting Pam Hughes. Nursing

Coordinator and Nursing Supervisor are all synonyms for Beth Varner's position, *to* *is* *(Patient Care Assistant)*

On the verbal counseling form, I wrote that on 8/17/13, the PCA reported "She

(Michelle) didn't bother to learn my name. She called me Aide instead of my name. She wouldn't

help me with any of her patients" I wrote this on the verbal counseling form because it was part

of the Community Cares violation of the policy. The Aide Chikia Brunner, informed me how hurt

she was and upset that Michelle wouldn't even bother to learn her name and kept calling her Aide

for 12 hours and "ordered her around" to do things and treated her "like a slave." I believe I had this

conversation with Chikia sometime before 8/22/13 but after 8/17/13. I do not know the exact

date. When I met with Michelle to give her this form, I counseled Michelle about the incident

with Chikia as well. Michelle stated that she could not remember her name (referring to the *Chikia* *mp*

Aide). I asked Michelle to sign the verbal counseling form and Michelle stated that she was not

going to sign it. I gave a copy of it to Michelle. Michelle also received a pamphlet regarding

*for anger management. mp*

EAP. I do not recall if Michelle brought up or mentioned the Union in this meeting. I did not

mention the Union in this meeting. Kylee attended this meeting. I do not recall if Kylee

mentioned the Union in this meeting. .        Michelle never handed me or tried to give me an

ADO form ever. I am familiar with what an ADO form is. I recall that I did receive one ADO

form in my mailbox but I cannot recall if it was before this incident with Michelle. The ADO

form was about night staffing in 2200. I recall that this ADO form had several signatures on it

that appeared to all be in the same handwriting. I don't recall if Michelle's name was on it but I

do recall that the ADO concerned night shift staffing (7 p to 7 a) and Michelle works 7 a to 7 p.

I have only received one ADO form and that was the one in that was left in my mailbox.

- 4 -

Initials: _____ *mp* _____

Case 08-CA-111260

5/29/2014

I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this Confidential Witness Affidavit consisting of 5 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.

Date:  May 29, 2014      Signature:  _Maureen Piersol_
                                               Maureen Piersol

Signed and sworn to before me on  _5-29-14_  at

_Cleveland, Ohio_

_Sharlee Cendrosky_
SHARLEE CENDROSKY
Board Agent
National Labor Relations Board

- 5 -

Initials: _____

— NOV 5 2015 — / mgmt

V— Venessa — typed Notes refer to;

except for

(Walk out) →

around 10:40

Returned

Reiterated Ask for Information request regarding Document 3 again letting them know They have a choice Merely giving us another Comprehensive proposal =

also give Medical notation + rows of work proposals

Caucus

D— Compared + day w/ last PROPOSAL — Mostly prevailed us That = Why need to Change =

— Stood on our last a — weekend (work)

Non-Substantive About That =

A

1

— 185

Weekend work = Info request

— Essence w/ π (only 11 day Schedule)
   is evy third weekend

— A— has opts

— discuss of weekend covrge — enable
   us to schedul more effectvly =

—
   (Study on last proposal)        only about
                                    weekend
                                    work

— D — would have so many proposals =

A — even other hospituls =)

= our proposal would not make us
   schedul where we need to Schedule
   RNs every other weekend =

= hev recruitment + retention —

                          (=
                          DON

                          = Not Chevy or he
                            word —
                            of oct 6th
Not Presentatn —         Package proposal

— Not more off on the Packge proposal
       DON — word —

Care
Bargain update

• CHS/Quorum Corp. has Given
our team a comprehensive proposal.
While there are some benefits
+ protection included as a whole,
it is still unacceptable. the proposal
includes:

1) NO Safe Staffing or ~~PD~~
Input Professional practice,
Patient Safety

2) NO grievance procedure w/
binding arbitrat. — we need a
fair set of Rules that RNS
~~able to~~ that the hospital must
follow.

3) Ridiculous + insulting
Language that takes away all
of our contract + legal rights.
Unacceptable

4) NO improvement in wages = Still
keeping them raises — will
not help w/ recruit + retent.

5) Protect, keep current levels
of HI, PTO, & other

3 of 5

4 of 5

Finished
oracle Comparison Flyer

- Next time:
    Careers Seniority / ATO
    CERNER - technology
    go thru that prepare for a discussion.

5 of 5

file://///cna-fnp-01/Division Resources/CHS/Quorum/Quorum Health Cor...

| From: | Vanessa Sylvester |
|---|---|
| Sent: | Monday, November 23, 2015 3:51 PM |
| To: | 'doncarmody' |
| Cc: | Janice P. Ellis |
| Subject: | FW: RFI Quoum Health Corporationmich |

Mr. Carmody,

Your email establishes that you have purposely evaded the Union's requests for information and demand to bargain. Anyone approaching these matters in good faith would have long ago furnished the requested information and submitted to the collective bargaining process. You, on the other hand, are dedicated to delay and causing confusion. That is, rather than respond, you would prefer to continue playing the CHS corporate shell game. We don't have time for such nonsense. If you intend to make a substantive response on behalf of the CHS Hospitals you represent, you should do so immediately.

**From:** doncarmody [mailto:doncarmody@bellsouth.net]
**Sent:** Thursday, November 12, 2015 11:14 PM
**To:** Vanessa Sylvester
**Cc:** Janice P. Ellis
**Subject:** Re: RFI Quoum Health Corporationmich

On September 21, 2015, you forwarded an E-Mail to Jan Ellis and me with the subject matter entitled "RFI Quorum Health Corporation", which was referred to DHSC, LLC d/b/a Affinity Medical Center, Hospital of Barstow, Inc. d/b/a/ Barstow Community Hospital, and Watsonville Hospital Corporation d/b/a Watsonville Community Hospital, respectively, for a response, those being the only legal entities addressed with which your organization has collective bargaining relationships (the "Hospitals").

Thereafter, Human Resources replied on behalf of each Hospital, asking you to clarify what legal entity or entities you were seeking information from relative to the announced Quorum transaction.

On October 21, 2015, you communicated, again by E-Mail to Jan Ellis and me, and broadly asserted that "CHS" is "The Employer" with the obligation to provide your requested information.

Then, on October 30, 2015, you communicated by E-Mail to Jan Ellis and me, again, incorporating your two prior requests by reference, and asking for a meeting with " . . . representatives of CHS, the affected hospitals, Quorum Health Corp. and the person(s) most knowledgeable about the proposed transaction . . ."

Now, your most recent E-Mail to Jan Ellis and me of November 6, 2015, to which this is a reply, makes a vague reference to "the employer" (Parenthetically, although you also attempt to attribute to me some reference to "the employer", what I merely told you, without any specific identification of any particular entity, was that it was my understanding that a response was underway).

At this point, you must advise whether you are asking that the Hospitals provide you with the information being sought concerning the Quorum transaction, in order that the Hospitals can provide you with an informed response in such circumstances.

GC Ex  431

4

Bates # 0047

**From:** Vanessa Sylvester
**Sent:** Monday, January 04, 2016 7:12 AM
**To:** 'doncarmody'
**Cc:** Janice P. Ellis; James Moy; Teresa Mack; Michelle Mahon
**Subject:** FW: Watsonville Community Hospital: C.N.A. / Request for Information Re Quorum Health Corporation / Your E-Mail of December 16, 2015

Mr. Carmody,

The Union expects the employer to provide the items requested in the September 21 request for information regarding the spinoff of Quorum Health Corporation. This information is critical to enable meaningful collective bargaining at Barstow Community Hospital as well as all the other facilities, Affinity and Watsonville.  The Union also expects you to make a representative available who has the knowledge to answer any questions about the proposed transaction, as well as the authority to bargain over related mandatory subjects of bargaining.

The Employer cannot credibly claim it was confused by the Union's clear and repeated demands for information regarding the proposed spin off of Affinity, Barstow, and Watsonville into QHC. The Union responded to the August 20, 2015 announcement of the "impending" spinoff with a September 21, 2015 information request directed to you, the chief negotiator for all the hospitals as well as counsel for CHSI, and copying the local HR Department for each facility. You are well aware that CNA/NNOC views the affiliated hospitals and CHSI and/or CHSPSC as a single and/or joint employer and that the new entity is being created by CHSI.  Your purported inability to determine the entity from which the Union is seeking information appears to be a thinly veiled attempt to get the Union to disavow the single/joint employer relationship between the affiliates and CHSI.  Indeed, you have not claimed that the affected hospitals do not possess the requested information, nor can you contend that they do not have a duty to furnish the information—because you know that the parties you claim to represent have access to this information and an obligation to furnish it, given the circumstances of the proposed spinoff. Your persistent violation of your duties has had no other effect, and no other purpose, than to frustrate the possibility for any meaningful bargaining on the subject of the proposed QHC spinoff. As I have stated more than once in the past—you have a duty to produce any and all information responsive to the requests.

Your December 22 "response" on behalf of Watsonville was woefully inadequate. As you are well aware, an employer cannot satisfy its duty to furnish relevant information by pointing the Union to publicly available sources <u>months after</u> the request was made. We expect you to respond to each item of the September 21 request, on behalf of Barstow, Watsonville, and Affinity.

In the meantime, until you comply with your duty to bargain in good faith, no entity should alter any of the nurses' existing terms and conditions at any of the affected hospitals. In other words, to the extent you (on behalf of any of the entities you purport to represent) believe that the QHC spinoff may impact nurses' working conditions, you must not implement such changes absent proper notice, bargaining, and our agreement. Please communicate your understanding and acceptance of this basic tenet of the collective bargaining process.

**From:** doncarmody [mailto:doncarmody@belisouth.net]
**Sent:** Tuesday, December 22, 2015 12:34 PM
**To:** Vanessa Sylvester

GC Ex 432                                     8

**Cc:** Kristi K. Abundis
**Subject:** Watsonville Community Hospital: C.N.A. / Request for Information Re Quorum Health Corporation / Your E-Mail of December 16, 2015

Ms. Sylvester:  This is in reply to your December 16th E-Mail to my Son, Bryan, relative to your request for information pertaining to the planned Quorum transaction vis-à-vis the mediation session scheduled for Watsonville, today.

Watsonville Community Hospital interprets your underlying E-Mail as the C.N.A. finally having answered – at least insofar as Watsonville is concerned, considering your reference to the mediation session at Watsonville today - the simple question posed to you consistently since your September 21st information request (we're unaware of a "September 29 request for information" mentioned in your E-Mail) as to whether your request was being directed to one or another of the Hospitals involved in the Quorum transaction.

Of course, the other Hospitals subject to the Quorum transaction remain in the dark.

The only information which you have now requested from Watsonville, and which Watsonville would have knowledge about, is the information that has been reported publicly, such as via filings with the Securities and Exchange Commission (including the Form 10 referred to in Item (12) of your request) and as described in the August 3rd press release already provided to you (mentioned in the opening line of your September 21st information request), as well as concerning benefits, as follows:

Item (3):         The name and contact information of the CEO is as follows:

                    Thomas D. Miller, Chief Executive Officer
                    4000 Meridian Boulevard
                    Franklin, TN 37067

Item (9):        The Nurses will continue to receive the same health and dental benefits, short and long term disability, and life insurance upon the closure of the planned Quorum transaction.

Item (10):        The Nurses will continue to receive the same retirement benefits upon the closure of the planned Quorum transaction.

Item (21):        A list of all CHS affiliated hospitals that will be a part of the proposed QHC spinoff is set forth on Page 9 of the Form 10 filed with the S.E.C. on September 4th and is included in the August 3rd press release.

A hard copy of this response will be furnished to you at today's mediation session.

Bates # 0052

| | |
|---|---|
| **From:** | Vanessa Sylvester |
| **To:** | Don T Carmody (doncarmody@bellsouth.net) |
| **Cc:** | Michelle Miller; "Kristi_Abundis@chs.net"; "Kiley.Drake@Affinitymedicalcenter.com"; Michelle Mahon; James Moy; Teresa Mack |
| **Bcc:** | Brendan White |
| **Subject:** | QHC Request for Information |
| **Date:** | Friday, April 15, 2016 5:40:00 PM |
| **Attachments:** | C.H.S. - Quorum Health Corporation - Press release Announcing Spin-Off....pdf |

Mr. Carmody,

CHS' belated messages announcing the April 29 completion of the Employer's proposed corporate spinoff is nothing more than another demonstration of the Employer's contempt for the collective bargaining process. As you know, and as recited in various pending complaints, the Employer has (1) failed and refused to furnish information about this transaction, (2) unilaterally and unlawfully implemented spinoff-related changes to RNs' terms and conditions of employment, and (3) in all other respects failed and refused to bargain over the creation of QHC. That is, the Employer has made no valid effort to negotiate with the Union over this transaction or its impacts. Your message is simply more of the same lawless behavior. Although, based on this past pattern of misconduct, I would have a hard time believing that you sent me this announcement a week late because you actually want to bargain in good faith—if I am wrong, please do not hesitate to contact me to schedule a meeting with a responsible representative of the Employer.

Vanessa Sylvester

GC Ex 433



**Affinity**
MEDICAL CENTER

To:    Employees
From:  Ron Bierman, CEO
Date:  April 29, 2016
RE:    Quorum Health Corporation Spin-off

Today, Community Health Systems completed the spin-off of Quorum Health Corporation, creating an entirely new, independent company with 38 hospitals in 16 states. Our future is very promising as an affiliate of Quorum Health. With the focus of the new company on hospitals like ours, we can expect specialized support so we can respond to the unique needs of our community.

We expect this to be a very smooth transition. Your pay rate, title and responsibilities remain the same. There are no changes to benefits or the 401k plan for those employees who participate in them. Our hospital leadership team, medical staff, employees and hospital name will all remain the same, and we will continue to have access to resources for safety and quality, operational excellence and financial health. Patients can continue to expect the same quality of care, and we will continue to provide charity care and pay taxes to our community.

Department leaders will be connecting with their new QHC corporate colleagues over the next few days to learn about any immediate changes or new policies. Unless you are instructed to use new policies or procedures, please continue to follow the ones you do today. If you have questions, please first ask your department director.

As we learn more, I look forward to sharing additional information with you about the transition process. In the meantime, attached to this memo is a letter from Tom Miller, CEO of QHC, he asked I share with you.

As always, thank you for all you do to support our hospital each day. I appreciate your hard work as we continue to provide patients with high quality care.

GC Ex 434

**To:** QHC Corporate Office, QHR Corporate Office, Hospital C-Suite
**Date:** April 29, 2016

**Welcome to Quorum Health!**

With 38 affiliated hospitals in 16 states, and 150 non-affiliated hospitals served by QHR, Quorum Health is already positioned to make a significant impact on the communities we serve.

So what does being part of Quorum Health mean?

**People.** It means that 14,000 employees are dedicated to improving the lives of the people who place their trust in our hospitals, whether you are a front-line caregiver or providing support behind the scenes. Each of your contributions is valued and important.

**Quality.** Quorum Health-affiliated hospitals are already leaders in quality and safety, with nearly three-quarters being named Top Performers on Key Quality Measures ® by The Joint Commission last year. But our work can never be done. We will always continue to place the highest priority on the delivery on safe care.

**Access.** The vast majority of affiliated hospitals – 84% – and many of the hospitals served by QHR are the sole providers of acute care in their community. We will continue to invest in our services, facilities and equipment so people can access the care they need close to home.

**Expertise.** Whether providing personalized care in affiliated hospitals, offering support from the corporate office or providing consulting solutions, Quorum Health is already an industry leader with deep hospital management experience.

A lot of time and resources have gone into completing the spin-off of Quorum Health, and there is still more to accomplish. But the most important part of what we do will never change, and that is to provide access to trusted healthcare services. Everyone's role in our organization – from physician practices to hospitals to the corporate office – is important to ensuring we live up to this commitment.

Thank you for all you do, every day, for your patients and your peers. I can't wait to see what we can d together.

Tom Miller
Chief Executive Officer

<u>EXHIBIT NOT SUBMITTED</u>

GENERAL COUNSEL 's Exhibit No. __435__

Case Name _____DHSC_____  (☐) Identified

Docket No. ____08-CA-117890____  (☐) Received

Date _____3-10-17_____  (☑) Rejected

This exhibit is not being submitted with this case because
it was:

(☐) Identified, but not offered in evidence;

(☐) Identified, received, but withdrawn from evidence;

(☐) No duplicate was furnished to the Reporter;

(☐) Withdrawn by _____
     in order to make duplicate(s);

(☐) Retained in the possession of _____

_____

(☐) Other _____

_____

_____

_____
Signature of Presiding Official

EXHIBIT NOT SUBMITTED

GENERAL COUNSEL 's Exhibit No. 436

Case Name_____DHSC_____ (☐) Identified

Docket No._____08-CA-117890_____ (☐) Received

Date_____3-10-17_____ (☑) Rejected

This exhibit is not being submitted with this case because it was:

(☐) Identified, but not offered in evidence;

(☐) Identified, received, but withdrawn from evidence;

(☐) No duplicate was furnished to the Reporter;

(☐) Withdrawn by _____
       in order to make duplicate(s);

(☐) Retained in the possession of _____

_____

(☐) Other _____

_____

_____

_____
Signature of Presiding Official

<u>EXHIBIT NOT SUBMITTED</u>

GENERAL COUNSEL 's Exhibit No. _____437_____

Case Name _____DHSC_____  (☐) Identified

Docket No. _____08-CA-117890_____  (☐) Received

Date _____3-10-17_____  (☑) Rejected

This exhibit is not being submitted with this case because it was:

(☐) Identified, but not offered in evidence;

(☐) Identified, received, but withdrawn from evidence;

(☐) No duplicate was furnished to the Reporter;

(☐) Withdrawn by _____
      in order to make duplicate(s);

(☐) Retained in the possession of _____

_____

(☐) Other _____

_____

_____


                              _____
                              Signature of Presiding Official

<u>EXHIBIT NOT SUBMITTED</u>

<u>GENERAL COUNSEL</u>___'s Exhibit No._____438_____

Case Name_____DHSC_____ ( ) Identified

Docket No._____08-CA-117890_____ ( ) Received

Date_____3-10-17_____ (✓) Rejected

This exhibit is not being submitted with this case because
it was:

( ) Identified, but not offered in evidence;

( ) Identified, received, but withdrawn from evidence;

( ) No duplicate was furnished to the Reporter;

( ) Withdrawn by _____
      in order to make duplicate(s);

( ) Retained in the possession of _____

_____

( ) Other _____

_____

_____

_____
Signature of Presiding Official

NNOC Counter Proposal 7-6-16

## ARTICLE 10. HOURS OF WORK AND OVERTIME

When changes in shifts, start time, and shift durations are anticipated, the Hospital shall notify the Union and the affected RNs at least (30) thirty days before implementation of the scheduled change.

### SECTION l. DAILY COMPENSATION

The straight-time workday for eight hour shift RNs shall be eight (8) hours of work, exclusive of a one-half (1/2) hour unpaid meal period. The straight-time workday for (10) hour shift RNs shall be ten hours of work, exclusive of a one-half (1/2) hour unpaid meal period. The straight-time workday for (12) twelve hour shift RNs shall be twelve (12) hours of work, exclusive of a one-half hour unpaid meal period.

### SECTION 1 (a). MEALS AND REST PERIODS

Each nurse shall be granted a rest period of fifteen (15) minutes during each four (4) hours of work without deduction in pay.

Nurses who work scheduled shifts of five (5) hours or more are entitled to a duty free unpaid meal period of thirty (30) minutes. Duty free includes but is not limited to RNs will not be required to carry pagers, work cell phones or perform work duties of any kind during such meals and rest periods. The hospital will provide adequate coverage during these meals and rest periods to insure patient safety. In the event a meal is missed, the RN must complete a Missed Meal Period From to submit to their supervisor. Time worked in lieu of meal periods will be considered for overtime purposes.

### SECTION 2. REST BETWEEN SHIFTS

When an 8-hour, 10-hour, or 12-hour Nurse has worked a shift of at least 15.5 hours, and then fails to receive an eight (8) hour rest before the next regular full shift, the Nurse shall receive time and a half pay for any hours worked in the subsequent shift. The Hospital reserves the right to change the existing time schedule to alter the day off so the nurse may be afforded an eight (8) hour rest period. The nurse may waive the provision of this article by specific request of the nurse and written agreement with the Hospital.

### SECTION 3. WEEKLY COMPENSATION

Work authorized in accordance with Hospital policy in excess of thirty-six (36) hours worked in the weekly pay period shall be compensated at the rate of time and one-half (1-1/2) the Regular rate of pay for day(s) on which the overtime is worked. Sick

GC Ex 439

**NNOC Counter Proposal 10-11-16**

## ARTICLE 12:  SENIORITY

### SECTION 1.  DEFINITION

    (a)    Seniority is defined as the length of time a RN has been continuously employed in any capacity by the Hospital predicated on the most recent date of hire.

### SECTION 2.  ACCRUAL

    (a)    A newly-hired RN's seniority shall commence after the completion of his/her probationary period and shall be retroactive to the date of his/her last hire.

    (b)    Seniority shall accrue during a continuous authorized leave of absence with or without pay, provided the RN returns to work immediately following the expiration of such leave.

### SECTION 3.  APPLICATION

    (a)    Seniority shall be **the** factor in determining the eligibility for computation of benefits and the selection of PTO.

### SECTION 4.  TERMINATION OF SENIORITY

Seniority shall be terminated by voluntary resignation, discharge for just cause, (12) twelve months of unemployment as a result of reduction in staff, or failure to return from a leave of absence in accordance with the terms of the leave.  A RN who is re-employed following termination of seniority shall be considered as a newly-hired RN for all purposes under this Agreement.

GO Ex 440

**SECTION 5. RESTORATION OF STATUS**

RNs who maintain the same skill level and return to employment in accordance with the provisions of this article within twelve (12) months of the date of separation shall be restored to their former status with respect to seniority, salary classification and all fringe benefits; however, there shall be no accumulation of earnings or benefits during the period of separation, nor shall the Hospital be required to provide any insurance coverage that may have lapsed until such coverage has been re-applied for by the RN. In the event of such a re-application by the RN, the coverage, if granted, shall be effective as of the earliest possible date consistent with the hospital's policy.

**NNOC Counter Proposal 10-11-16**

## ARTICLE 13:  LOW CENSUS ROTATION/LAYOFF

SECTION 1.    LOW CENSUS ROTATION.

When low patient volume requires adjustment in staffing, low census and/or on-call time will be assigned within a department or job code in the following descending order of priority:

  1.) Volunteers requesting low census under guidelines established by the Hospital

  2.) Agency/contracted RNs

  3.) Per Diem RNs.

  4.) Part time RNs working above their approved scheduled hours.

  5.) Regular full-time and regular part-time RNs.

Low census days/hours shall be rotated in accordance with applicable Hospital policies and procedures.  The Hospital will endeavor to rotate low census days/hours equitably among all RNs within a department/unit, providing skills, competence, ability and availability are considered substantially equal as determined by the Hospital.

The Hospital may assign low census days/hours on a partial or full-shift basis, in its discretion.  RNs assigned a partial shift low census after reporting to work shall be entitled to pay for time worked in accordance with Ohio State Wage and Hour regulations, or two (2) hours of pay at their base rate, whichever is greater.

In administering low census days/hours, the Hospital will maintain a skill level mix appropriate to the remaining patient requirements.  RNs may elect to use accumulated, unused PTO to be compensated for hours lost due to the low census assignment.

A regular RN taking voluntary or mandatory low census shall not have his/her PTO and EIB leave accrual rates reduced as a result of the low census assignment, and shall have the option of using accrued PTO.

SECTION 2:  LAYOFF

*3*

In the event the Hospital determines to conduct a layoff, the Hospital will ~~attempt to~~ communicate information about the impending layoff **30 days or more prior to implementation.** ~~as soon as possible. However, management reserves the right to alter the layoff procedure and withhold detailed information about the layoff as confidential business information, as permitted by law, in order to protect the Hospital's business interests.~~

RNs will be laid off and recalled in order of seniority with the Hospital consistent with provisions provided below, in the reasonable judgment of the Hospital, they have the qualifications and ability to competently perform the available work with a reasonable orientation period, not to exceed eighty (80) hours over a period not to exceed (30) calendar days.

Fo purposes of recall following a reduction in staff and subject to the paragraph above, seniority shall be applied in the reverse order of reduction in staff. If the positions, and if the Hospital has laid of RNs, the Hospital will first offer such positions to laid off RNs, in accordance with seniority.

## SECTION 3.   RECALL AND REHIRE

When a vacancy exists, the Hospital will give priority to rehiring any qualified RN interested in the position who was terminated from any hospital for reasons other than for cause.

a.    **If Rehired Within 90 Days**

A RN rehired after an absence of 90 days or less:

☐ Will have his/her seniority date restored;

☐ Will have paid benefits restored the first of the following month, if eligible;

☐ May enroll in elective benefits the first of the following month, if eligible;

☐ May begin or resume participation in the 401(k) plan as of the next permitted enrollment/reenrollment date, if eligible; and

☐ Will have accrued EIB as of his/her termination date restored.

b.    **If Rehired After 90 Days**

A RN rehired after an absence of more than 90 days will be treated as a newly hired RN. New pre-employment tests and benefit waiting periods will apply. Such RNs must also demonstrate skills competency as required by their position prior to resuming their duties, and should attend annual reorientation sessions. If less than 12 months has elapsed since such

rehired RN attended a mandatory annual reorientation session, the RN should attend reorientation within the same timetable as would have applied if their employment had not ended.

**NNOC Counter Proposal 10-11-16**

**ARTICLE 14: POSITION POSTING AND FILLING OF VACANCIES**

**SECTION 1. POSTING**

(a) Staff positions under this Agreement which are permanently vacated or newly created by the Hospital shall be posted on the Hospital website for a minimum of **seven (7)** calendar days. The notice shall generally include the job title, pay grade, salary range, and a summary of position duties, FTE, any special demands (such as extensive weekends, holidays, etc.), position requirements (such as experience or educational requirements, person to contact, and instructions how to apply. Job descriptions shall be available in the Human Resources Department. Qualifications shall be the required skills, license, certification, education, experience and ability to perform in the position at the required level with normal orientation to the unit and its procedures.

To be eligible for consideration, RNs must file an application to fill a posted vacancy during the posting period. Any non-probationary RN with a satisfactory work record in his/her present job and who also meets the minimum qualifications may apply to transfer to fill such vacancy. The Hospital may disqualify an applicant who has less than six (6) months service in his/her current position or who is not currently in good standing in their present position. The Hospital will transfer the most qualified applicant on the basis of comparative qualifications, skill, ability, education, experience and seniority. Where the qualifications, skill, ability, education and experience of two or more applicants are reasonably equal, the Hospital will award the transfer to the applicant with the greatest bargaining unit seniority. If no applicant from the bargaining unit is qualified for the position, the Hospital may hire from outside the bargaining unit.

(b) Where a vacancy as defined herein becomes available on a particular unit, classification, shift, and category of employment (i.e. full-time or part-time), and a non-probationary RN in that unit, classification and category of employment desires a change to that shift, he/she shall be placed in that position. In the event more than one such RN requests the transfer, bargaining unit seniority shall prevail.

7

(c)    A vacancy is defined as an opening in a bargaining unit position which the Hospital has decided to fill with a regular RN.  The Hospital retains the discretion to not fill an open position.

## SECTION 2.  PREFERENCE IN FILLING VACANCIES

All RNs may apply for such permanent vacancy or newly created position and shall be given preference in filling such vacancy based on bargaining unit seniority, provided: 1) the RN is, in the reasonable judgment of the Hospital, equally competent and able as compared to other applicants for the vacancy; and 2) approval of the applicant will not adversely affect patient care/hospital operational efficiency.  Delay of transfer into the position by reason of (2) shall not exceed sixty (60) calendar days unless the RN and the Hospital agree, in writing.

For purposes of this Article, Per Diem RNs shall accumulate time for purposes of bidding for posted positions only, one month for each 166 hours of work and shall have equal rights with Regular RNs.

If a Per Diem RN is awarded a Regular position:  (1) the RN will be eligible to be covered under the health plan on the first of the month following the date of change in status as long as the RN has completed at least 30 days of employment. **RNs will be allowed to utilize any sick leave benefits accrued immediately.**

## SECTION 3.  OTHER SOURCES

If during the **seven (7)** calendar-day posting period there is no application for the permanent vacancy or newly created position by any RN employed by Hospital, the Hospital may fill the position from any source.

## SECTION 4.  TEMPORARY FILLING OF VACANCIES

The above does not prevent the Hospital from filling the vacancy **(after the seven (7) calendar day posting period)** on a temporary basis for a temporary period up to a maximum of ninety (90) days unless such temporary period is extended by mutual consent.  The Association agrees that it will not unreasonably withhold consent to extending the temporary period.



## SECTION 5.  LIMITS ON APPLICATIONS

Any RN employed by the Hospital who applies for and is awarded a posted position may not apply for another vacancy before six (6) months unless there is mutual agreement between the Hospital and the RN.

# ARTICLE 28:   BULLETIN BOARD

The Hospital shall provide a glass-encased bulletin board for the purpose of posting proper communications issued by the ~~Association~~ **Union** and emblazoned with the **Union** logo, which shall be factual and informational in nature. ~~and which shall not be inflammatory, derogatory, defamatory, scandalous or offensive to the Hospital, and/or the Management of the Hospital, and/or any employee or representative of the Hospital.~~

~~The Association shall deliver to the Hospital's Human Resources Department a copy of any such communication reasonably in advance of posting the communication.~~

# ARTICLE 29:  RN REPRESENTATIVES

The **Union** may appoint ~~four  (4)~~ RNs who are employed by the Hospital to serve as official representatives.  The Hospital shall be notified in writing of the appointment of each RN Representative before the Hospital will be obliged to recognize the RN Representative.

The functions of the RN Representative shall be to inform RNs of their rights and responsibilities under this Agreement and to ascertain that the terms and conditions of this Agreement are being observed. All time spent by the RN Representative **while at the Hospital** serving these roles will be ~~unpaid.~~

The function and activities of the RN Representative shall not interfere with the job duties of the Representative or of any other RN.  The RN shall **notify** ~~obtain permission from~~ the RN's shift supervisor prior to engaging in any activity relating to the RN function.  A mail box for RN **Representatives** will be provided at the Hospital.

A RN shall be provided **thirty** (**30**) minutes at the end of the nursing orientation program for all newly-hired RNs.  It is understood that the RN and the newly-hired RN will both be on ~~their own time~~ **work time**.

## NNOC Counter Proposal 10-11-16

### ARTICLE XX GRIEVANCE PROCEDURE

**Section 1.** A Grievance shall be defined as a claim of a Registered Nurse, or of the Union during the term of this Agreement, which involves the interpretation of, administration of, or compliance with a specific provision of this Agreement. No Grievance may be filed by or on behalf of a RN during the RN's probation period as defined in Article xx of this Agreement. For the purposes of defining "days" in this Article, "working days" shall exclude Saturdays, Sundays and contract holidays, while "calendar days" are inclusive of all days of the week. Any time limit or steps contained herein may be waived by the mutual agreement of the parties in writing.

**Section 2.** Prior to the filing of a written Grievance, nothing contained in this Article shall prevent any RN with or without a Nurse Representative from informally and verbally presenting and resolving any Grievance. In the event the matter is not resolved in the manner described in this Section, the RN and/or the Nurse Representative may present a formal written Grievance in accordance with Section 5, below.

**Section 3.** All Grievances relating to discharge or suspension must be filed, in writing, within five (5) working days of on a Grievance form provided by the Union. All other Grievances must be filed in writing, within fourteen (14) working days after the event or events giving rise to the Grievance occurred or within fourteen (14) working days after those events reasonably should have been known to the RN or the Union, by a completion of a Grievance Form provided by the Union..

**Section 4.** Subject to staffing and patient care needs, Nurse Representatives shall be given a reasonably opportunity to investigate and process Grievances. Notice must be given to the appropriate supervisory personnel before conducting any investigation or processing a Grievance on work time.

**Section 5** – Grievances shall be processed in the following manner, subject to the provisions set forth in Section 6, below:

//

**Step 1:** Grievances shall be filed with the RN's immediate Department Manager or his/her designee by hand delivery of the Grievance Form. A Grievance shall identify, by completion of the form: 1.) the specific provisions of the Agreement claimed to have been violated, 2) the Hospital representatives, if any, or RNs involved in the events of the Grievance, 3.) a description of the violation, and 4.) a description of the remedy requested. The Grievance Form shall be signed by an authorized Nurse Representative. A discussion of the Grievance shall be held within ten (10) working days of receipt of the Grievance. For purposes of a discussion of the Grievance, the RN may be accompanied by a Nurse Representative. A written answer from the RN's supervisor or his/her designee shall be made available to the Nurse Representative within ten (10) days of this Step 1. If the Grievance is not mutually resolved in writing in the course of processing of the Grievance pursuant to this Step 1, whether or not a discussion is held, the Grievance shall be presented in writing to the Hospital as set forth in Step 2.

13

**Step 2:** If the Grievance is not mutually resolved in writing in the course of processing the Grievance pursuant to Step 1, above, the Grievance next shall be presented to the Chief Nursing Officer (CNO) or his/her designee for discussion with the aggrieved RN and a Nurse Representative within ten (10) working days of receipt of the answer provided for in Step 1. The Step 2 discussion shall be held within ten (10) working days after receipt of the grievance provided for in this Step 2. The written answer of the CNO or his/her designee shall be made available to the Nurse Representative within ten (10) working days following completion of the discussion described in this Step 2.

**Step 3:** If the Grievance is not mutually resolved in writing in the course of processing the grievance pursuant to Step 2, above, the Grievance then shall be presented to the Human Resources Director for discussion with the RN and the Nurse Representative and a Union Representative within ten (10) working days of receipt of the answer provided for in Step 2. The Step 3 discussion shall be held within fifteen (15) working days following receipt of the Grievance provided for in this Step 3. The Director of Human Resources shall render a decision in writing and provide a copy to the Union Representative and Nurse Representative within fifteen (15) working days following the completion of the discussion described in this Step 3.

**Step 4:** If the Grievance is not mutually resolved in writing in the course of the processing of the Grievance pursuant to Step 3, above, the Union may, within ten (10) working days following receipt of the decision provided for in Step 3 notify the Hospital in writing that the Grievance is being submitted to a neutral arbitrator, as provided for in this Step 4, below. The Union's notice will:

a. Request arbitration for the American Arbitration Association, identifying the Grievance and filing whatever forms are required by the American Arbitration Association; and

b. Request the American Arbitration Association to send to each party a list of seven (7) proposed arbitrators

Following receipt of the copy of the list, each party shall cross off from such list the name(s) of any arbitrator or arbitrators not acceptable and shall forward its list to the American Arbitration Association. From the combined lists, the American Arbitration Association will select the arbitrator commonly indicated as the greatest preference of the parties. In the even this

procedure results in no common choice, either party may request that the American Arbitration Association send a second list of seven (7) proposed arbitrators. Following receipt of the copy of the second list, each party may request that the American Arbitration Association name an arbitrator. The parties, by mutual agreement, may also by-pass the above procedure and mutually agree on an arbitrator. In all cases, the decision of the arbitrator will be final and binding on all parties.

15

The arbitrator's jurisdiction shall be exclusively confined to the facts and circumstances giving rise to the Grievance and the issues presented on the face of the Grievance. The arbitrator shall have the authority only to interpret the terms and provisions of the Agreement and shall have no authority to add to, modify or change any of the provisions set forth in the Agreement.

Damages, if awarded, shall be reduced by the RNs receipt of unemployment compensation benefits, worker's compensation benefits, or employment.

The cost and the expense of the arbitrator and the hearing room shall be shared equally by the parties. If either party requests an official transcript, watch party will pay half. All other expenses shall be borne by the party incurring them, and neither party shall be responsible for the costs of the other.

**Section 6.** In the event a Grievance relates to a personnel determination by the Hospital, the Hospital may choose to inform the Union in writing that the Grievance shall proceed directly to arbitration pursuant to Step 4 of this Article.

**Section 7.** No RN shall have the right to submit a Grievance to arbitration, except through the Union.

**Section 8.** Any grievance not answered within the specified time periods may be appealed to the next Step of the Grievance procedure immediately. Grievances may be entertained at any Step by the mutual consent of the parties in writing. Class action Grievances, i.e., those involving five (5) or more RNs and involving the same issues and circumstances, shall commence at Step 3. The time limits may be changed at any Step by the mutual consent of the parties in writing. Failure by the Union or RN to comply with any time limitations including those relating to an arbitration demand will void the Grievance, with prejudice, such that the Grievance shall not be subject to further processing, re-filing or resolution by an arbitrator.

**Section 9.** Any time limit imposed upon the handling of Grievances shall commence on the date of receipt of the subject documentation.

**Section 10.** If the Hospital representative requests the participation of an additional management representative at any Step in the Grievance process, the Union shall be entitled to an equal number of representatives.

The Union shall provide the Director of Human Resources with written notice of all Nurse Representatives or others who may be involved in the grievance process.

16

10/5/15

Vanessa Sylvester
Michelle Mebon
Amy Pulley
Debbie McKevay
Roseanne Nolon

No comprehensive response will be given
2° Bargaining in bad faith

regressive proposals
TA's not included
① call back & stand by

educators:
Kevin Brukney

Agree ⊂ RN
Disagree ⊂ Association vs union verbage

gye boyle
Jon carmody
Jan Killis

① grievance procedure included

Don - we have the audacity to say agreement

VS - passage us 8 contract Null + void

CHS → walked out 10:40 am 11/5/15

V - has sent info requests x 3
D - response is on its way
→ Gave proposals for weekend Rotation & Hours of work + others
They have a chance to Respond in good faith

Gave

GC Ex 44

10/5/15

Reject Counter proposal
① Weekend rotation
② Hrs of work + overtime)

~~Parrot referrals to~~

Angie → weekend Coverage
of 3rd week end
↓ problems of finding help on weekend

leverage to schedule of wknd.

Don →   Not changing over proposal of one word   10/6/15
Call up the NLRB + tell them that

you have not persuaded us to change

11/2/16   Michelle Mahon          Tim Viskocil
          Rose Anne Wilson        (Federal Mediator)
          Amy Pulley              Don Carmody
          Deb McKinney            Jan
          Tamera Wiseman          Kylee

11:38 AM

30 second call light answering —
        per Kylee spoke c̄ Charlie that is
        no longer happening
        (Call lights to be answered immediately
        as long as it doesn't interfere
        c̄ pt. care

        Several falls c̄ injury one lead
        to death (c̄ in last 30 days)

Jan        Kylee unaware of above!
"Don't
lecture to us"

        ~~September~~

Don → Difference of opinion re: hostile work
        environment
        Amt to ask for info individually
        re: discipline on 4100.

Kylee — PAT = not a RN scheduling issue it is a
        pt flow issue
        LPN hired to ↑ service — do bedside help
        Mary Skively to leave          in dept c̄ dc
        to do heart pts         CVOR → PAT

**GC Ex  442**

②

7/2/16

Kylee: re: Cerner bridge training proposal.

feel training 15-30 minutes c̄
ample time to ask questions +
practice
Can not implement 1 wave it a time)
responded to our proposal p̄
already implemented education

Will do survey Monday re: training

✱✱ ADO's ē have already rec'd all ADO's
during trial

Don — what we asked for is
Copies of all ADO that was that
Relied upon to produce
Ohio — WVa safety report
pt care

Every single ADO completed by every
nurse was relied upon to produce
pt care report.

ADO's completed by Affinity nurse's

What ADO's were used to
complete pt care report?

caused
Michelle
evening sues
1 of past sues
of her month

Already
have ADO's

Bluefield
Green Briar        ) ADO's used to
Affinity           ) complete pt care report



11/2/16  How important is it to establish PPC.

— copies of ADO's used to create pt. care report.

we stand on our proposals - contract package

we reject all of your proposals

2:04 pm  " Bad faith bargaining "
— walked out of room.
next mtg 11/28/16

**NNOC Proposal to Affinity Medical Center**

**Date:**

**Time:**

## ARTICLE 29. PROFESSIONAL PRACTICE COMMITTEE (PPC)

### SECTION 1.  COMMITTEE MEMBERSHIP AND MEETINGS

The Professional Practice Committee shall be composed of twelve (12) Regular nurses covered by this Agreement who are currently employed by the Hospital. The Professional Practice Committee shall schedule one Regular meeting per month and may schedule additional meetings in a given month. Each Committee member shall be entitled to a maximum of four (4) hours' pay a month at the nurse's straight-time rate for the purpose of attending such Committee meeting or meetings. Payment to nurses who attend such meetings shall not constitute time worked for any purpose under this Agreement. Such meetings shall be scheduled so as not to conflict with the routine. The Professional Practice Committee shall prepare an agenda and keep minutes of all meetings, a copy of which shall be provided to the Chief Nursing Officer. Upon election or appointment, the Hospital Administration will be notified of the names and shifts of the members of the Committee and promptly in the case of any substitutions for Regular members.

### SECTION 2.  FUNCTION

The Professional Practice Committee shall act as an advisory body to Nursing Service and Administration. The Hospital will duly consider such recommendations as are made by the Professional Practice Committee.

The objectives of the Professional Practice Committee shall be:

    (1)      to concern itself with standards for professional practice to nurses;

    (2)      to work constructively for the improvement of patient care and nursing practice;

    (3)      to recommend ways and means to improve patient care;

    (4)      to study and make recommendations on ways to improve weekend-off scheduling;

    (5)      to recommend ways and means to improve in-service education and training;

    (6)      to work jointly with Hospital/Nursing Administration to provide

GC Ex 443

and maintain a system which identifies patient needs for registered nursing care. Recommendations will be considered relating to the assignment of nursing personnel with due regard to patient needs.

## SECTION 3. NOTIFICATION PROCEDURE

In the event a nurse has a nursing practice problem:

(1)  the nurse shall notify his or her Supervisor of the problem in an attempt to resolve the matter informally. If no remedy is provided,

(2)  the nurse shall submit, in writing, an explanation of the nursing practice problem to his or her supervisor, with copies to Nursing Administration and to the Professional Practice Committee.

(3)  The Professional Practice Committee shall consider the issue and, if appropriate, shall make its recommendation to Nursing Administration in writing.

(4)  If the problem is not resolved in a timely fashion, the matter will be referred to the Chief Nursing Officer, who will have the following options:

  a.  secure a mutually agreed upon consultant or expert to study the problem;

  b.  To engage in binding arbitration to resolve the problem;

  c.  To commission a study by a mutually agreed upon independent agent or agency; or

  d.  To direct an in-house study of the problem which study shall be completed within a mutually agreed upon time and shall be reviewed by the CEO within 10 days of completion.

(5)  Any nursing practice problems received by the Hospital management will be routed to PPC within ten (10) days.

Nursing Practice Review Committee

At the request of either party, a difference of opinion between the PPC and Administration concerning matters falling within the PPC's objectives (paragraph above) will be handled by being referred to the Nursing Practice Committee. The Committee will be the exclusive means for resolving any such differences of opinion and shall be composed of:

a. The Executive Director of NNOC or his/her designee and one (1) elected Staff

Nurse member of the PPC;
b.  Two (2) members designated by the Facility

A meeting of the Nursing Practice Review Committee shall be held within ten (10) days of the referral (unless the Committee mutually agrees otherwise) for the purposes of jointly reviewing the original problem presented by the Professional Practice Committee, together with a summary of the information exchanged between the parties on the problem since its original presentation and to begin joint explorations leading to resolution of the matter. Any representative of the Nursing Practice Review Committee may request and shall receive relevant information from the representative of the other party, or may introduce further relevant information. The recommendation of the Nursing Practice Review Committee shall be reached within thirty (30) days of the Committee's meeting.

No recommendation shall become effective unless a majority of the Nursing Practice Review Committee concurs.

Limitations

Disputes between the PPC and the Employer regarding the PPC objectives and issues unresolved by the Nursing Practice Review Committee are not subject to the grievance procedure.

## SECTION 4. CHANGES IN STAFFING MATRICES

The Hospital shall notify the NNOC of any proposed changes in staffing matrices, skill mix, ancillary staff or patient classification system at least forty-five (45) days prior to the proposed implementation date of the changes, except in a emergency situation. Simultaneous with the notification of the proposed changes, the Hospital shall supply the NNOC with a detailed description of the reasons for the proposed changes. Additionally, the Hospital shall provide a detailed analysis of how the proposed changes conform to State and Federal laws, including the data allegedly supporting the need for the change from each affected patient care unit.

Upon request, the CNO will agree to meet with the NNOC Representative to discuss this provision and pursue resolution of these issues in a timely manner.

Present

Us
Then (mgmt)

11-2-16
   Tim Viskocil - Federal Mediator
   Amy, Rose Ann, Michell, Debbie Tamara

1014 - Gave updated Status of Bargaining to
   mediator and he took to mgmt

1125 - mediator says they want to meet

1130 - Mgmt in Kylice, Don, San
   - Don - ? no Vanessa, Still chief specks Person
     M yes!
K - 30sec call light - immidiatly - But Not policy
M - pulling people out - is causing safety
         issues
   D - we do not intend to Do Anything
   M - fall with Death
K - Not Aware      in Ability  to
   of Death
      Ability to
   D - Don't Lecture to us
   D - Discipline M. Adams - today - tommorow
   m - What About All disciplines
   D - Put in Request for Info About
         All discip'lines
      M -
   K - PAT - False - At flow Issue - Hired
      LPN - Jow Radiobagy - Registration

GC Ex 444

②

LPN - offered Position today - Labs PIAt,
working desic

Mary Scavelli - WILL do CVOR Apt
    will leave CVOR to do heart Apt
M- New - no one there p 5pm
    K- we have discussion WeAre trying to
M- We Are too-    Better care
    K- July emails from Sent -
    M- will Supply a completed Request
D- issue Adress
    K- Cerner Bridge training
        - Directors are trained - 15 minutes -
            cannot do lunit At time, comments
            can have so 2 Nurses sign
        M- $   we have been waiting for
            you
        K- said they cannot wait for us
        m- you have been waiting since Sept
        - was implemented refor this Bargaining Session
M - you have Already violated the Act!
    K- nothing -
    D- have not violated the Act  So good luck
        with that
    B- Do you have ADO's
    m- All have been given
    D- every single ADO has been given
        was every Neto - for Ohio
    m- we gave you them - every single
        ADO
    D- every Single ADO was turned

lt2 p3

M- We Are currently working a
copy.

D- What I Am Asking for is A copy
of every Single Abc that was used
for PCR for Ohio

M- yes

D- every Single ADO completed by OH
Nurse, was turned over.

M- I believe All ADO's Are from W.V

Don - one what we Are Asking for is
ADD's completed by Ohio ADO's

M- you have been Refusing to Accept them
for yars.

D- Showed Michelle list -
what ADD's will b

D- the Are No ADD's from WV
that were Submitted to us in Jan

M- we Are working on Providing you a copy
of All ADO's that were used to Complete
PCR -

M- you have All of Ohio

M- you Are

D- How important to you to complete
A PPC proposal,

m- PPC is important

Don
demeanor
very
cordis end to
he is pointing
And talking down
to michelle

(4)

Rejecting All Proposals — We will not
get Proposals + Nickle +dime
stand on All proposals and standing
on our Package
— we Are Waiting
1205 — Bargaining over

Bargaining                    11-2-16

Attendance: MM, R.W, A.B, D.M, Kylie, D.C, J.E.

10:00  Nurses meet c̄ mediator Tim Viskocil
and discuss where we stand, waiting on
several responses owed to us.

We handed Tim 3 pgs of proposals, indicating
what they owe us, along c̄ several information
requests we are still awaiting

11:27  Management & Nurses meet jointly

Kylie stated that the 30 sec call light rule
had been nixed!

M.M speaks on this, stating Charlie is
demanding the call lights stat, & pulling
RN's out of pt care & charting to answer call
lights & then write them up for error in charting,
also there has been several falls on 2100 c̄
injuries and @ least 1 death in the last month.

M.M asked if Management had a response
on the 2100 discipline & D.C. stated they

Kylie discussed the P.A.T schedule change
(+1 PN was offered position & will
be doing lab work in P.A.T

Kylie Drake also stated "Blood implementation
in Cerner has already begun.

GC Ex 445

Cmt                              11-2-16

D.C asked for ADO's + M.M stated
you already received all the ADO'1
you requested were given to you @ the
hallm trial

Dm is Demanding WV ADO's
@ Affinity Bargaining

M.M states you will be receiving
all The ADO's for WV + a written response!

D.C. states they are standing on their
Package proposal

Will not give us any Counter proposals

Debbie handed them a 2100 Strike
pledge, d/t safety issues on 2100
& hostility on the unit from Management.

D.C stated They do not feel there is a hostile
environment & stated they have a difference
of opinion

D.C demeanor is repulsive Throughout
bargaining today

<u>**EXHIBIT NOT SUBMITTED**</u>

GENERAL COUNSEL 's Exhibit No. 446

Case Name _____ DHSC _____ (✓) Identified

Docket No. _____ 08-CA-117890 _____ (☐) Received

Date _____ 3-07-17 _____ (☐) Rejected

This exhibit is not being submitted with this case because
it was:

(✓) Identified, but not offered in evidence;

(☐) Identified, received, but withdrawn from evidence;

(☐) No duplicate was furnished to the Reporter;

(☐) Withdrawn by _____
        in order to make duplicate(s);

(☐) Retained in the possession of _____

_____

(☐) Other _____

_____

_____

_____
Signature of Presiding Official

Message

| | |
|---|---|
| **From:** | Boyle, Angela [/O=CHS EXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AMBOYLE5E6] |
| **Sent:** | 9/26/2014 8:10:27 AM |
| **To:** | Ellis, Jan [jan_ellis@chs.net] |
| **Subject:** | FW: Follow-up to 8-12-14 email and reiteration of request for information regard Affinity wage increases |
| **Attachments:** | JB to DC-RB re Affinity wage increases.pdf; JB Affinity email to DC 8-20-14.pdf |

Jan,

Would you have any time today to discuss this? I need some "guidance" before I speak with Don about this DTB. Thanks

Angie Boyle, SPHR | Vice President, Human Resources
Affinity Medical Center | 875 8th St NE| Massillon, OH 44646
Tel: 330.837.6860 | Cell: 330.413.5905 | Fax: 330.830.6927 | http://www.affinitymedicalcenter.com

**From:** John Borsos [mailto:JBorsos@CalNurses.Org]
**Sent:** Wednesday, September 17, 2014 3:01 PM
**To:** Boyle, Angela
**Cc:** Michelle Mahon; Ellis, Jan; 'doncarmody'
**Subject:** Follow-up to 8-12-14 email and reiteration of request for information regard Affinity wage increases

Angie:
This email will serve as a response to your email of August 21, 2014, related to 2014 wage increases at Affinity Medical Center. This letter will reiterate, once again, the Union's position that annual wage increases at Affinity Medical are, and have been, a condition of employment at Affinity and remain a part of the Employer's obligation to maintain the status quo, as it relates to wages and working conditions for the 250 registered nurses represented by NNOC ("the Union") at Affinity Medical Center. Accordingly, your email adopts an unlawful, regressive position, and is a retreat from the Employer's position of August 11, where you stated that the employer had budgeted 1.5% for merit increases for Affinity employees in 2014, the budget had been approved, and the exact details regarding implementation awaited direction from Human Resources.
It remains the Union's position that these wage increases are part of the status quo and therefore should be provided. Toward that end, on May 28, 2014, the Union set forth a request for information related to this obligation, a request that was augmented in my email to Don Carmody, dated August 20, 2014. Both are attached to this email.
To date, we still have not received the following information from our May 28th request:
1. The date that you intend to provide the legally-required wage increases.
2. The total aggregate amount of the increase that will be allocated to the NNOC-represented nurses.
3. To clarify this request, we are requesting the percentage of the increase, based on performance evaluation, for each of the NNOC-represented nurses.
4. Documents, including meeting minutes, meeting agendas, and emails, including those among representatives of Affinity Medical Center and CHS corporate representatives in which the amount of wages increases was discussed and whether or not wage increases should be provided to NNOC-represented registered nurses. This request remains relevant, particularly after you informed us that wage increases had been budgeted, CHS had approved the budget and still wage increases have not been provided.
5. You write there is no documentation that is responsive to this request.
6. You provided the information for 2012 and 2013, but write that 2010 is not available.
7. To clarify this request, we mean the amount in a percentage wage increase that each individual nurse represented by NNOC received in 2011, 2012, and 2013.
8. You provided this information in the aggregate.
9. Your response is evasive. We are looking for the precise formula used to determine what raise a particular nurse received based on her performance evaluation. For example, if there was a scale where be a rating on a nurse's

AFFINITY, et. al
Subject to Protective Order - Confidential

1

GC Exh.____

446

performance evaluation merited a specific wage increase we would like to know the scale. We are also requesting if there was an appeal process whereby a nurse could challenge her performance evaluation if she disagreed with it. We are also requesting the review and approval process that Affinity followed to determine a nurse's increase.

10. The approval process, including approval between Affinity and CHS corporate, regarding the decision whether an individual, group, or facility is entitled to a wage increase. You write that the VP of Human Resources makes the initial determination and that decision is subject to review by the CFO and CEO of Affinity Medical Center. This response appears to contradict the explanation you provided in August 2014, when you explained that an Affinity budget required CHS corporate approval. We reiterate our request for this information and believe it is relevant to determine the criteria that is used by the Employer to determine whether and how wage increases will be provided, a subject that the Union may be prepared to make proposals on, provided we understand the criteria.

11. The classifications of any Affinity Medical Center employees, including executives and/or managers who have received a wage increase from January 1, 2014 to the present. As we understood your explanation when we met in August, you represented that Affinity Medical would be making wage increases for all groups of employees and no single group of employees would receive an increase unless all employees would receive increases. If other employees have received wage increases, there should be no reason why wage increases were not provided to NNOC-represented registered nurses. Accordingly, we believe the requested information is entirely relevant.

In addition, you also have not provided the following information that was contained in the August , 2014 email:

1. The Affinity 2014 annual budget which was adopted in the last quarter of 2013 which sets forth budgeted wage increases for Affinity employees for 2014.

2. Notice and/or other communication from CHS approving the budget.

We are next scheduled to bargain on October 2-3, 2014. We will expect receipt of the above-requested information at that time along with a firm date when the wage increases will be effective.

Sincerely,

John Borsos

EXHIBIT NOT SUBMITTED

GENERAL COUNSEL 's Exhibit No. 447

Case Name _____ DHSC _____ (✓) Identified

Docket No. _____ 08-CA-117890 _____ (☐) Received

Date _____ 3-07-17 _____ (☐) Rejected

This exhibit is not being submitted with this case because it was:

(✓) Identified, but not offered in evidence;

(☐) Identified, received, but withdrawn from evidence;

(☐) No duplicate was furnished to the Reporter;

(☐) Withdrawn by _____
      in order to make duplicate(s);

(☐) Retained in the possession of _____

_____

(☐) Other _____

_____

_____

_____
Signature of Presiding Official

Affinity 11/2/16            Debbie
                           Amy
        11:27 meet with Union    Michelle

DC      No Vanessa

Michelle   Not today.

DC      Still Chief Spokesperson

Michelle:   Yes

DC:     Why don't you go ahead +
        30-sec

Kiley   We're no longer doing it. Checked w/ Charlie

mm:     As soon as Call light - Charlie screams down hall
        Pulls people away from charting
        Not enough staff on floor to answer immediately
        or w/in 30 sec. Rule amped up to immediately.
        Patient Care Sup

DC:     Appears difference of opinion. K
        Nothing intend to change

mm:     You're aware fall w/injury that led to death.

Kiley   Several  ?

**GC Ex** 447

2

MM: Several falls that led to death.

K      Time period

mm     Within the last month.

K      Safety Huddle daily — never brought up.

mm     Request

DC     Not relevant

mm     It is

K      Would have to verify.

mm     In any event, staffing is short.
       RNs can
       Info believe relevant in several Regards

DC:    You're asking for it

mm     Will Re-submit — Safety + RN provid patients

3

DC:    Don't lecture us.

Michelle:    It's certainly relevant. Joint responsibility for safe pt care

DC    Written response for Adams today & tomorrow

Michelle:    How to address to all 2100

DC:    Again difference of opinion. No other process except to put in grievance regarding any particular discipline you want to challenge. Kiley,

Kiley:    Change in pre-testing. False. It is a patient issue. Have hired Lab — will do testing. Radiology — problem

Amy:    Not showing up on time. At least

Kiley:    Mary Scovelli.

Amy:    Said already pulled back — not available

Michelle:    What if not available? Teaching

Appointments? Why not PAT RNs

4

If doing, these things should resolve issue.
No one there After hours

After hours?

After 5:00 pm.

Bulk of business in prior to 5pm.

We've been discussing.

But not bargaining.

Supplemental information

MM      Offered to meet — on PAT; verbal

K       Can forward you emails that responded.

MM      Will submit a complete + comprehensive RFI
based on our discussion + your proposed solution

Amy :

Kiley :   Offer yesterday

          Lab draws in PAT? What else

5

Kiley:   Yes. Helping them with whatever they need.

Dc:   Address this issue Cerner Bridge.

You submitted your proposal. ~~Directors~~ dont have

We can't implement one @ a time. 2 RN check —
Space to verify. Willing to do Survey monkey

Pretty confused because done training.
Can't wait
In sept. Carmen approached. Schedule effects
bargaining. We were available. You implemented
change — giving

DC:

Kiley:   No, I have rd.

Amy:   Even people giving training say it's flawed.

Michelle:   We can submit. No one to

Kiley:   Patients divided up
Not what's happening.

6

MMS: We'll do a survey monkey. Draft some questions.

Kiley: You're welcome to do so.

Michelle: Uninterrupted – not happening. We'll need technical information. At this point, already violated the act.

DC: We haven't violated the act, so, good luck

↓

DC: Do you have the ADO's you used to produce the Patient Care Report.

Michelle: You've received during hearing @ NLRB. Ones you requested.

DC: Is it your statement that whole stack of ADO submitted, every single one was relied upon for the Patient Care Report?

Michelle : Affinity's ADOs

DC: Merges report. Not a roadmap, but copies of ADO that were referred to in the report

Michelle: Affinity.

7

DC: Not West Virginia — those are Affinity.

Michelle: Working on — you'll get rest of them.

DC: We've asked for COPIES of every single one you relied upon for the PT Care Report ~~you where~~ And you're telling me that every one was used.

Michelle: Yes.

DC: As they relate to the Patient Care Report.

You asked for Affinity ADOs — don't be confrontational.

Michelle: Currently preparing a copy of ADOs that were so

DC: What asked for is that ADOs are those you relied upon were on the list. Is that same as ones Affinity?

Michelle: Yes it is.

DC: And Bluefield & Greenbrier?

8

Michelle: Will be supplementing for Bluefield & Greenbrier so that you will have every single ADO Any that predate Patient Care Report.

DC: Wonderful — after 3 years, you're telling me that every single one was relied on for document.

Michelle: Yes

OC At Bluefield

Michelle: List was West Virginia

DC: No. More completed on Ohio, than West Virginia.

Yes.

Sp

Once again, making clear for 3 years are ADO's

You have

9

DC: You're saying that you're putting together what user you're copying?

Michelle: No — not going to give you what already. Big stacks — you told me 28 were relied on. Can pull it up.

DC: Let's pull it up and look at.

Michelle: You've been refusing to accept AOOs (They look at his)

DC: Not ~~the same~~ the same — Request for ADU's for PPC bargaining proposal.

↓ Great to hear at long last because you're talking out of both sides of mouth

Michelle: Do you have proposals today?

DC: Looking at document about ADO's

↓ These are all West Virginia.

↓ What's page 3 — OH?

Michelle: That is Ohio.

DC: At bargaining on July 6 or 7. Do I have stack of ADO's with me? No

*10*

Michelle: I think went the other way. I was asked if I
had them ; said not with me
Ms Sylvester

What

DC: Straight answer — are those all relied upon from
Ohio?

Michelle Not—all of ADOs were

DC: Why do you have OH ADO presented as WV list?
128022 — What is that ADO, why on the
Chart

Michelle: Used in past

DC: What else does the PPC use to create Pt Care Report

Michelle: Testimony from RUs

DC And ADO's.

You can ex

DC: For the record, there are no West Virginia
ADOs

*11*

Michelle: We knew that

DC      Then why did you give me this Chart + say every one was used for Pt Care Report WV.

Michelle: That's not what said.

DC:     Yes you did. Then I look — no WV ones. So what used to prepare report?

DC      You're working on copies of each + every one that was used in Pt Care Report.

Michelle: Yes.

DC:     When might I get it?

Michelle: Pretty voluminous.

DC.     All together — you said used. So shouldn't be difficult to find them

Michelle: Didn't copy.

DC:     If you relied on stacks. And constitutes all used.

Michelle: You have actually copies from Affinity

/2

Michelle: Since January.

DC: We're going in circles.
Telling me on one hand you did it but on other
that will take time to pull it together

Michelle: Why didn't 2 years ago? RNs offered them
to you — if took them at time, you'd have them.
You should have had them.


DC: Not the same thing.
How important is Patient Care Proposals.
How important to you is Establishment of PPC?

Michelle: PPC or something like it.

DC: I've been told by Ms Sylvester that avon't
come to agreement without a PPC.

DC: Not at last conceded that ADOs are part
of Pt Care Reports and that PPC uses them for reports.

DC: You've told me info in response to request.
Asked for copies of ADOs & you're at long
last going to give them to me.

*13*

Michelle:  What's neft? Proposals for us

DC      No.

Michelle:  Not respond to our Proposals?

DC:      No-ours is package — standing on package
We're not going to nickel + dime on one or another
When have fundamental differences & you've
finally agreed to produce documents relevant
to request for important to your PPC.

Michelle: This is nonsense — bad faith bargaining

DC      Nonsense for you to make a proposal; asked
3 x  When Sylvester said that ~~they~~ the
committee do it using ADO's.

Michelle: We didn't say that.

DC      We're done.

Michelle: We're not — Debbie.

Your said, Issues on ~~don't~~ 2100 exist. We're
willing to vote yes on strike vote. (Gives document

Amy :   You're stating standing on package?

14

DC: Standing.

Amy: So you're rejecting our proposals?

DC  Yes because standing on ~~package~~ proposal

Michelle: You Received ours @ Affinity

DC:  Only Hearing today Affinity are the ones that you used. We're done for today Commissioner.

12:03p

## NOTES TO READ 1/21/15

1. Please visit your folder in the 2100 Mailbox located in the 2100/2200 Break Room on the countertop. There is information in your mailbox.

2. If you have a Pyxis discrepancy, please remember to report it immediately so it can be addressed. The charge nurse for each shift needs to check the Pyxis at the end of the shift to make sure any discrepancies are addressed before <u>any nurse</u> leaves and the next shift takes over

3. Please continue to be vigilant about scanning armbands and medications. If a medication will not scan, it must be communicated to the pharmacy.

4. All critical labs must be called to the physician within 30 minutes of the lab calling you. Be sure to document the <u>specific time</u> you notify the physician about a critical lab. .do not just document the time as a general range.

5. Please remember that if you do an ECG, you must also have a physician's order written for each ECG prior to completing the ECG.

6. There are problems being noted with documenting medications by history (patient's home med list). Some nurses are not addressing this area with their patients when they are being admitted. Please don't assume everything is correct from ED. As was covered in skills lab: this area is part of Admission Info & History Adult (Part 1) and the admitting nurse is to complete patient compliance and the last dose taken. The floor nurse must document on medication history whether the ED nurse did it or not; ED nurses will <u>not</u> document compliance. The admitting nurse also needs to enter the patient's pharmacy into the computer under the "Patient Pharmacy" tab at the top of the screen. Electronic prescriptions cannot be submitted without this information.

7. Please remember to consistently document the indication for pain medications and subsequent effectiveness. Be sure to document the pain indication number (0-10 scale) before administering a pain medication and the effectiveness must be documented an hour after administering via the same pain indication number scale.

8. 2100 continues to have a large number of patients who state (upon completing their post hospital survey) that nursing is not educating them about their medications, especially new medications. Please be sure to provide written information and educate (+ answer questions) about medications for each patient. (Information was placed in each of your mailboxes on 12/5/14 re: medication education.) Please do not give your patient their medications and tell them "here are your medications" You need to constantly educate and re-educate the patients about their medications. We appear to have a lo

GO Ex 448

## RE: Michelle Custer, RN

**Boyle, Angela [angie_boyle@chs.net]**

| | |
|---|---|
| **Sent:** | Thursday, December 18, 2014 2:46 PM |
| **To:** | Michelle Mahon |
| **Cc:** | Drake, Kiley [Kiley.Drake@Affinitymedicalcenter.com] |
| **Attachments:** | Custer Time.pdf (994 KB) |

Dear Michelle:

In response to both of your information requests concerning discipline of Michelle Custer, attached find a copy of her attendance record from July 30, 2013 through July 30, 2014. There are no prior disciplines. You may make an appointment to obtain a copy of Michelle's complete personnel file, including all disciplines by calling Kiley Drake at 330-837-6860; the file is too voluminous to scan and send electronically.

You have requested a copy of the AMC staffing plan, and that has already been provided to you at collective bargaining.

With regard to your request for "any discipline issued to any RN for the failure to follow 'chain of command'", as you can see from the documented verbal counseling, the failure to follow chain of command was only one aspect of the conduct that led to the verbal counseling. As such, documents related to discipline of RNs for failure to follow chain of command are neither comparable nor relevant to your representation of Michelle in bargaining about the verbal counseling. Therefore, no information is included here with regard to this particular request.

You have requested documents or spreadsheets documenting "points" for Michelle and others. The Hospital does not maintain a "point" system and has no such records.

You have requested time reports for Affinity's 250 nurses for a period of twelve months. This request far exceeds the bounds of relevance or reasonableness in order for the NNOC to be prepared to bargain about the attendance discipline issued to Michelle, and we reject the request for that reason.

You have requested documentation demonstrating the dates and times over the past twelve months that Michelle has volunteered to work when the Medical/Surgical unit was short staffed. The Hospital does not maintain any such documentation, so none has been provided. However, I would also note that, even if such documentation did exist, we do not consider it relevant to bargaining over discipline for violation of the Hospital's attendance policies.

Please let me know when you are available to bargain about the two disciplinary actions that were the subject of the NNOC requests for information and demands to bargain concerning Michelle Custer. I am available Wednesday, January 7 at 2:00 pm or Monday, January 12 at 3:00 pm.

Angie Boyle, SPHR | Vice President, Human Resources
Affinity Medical Center | 875 8th St NE| Massillon, OH 44646

GC Ex_____449

Tel: 330.837.6860 I Cell: 330.413.5905 I Fax: 330.830.6927 I http:/www.affinitymedicalcenter.com

**From:** Michelle Mahon [mailto:MMahon@nationalnursesunited.org]
**Sent:** Friday, August 23, 2013 3:58 PM
**To:** Boyle, Angie
**Cc:** Ruth DeLillo, RN; Amy Pulley (amypulley74@hotmail.com); Pam Gardner (pamgardner@ameritech.net)
**Subject:** Michelle Custer, RN

Please see the attached demand to bargain and information request regarding Michelle Custer, RN.

Michelle Mahon, RN
National Representative
National Nurses United
mmahon@nationalnursesunited.org
234-207-6706



www.NationalNursesUnited.org
@NationalNurses

Disclaimer: This electronic message may contain information that is Proprietary, Confidential, or legally privileged or protected. It is intended only for the use of the individual(s) and entity named in the message. If you are not an intended recipient of this message, please notify the sender immediately and delete the material from your computer. Do not deliver, distribute or copy this message and do not disclose its contents or take any action in reliance on the information it contains.

GC Ex.

**TIMECARD**

CUSTER, MICHELLE R 7/30/2013-7/30/2014



Page: 1



Page: 2

4

Page: 3



Page: 4



Page: 5



Page 6

# Custer Demand to Bargain

Michelle Mahon

**Sent:**          Wednesday, July 30, 2014 6:11 AM
**To:**            Boyle, Angela [angie_boyle@chs.net]
**Attachments:**   Custer Demand to Bargain 7~1.pdf (117 KB)

---

Angie,
Please see the attached demand to bargain.
Thank you, Michelle


Michelle Mahon, RN
National Representative
National Nurses United
mmahon@nationalnursesunited.org
234-207-6706



www.NationalNursesUnited.org
@NationalNurses

GC Ex 4JD



Angie Boyle, SPHR
Affinity Medical Center
875 Eight Street Northeast
Massillon, Ohio 44646

July 30, 2014

Dear Angie,
It has come to the Union's attention that Affinity Medical Center has issued discipline to RN
Michelle Custer over attendance.  The Union hereby demands to bargain over this discipline.  So
that we may bargain over this discipline we request the following information:

1) A copy of Michelle's complete employment file;
2) A copy of Michelle's time clock report for the past 12 months;
3) A copy of any and all documents or spreadsheets that document Michelle's points;
4) A copy of all time reports for any and all  Affinity Medical Center RNs  who have been
members of  the bargaining unit in the past 12 months  for the past year;
5) A copy of any and all documents or spreadsheets reflecting the points of any and all
Affinity Medical Center RNs  who have been members of  the bargaining unit in the past
12 months  for the past year.

Please provide the requested information by August 7.

Sincerely,

Michelle Mahon, RN
National Representative

2